UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
SALUS CAPITAL PARTNERS, LLC          Case No. 17-cv-05536 (NRB)(KHP)

                            Petitioner,

                   - against -

ANDREW MOSER,

                            Respondent.
-----------------------------------------------------------X

## DECLARATION OF ANDREW MOSER IN SUPPORT OF MOTION TO DISMISS AND OPPOSITION TO CONFIRMATION OF ARBITRATION AWARD

ANDREW MOSER, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury:

1. I am the named respondent in the notice of petition in this proceeding, and am fully familiar with the facts set forth and circumstances described herein. I make this affidavit based upon my records and personal knowledge, and in support of this motion to dismiss this proceeding; or in the alternative, in opposition to confirmation of the arbitration award.

***Salus Prospers Under My Leadership***

2. In late 2011, I co-founded petitioner Salus Capital Partners, LLC ("Salus") with four colleagues to offer creative asset based lending solutions to distressed borrowers who were unlikely candidates to receive loans from traditional banks.

3. During this time, we were introduced to HGI Asset Management Holdings, LLC ("HAMCO"), which was a subsidiary of Harbinger Group, Inc. (now known as "HRG"). At the

time, HRG was a diversified holding company run by Philip Falcone ("Falcone"), its hedge fund manager.

4.   Through HAMCO, HRG supplied Salus with $62 Million in seed capital in exchange for 80% equity in Salus. My co-founders and I shared the remaining 20% equity, and on December 1, 2011, the members entered into a limited liability agreement ("LLC Agreement"). A copy of the LLC Agreement is annexed as Exhibit "B" to the Declaration of E. Christopher Murray dated July 27, 2017 ("Murray Declaration").

5.   Pursuant to the LLC Agreement, I was designated as an Officer and President of Salus, and entered into an employment agreement with respect to my position as President and Chief Executive Officer. Thereafter in August 2014, Salus and I entered into an amended and restated employment agreement (the "Employment Agreement"). A copy of the Employment Agreement is annexed as Exhibit "A" to the Murray Declaration.

6.   Under my leadership, Salus generated substantial and consistent cash dividends for HRG, and generated a profit in only my second month as President and CEO. By the end of its first year, Salus' lending portfolio surpassed $250 million; and within three years, Salus had over $200 million in cumulative gross revenue.

7.   Salus received numerous awards recognizing its success, including but not limited to the 2013 "Deal of the Year" Award from the Association for Corporate Growth; the 2014 "Reorganization of the Year" Award from M&A Advisor; and the 2014 "Lower Mid-Market Lender of the Year" at the M&A Atlas Awards.  Salus received six different industry awards and I was personally recognized in 2014 with nominations in four different categories of industry awards, including Dealmaker of the Year and Growth Story of the Year, both from ACG.

8. Throughout my tenure, I worked tirelessly for Salus, between 70 and 85 hours per week, traveling regularly, meeting with existing and prospective borrowers, and overseeing Salus' collateral. I was primarily responsible for developing and executing Salus' corporate strategy, expanding its business, and defining its corporate culture.

9. In June 2014, my hard work and successes were acknowledged by my selection as EY Entrepreneur Of The Year™ Award for the New England region, which recognizes individuals who demonstrate success in innovation, financial performance, and personal commitment to their business and community.

*HRG's President, Omar Asali Retaliates Against Me*

10. Despite my hard work and success, Salus was faced with serious operating challenges in late 2014 when Falcone, an original Salus co-founder and the principal connection between Salus and HRG, abruptly resigned as HRG's CEO and Chairman.

11. Falcone had been engaged in a heated battle over control of HRG with Omar Asali ("Asali"), HRG's President that concluded with Falcone's sudden departure from the company. During Asali and Falcone's feud, both Asali and Falcone instructed me not to communicate with the other, and when Falcone left HRG, Asali began a systematic removal of all of Falcone's hires and or direct reports.

12. At the beginning of his tenure, Asali's leadership did not appear problematic for Salus. Asali expressed support for a five-year plan for new equity financing for Salus, and even increased my annual salary from $350,000 to $500,000. However, in December 2014, when Falcone actually departed, it became apparent that Asali would not support Salus.

13. Asali cancelled Salus' equity financing plan; assumed direct oversight of Salus' most significant loans; terminated HRG personnel to whom Salus executives reported and who

were most familiar with its policies, procedures and strategy; and advised that I needed to identify a new source of capital so Salus could continue its business.

14. Asali took such actions despite Salus having the full support of HRG's Chief Financial Officer, Thomas Williams ("Williams"). Williams advised me on multiple occasions that he did not agree with Asali—especially with his cancellation of Salus' equity financing plan—but was warned that Asali would retaliate against Williams if he spoke out against Asali's decisions.

15. It became immediately clear that Salus would not survive Asali's reign at HRG.

16. In January 2015, Asali called a meeting in New York to introduce Joseph Steinberg (now Chairman of HRG) to personnel from all of HRG's financial asset management companies, including Salus. At the meeting, Asali advised that HRG would no longer support financial asset management companies, and intended that those companies—including Salus—terminate their business and cease operations.

17. Apparently, as expressed by HRG board members, HRG was concerned about protecting the financial appearance and rating of Fidelity & Guaranty Life Insurance Company ("FGL"), another HRG company.

18. Salus, as well as other HRG financial asset management groups, was largely funded by FGL's balance sheet. Asali was concerned that FGL would face heightened scrutiny by the insurance regulators in seeking to sell this asset, and possibly a ratings downgrading, if FGL continued to fund Salus deals despite its "no loss" track record and significant profits contributing to FGL. In fact, FGL's Chief Investment Officer, Raj Krishnan recognized the Salus Management team as one of the "best asset managers he had seen." However, as a result of Asali's decision, Salus was left without its primary source of funding.

19. Despite the fact that Salus was a profitable venture in making fully secured, collateralized loans, Asali sought to terminate Salus' business at every turn. I pleaded with Asali to consider other options (*e.g.*, additional outside funding, a potential sale of Salus, and the engagement of a banker), but Asali was firm in his decision to close Salus.

20. Asali's decision was not only harmful to Salus and its 49 employees, the directive also impacted all of its borrowers, each of whom had loan commitments remaining ranging from one to four years. If Salus closed, Salus investors would likely lose substantial amounts and borrowers would be placed in vicarious positions, to say the least, without funds to operate.

21. While Salus suffered from a lack of funding and faced closure, HRG continued reaping dividends from Salus and systematically altered its cost of funds so as to provide even greater profits to FGL without providing additional equity to Salus. In addition, under Asali's leadership Salus was directed to increase dividends to cover dividend shortfalls of other HRG subsidiaries and to partake in unethical and possibly illegal practices outside of Salus' credit policies and procedures for its existing loans.

22. During this time, HRG's investment counsel urged me and other Salus officers to consult with Jonathan Sack ("Sack"), a New York employment attorney with Sack & Sack. Apparently, there were serious concerns within HRG with Asali's conduct, intentions, and ruthlessness.

23. I could no longer remain silent.

24. I spoke with Salus' investors about additional funding and even presented Asali with two different companies that were interested in acquiring Salus and retaining all of its employees. Asali rejected all of these potential opportunities without reason or seeking independent review of such offers.

25. During this time, I was approached by Omega Advisors, Inc. ("Omega"), a large investor in both Salus and HRG. Omega expressed serious concerns with Asali's leadership, especially with respect to Salus.

26. Omega expressed interest in providing additional funding for Salus and in securing a purchaser -- even going so far as to introduce us to Mr. Robert Lewin of KKR & Co., L.P., as a potential buyer. Omega did not want to see Salus, a profitable business venture, shutter for no logical reason.

27. When Asali discovered that I was seeking the advice of our largest outside investor and that I was in productive discussions with Omega, Asali drove from HRG's New York office to Salus' Massachusetts' office to berate and embarrass me. Asali took me aside refusing me access to our Director of Human Resources and advised that I would be terminated from Salus if I did not choose to leave voluntarily.

28. By letter dated April 24, 2015, Asali formally terminated me "without cause," effective May 25, 2015.

29. Asali's decision to terminate me without cause was motivated by:

   a. Omega approaching me with concerns about Asali's business judgment and inquired about providing Salus with the capital needed to continue its business;

   b. Asali learned that I was in discussions with Sack regarding our rights under the Employment Agreement and a potential lawsuit against Asali;

   c. At the advice of Salus' counsel, on December 11, 2014, I sent an email to HRG Deputy General Counsel, Brendan Doyle, addressing concerns with improper directives for a loan to an HRG affiliate, which was not permitted by Salus' credit

       policies and guidelines. A copy of my December 11, 2014 email is annexed hereto as Exhibit "J";

    d. My refusal to accept Asali's directive that Salus—a profitable venture—terminate its business without entertaining realistic and logical alternatives; and

    e. That I was informing Salus' personnel and business partners that Asali's strategy with respect to Salus was ill-fated, flawed, irresponsible, and unethical.

30. It should be noted that, at the time of my termination, Salus still owed me $450,000 -- $200,000 of my full-vested 2014 bonus and $250,000 in severance (calculated at six-month's salary).

31. After my termination, Salus and I engaged in negotiations regarding my separation and release of claims. Salus required that I waive my rights to unpaid portions of my fully-vested 2014 bonus and accept restrictions on my post-employment activities, even though Salus, which already entered its wind-down phase, no longer had any legitimate business interests to protect.

32. Neither Salus nor any of its agents ever advised me that they were conducting an internal investigation into my alleged misappropriation of corporate funds.

33. During these negotiations, and much to my surprise, I was advised by Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), Salus' attorneys, that due to "strong evidence" that I misappropriated corporate funds and resources for personal use, Salus was contemplating re-characterizing my termination from "without cause" to "with cause."

34. Discussions ensued, and more than a month later, on July 7, 2015, Skadden advised me that my termination was "with cause," and demanded that by July 10, 2015, I pay Salus $847,368 -- $169,116.96 was attributed to unreimbursed personal expenses, and

$678,251.31 was for costs of Skadden's investigation. A copy of Skadden's July 7, 2015 correspondence is annexed hereto as Exhibit "K."

35. Skadden did not provide any detail, and instructed me that I could not communicate with Salus employees for further information regarding the purported personal expenses, nor was I supplied with any support for the costs of Skadden's investigation.

36. Asali even threatened me on multiple occasions, at one point sending a message to my personal email that "[i]f you cross powerful people with means there are consequences!"

37. I was unable to agree to Salus' unreasonable demands.

*I Was Unable to Participate in the Arbitration*

38. The time leading up to Falcone's departure was the beginning of a series of stressful events that exacerbated my various health ailments. Even today, although I have improved physically, I must attend regular follow-ups with various medical specialists and remain on multiple medications for what is expected to be the rest of my life.

39. From the end of 2014 through 2015, I received critical medical treatment, including:

   a. Abdominal surgery;
   b. Gallbladder removal;
   c. The surgical removal of half my stomach; and
   d. Treatment for a serious aortic aneurism, which is now closely monitored by a top surgeon.

40. During that time, I regularly visited doctors and hospitals for testing, and was constantly monitored by at least three different medical professionals to ensure that none of my medical ailments worsened.

41. At the same time, on September 11, 2015, Salus commenced the underlying arbitration against me by filing a demand for arbitration.

42. After my termination, Salus refused to pay my severance or my fully-vested 2014 bonus, so I was faced with the challenge of retaining counsel without the benefit of any regular income.

43. I managed to engage ounsel, and on October 13, 2015, filed an answer with counterclaims seeking $250,000 in severance and $200,000 in my full-vested 2014 bonus.

44. In or about March 2016, the arbitrator granted Salus' request to take my deposition and Salus scheduled my deposition for March 16, 2016.

45. Unfortunately, during that time, my medical condition worsened and it became impossible for me to meaningfully participate in the arbitration. At the direction of my doctors, I did not participate in the arbitration proceedings nor subject myself to lengthy legal preparation and an emotionally stressful deposition.

46. My attorney advised Salus' counsel of my health issues and filed a motion to continue the arbitration hearing until I was sufficiently healthy to proceed. In response, the arbitrator continued the hearing only until June 15, 2016, and Salus re-noticed my deposition for May 23, 2016. However, per my doctors' recommendation, I was still physically unfit to participate in the proceedings. Soon after, my attorney withdrew.

47. In May 2016, at Salus' request, I submitted a letter from my primary care physician, Dr. Ronald Katz, confirming that I was being treated by a cardiologist and gastrointestinal surgeon for serious medical issues. Dr. Katz recommended that I avoid high-stress situations (including dispute resolution proceedings and participation in depositions) at

least through the remainder of the year. A copy of Dr. Ronald Katz' May 6, 2016 letter is annexed hereto as Exhibit "L."

48. In addition to medical ailments preventing my meaningful participation in the proceeding, without a job and regular income I became further constrained financially. During this time it was very difficult for me to engage and pay counsel.

49. In order to cover my financial obligations (including food, shelter and clothing), I was forced to exhaust any available personal funds, liquidate my 401K, borrow against my children's insurance policies, and borrow money from relatives. I had been terminated in April 2015, and Salus was withholding my severance pay and fully-vested 2014 bonus. Due to the state of my finances, most of the legal advice and representation that I received was from friends or as personal favors.

50. To add to my financial difficulties and the increasing stress from my dispute with Salus, Salus (now controlled by Asali) engaged in a vindictive campaign to destroy my career and any of my potential business opportunities.

51. Despite a stellar and untarnished professional history, Salus began spreading rumors that I embezzled substantial assets and that I could not be trusted working with a financial asset management company in any capacity.

52. For example, on August 31, 2016, Salus' counsel wrote a letter to my new employer, Monroe Capital, referencing the arbitration and advising that I embezzled a large sum of money from Salus through repeated acts of fraud ("Monroe Letter"). In addition to defaming and embarrassing me, Salus threatened Monroe Capital with legal proceedings. A copy of the Monroe Letter is annexed hereto as Exhibit "M." Soon after Salus sent the Monroe Letter, I was terminated from Monroe.

53. In fact, based on Asali's persistent bad-faith campaign to ruin my career, I was terminated from two positions and was forced, by misinformed investors, to resign from a valuable business venture. Asali ensured that I would have no income to use to defend against the arbitrations which added to my stress and exacerbating my medical issues.

54. Although my doctors clearly recommended that the hearing be adjourned until the end of the year, the arbitrator proceeded with hearings in October 2016. The arbitrator agreed however to adjourn the October hearing dates if I was able to retain counsel. In addition, the arbitrator dismissed my counterclaims (without prejudice) for my fully-vested 2014 bonus and severance.

55. In October 2016, I spoke with Hugh R. Curran, Esq. of Bletzer & Bletzer P.C ("Curran"). Curran agreed to represent me in the arbitration but only if the arbitrator granted an adjournment of the hearing. Although Curran explained the situation to the arbitrator and requested an adjournment to finalize his retention, the arbitrator denied his requested.

56. With the state of my health, the amount of stress I was experiencing and the added stress of not being represented, I could not possibly participate in the October 2016 hearing.

57. Upon being advised that the hearing concluded, I attempted to provide affidavits and documents supporting my defenses. However, the arbitrator rejected many of my submissions, including an October 26, 2016 affidavit of Robert Kuppens ("Kuppens"), Salus' Chief Financial Officer for all times relevant to the dispute ("Kuppens Aff."). A copy of the Kuppens Aff. is annexed as Exhibit "E" to the Murray Declaration.

58. If anyone could attest to allegations that I misappropriated corporate funds during my tenure it would be Kuppens, the Chief Financial Officer of Salus for all relevant times. However, the Kuppens Aff. provided that I did not conceal any such charges, that Kuppens was

aware of the allegedly fraudulent expenses and that Kuppens knew of my intent to repay Salus for any personal expenses.

    59.    Specifically, Kuppens provided:

        a.  that he was aware of the audio video intelligence purchase, and my intention to reimburse Salus (*see* Kuppens Aff., ¶¶ 6-8);

        b.  that the purported personal use of the NetJets account was actually for business use (*see* Kuppens Aff., ¶¶ 9-10, 20);

        c.  that purported personal purchases of watches were actually authorized corporate gifts after securing a $5 million success fee for Salus (*see* Kuppens Aff., ¶¶ 11-12);

        d.  that the purported prohibited transaction of Salus' repurchase of my CLO note was authorized and approved (*see* Kuppens Aff., ¶¶ 13-19); and

        e.  that many other purported personal expenses were actually business expenses or charges to my corporate credit card for events I never even attended (*see* Kuppens Aff., ¶¶ 21-32).

    60.    In addition, the Kuppens Aff. provided that Salus failed to pay substantial portions of employee bonuses for 2014, including $200,000 of my fully-vested bonus. (*see* Kuppens Aff., ¶¶ 33-37).

    61.    Kuppens further supports my contention that I had every intent of paying any expense that was personal in nature and that I offered to reimburse Salus $115,000 for such personal expenses. (*see* Kuppens Aff., ¶ 22).

62. Looking back, it appears Salus took advantage of my medical condition, inability to attend the hearings, and inability to secure counsel. Without my meaningful participation, Salus was able to turn a potential $115,000 claim into an unconscionable $2.6 million award.

*Service of the Notice of Petition*

63. On or about July 5, 2017, my adult son received a copy of Salus' notice of petition filed with the Supreme Court of the State of New York, County of New York, personally delivered to him at my home in Walpole, Massachusetts.

64. On or about July 12, 2017, I received a copy of Salus' notice of petition by regular mail delivered to my home in Walpole, Massachusetts.

**WHEREFORE**, for the reasons set forth above, in the accompanying Declaration of E. Christopher Murray, the accompanying Memorandum of Law, and all prior pleadings and proceedings had herein, the motion to dismiss this proceeding should be granted in its entirety, or, alternatively, the Court should deny confirmation of the award.

Dated: July 27, 2017
Walpole, Massachusetts

ANDREW MOSER