# RODES EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------------X
SALUS CAPITAL PARTNERS, LLC,

                                                                                Index No.:

                                                  Petitioner,

                                                                                **NOTICE OF PETITION**

                    -against-

ANDREW MOSER,

                                                  Respondent.
------------------------------------------------------------------------X
SIRS:

     PLEASE TAKE NOTICE that upon the annexed petition of SALUS CAPITAL PARTNERS, LLC, verified on the 19th day of June, 2017, the partial final award and final award in the arbitration proceedings between the petitioner, SALUS CAPITAL PARTNERS, LLC, and the respondent, ANDREW MOSER, and upon all the papers and proceedings heretofore had herein, an application will be made before the Motion Support Office Courtroom, at Room 130, in the courthouse located at 60 Centre Street, New York, NY 10007, on the 3rd day of August, 2017, at 9:30 a.m., or as soon thereafter as counsel can be heard, for a judgment pursuant to CPLR 7510 confirming the award of the arbitrator and directing that judgment be entered thereon, and for such other and further relief as may be just, proper, and equitable, together with the costs and disbursements of this proceeding.

     PLEASE TAKE NOTICE, the pursuant to CPLR 2214(b), answering affidavits, if any, are required to be served upon the undersigned at least seven (7) days before the return date of this motion.

Dated: Garden City, New York
     June 19, 2017

                         Shari Braverman, Esq.
                         Braverman Law Office, PC
                         585 Stewart Avenue, Suite 528
                         Garden City, NY 11530
                         (16) 365-3838

TO:    ANDREW MOSER
       12 Dover Drive
       Walpole, MA 02081

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------X

SALUS CAPITAL PARTNERS, LLC,

                                                    Index No.:

                              Petitioner,

                                                    **PETITION TO CONFIRM**
          -against-                                 **ARBITRATION AWARD**

ANDREW MOSER,

                              Respondent.

-----------------------------------------------------------------X

STATE OF NEW YORK     )
                      ) ss:
COUNTY OF NEW YORK    )

       EHSAN ZARGAR, being duly sworn, deposes and says:

       1.     I am the General Counsel, Chief Operating Officer and Corporate Secretary of

HGI Asset Management Holdings, LLC, which is the parent company of SALUS CAPITAL

PARTNERS, LLC ("Salus" or "Petitioner") and as such I have personal knowledge, and I am

fully familiar with the facts of this action.

       2.     Pursuant to CPLR 7510, I make this Affidavit in support of Petitioner's Petition to

Confirm the Arbitration Award rendered in favor of Petitioner and against ANDREW MOSER

("Moser" or "Respondent").

**THE PARTIES**

       3.     Petitioner is a limited liability company organized and existing under the laws of

the State of Delaware and duly authorized to do business in the State of New York. Petitioner is

a wholly-owned subsidiary of HRG Group, Inc., which is a domestic corporation and a publicly

traded company, with offices located at 450 Park Avenue, 29th Floor, New York, NY 10022, and

Petitioner is managed by, and a subsidiary of, HGI Asset Management Holdings, which is also

wholly-owned by HRG.

4. Respondent is an individual who resides at 12 Dover Drive, Walpole, MA 02081.

## RESPONDENT'S EMPLOYMENT WITH PETITIONER

5. In or about November 2011, Petitioner hired Respondent as its President and Chief Executive Officer.

6. Petitioner and Respondent are parties to the Amended and Restated Employment Agreement (the "Employment Agreement"), dated August 26, 2014. (A true and accurate copy of the Employment Agreement is attached hereto as Exhibit A).

7. Among other things, the Employment Agreement states:

   a. that Petitioner and Respondent "agree to arbitrate any controversy or claim arising out of this Agreement or otherwise relating to Employee's employment by Company or the cessation of such employment for any reason" and that "[s]uch arbitration proceeding shall take place in the State of New York, City of New York." *See* Exhibit A at § 17(a)-(b).

   b. That Petitioner and Respondent "agree that any judicial proceeding in connection with (I) an arbitration pursuant to Section 17 . . . and any proceeding to confirm, enforce, modify or vacate an arbitration award . . . shall, to the fullest extent permitted by law, exclusively be brought in a state or federal court located in New York County, New York. In furtherance of this forum selection agreement, Company and Employee each: (I) irrevocably submits to the personal jurisdiction of such courts; (ii) waives and agrees not to assert, by way of motion, as a defense or otherwise in any such suit, action or proceeding, any claim that (A) Employee or Company is not subject personally to the jurisdiction of the above-named courts, (B) the suit, action or proceeding is brought in an inconvenient forum, (C)

2

> the venue of the suit, action or proceeding is improper, or (D), this Agreement or
> the subject matter hereof may not be enforced in or by such court; and (iii)
> waives, and agrees not to seek, any review by a court in another jurisdiction that
> may be called upon to enforce the judgment of any of the above-referenced
> courts."

8.      Respondent was also a Member of Petitioner and a signatory to the Petitioner's
Limited Liability Company Agreement (the "LLC Agreement"), dated November 23, 2011 and
effective December 1, 2011. (A true and accurate copy of the LLC Agreement is attached hereto
as Exhibit B).

9.      Among other things, the LLC Agreement states that "[e]ach of the Members
agrees to arbitrate any controversy or claim arising out of the LLC Agreement" and that "[s]uch
arbitration proceeding shall take place in the State of New York, City of New York." *See* Exhibit
B at § 10.2(a)-(b).

10.     On April 24, 2015, Petitioner terminated Respondent's employment. The
termination was deemed not for cause.

## PETITIONER'S INTERNAL INVESTIGATION
## INTO RESPONDENT'S WRONGDOING

11.     Following Respondent's termination, Petitioner conducted a routine due diligence
of Respondent's emails "and uncovered evidence that Moser affirmatively sought to conceal
unauthorized personal charges on his Salus corporate credit card. In particular, an email from
Moser to [the owner of one of Petitioner's audio-visual vendors] supported the view that Moser
was trying to avoid detection of such personal charges relating to services provided [by the
vendor] at Moser's residences." *See* Partial Final Award of Arbitrator, dated December 29,
2016, at 9 (attached hereto as Exhibit C).

3

12.     As a result, Petitioner hired the law firm of Skadden, Arps, Slate, Meagher &
Flom LLP ("Skadden"), which had previously represented Petitioner, to conduct an internal
investigation. *See* Exhibit C at 10.

13.     Skadden concluded, relying in part on the forensic accounting efforts of
AlixPartners, that there was "substantial evidence that Mr. Moser appropriated company funds
for personal use. . . ." Exhibit C at 11.

14.     Based on the above finding, by letter dated June 2, 2015 from Petitioner's
counsel, Petitioner put Respondent's counsel "on notice that a number of 'troubling issues' had
come to light including 'strong evidence showing that [Moser] misappropriated corporate funds
and resources for personal use.' Before characterizing the termination as one for Cause, the
request was made to meet with Moser 'so he can address these issues directly.'" Exhibit C at 12.

15.     Thereafter, Petitioner reached out to Moser "to review with him the charges in
question while the investigation was being conducted, to no avail." *Id.*

16.     Accordingly, on July 7, 2015, "Salus notified Moser that his termination had been
recharacterized as one for cause for having 'engaged in repeated acts of fraud, willful
misconduct, willful misapplication and willful misappropriation of corporate funds and breaches
of fiduciary duties.'" *Id.*

17.     Respondent finally agreed to meet with Salus. On August 3, 2015, Respondent
and his counsel met with a representative of Petitioner. At this meeting, Respondent personally
acknowledged approximately $140,000 in personal expenditures that he had charged to
Petitioner's credit card. "Moser agreed to reimburse Salus for these expenses, which included
the [audio-visual] charges, the purchase of his patio furniture, meals and personal vacations." *Id.*
at 13.

4

18. Despite this promise, Respondent failed to reimburse Petitioner even for the monies he acknowledged he owed. *Id.* at 14.

## THE ARBITRATION PROCEEDING

19. On September 11, 2015, pursuant to the Employment Agreement and the LLC Agreement, Petitioner filed a Demand for Arbitration against Respondent with the American Arbitration Association ("AAA"). Petitioner sought recovery against respondent under theories of fraud, conversion, breach of fiduciary duties, indemnification and New York's faithless servant doctrine.

20. Thereafter, AAA, in accordance with its Arbitration Rules, designated as Arbitrator, Alfred G. Feliu, Esq., and notice of the designation of the arbitrator was duly given to both parties.

21. On October 13, 2015, Respondent answered Petitioner's Demand for Arbitration and filed counterclaims.

22. On June 17, 2016, the Arbitrator dismissed Respondent's counterclaims.

23. Shortly after the filing of the Arbitration, the parties jointly agreed—with the approval of the Arbitrator—to hold the Hearing in Boston, Massachusetts for the convenience of the parties.

24. At some point during the Arbitration proceeding, Respondent stopped paying his share of AAA's and the Arbitrator's fees. Accordingly, Petitioner had to advance Respondent's shares of the fees to maintain the Arbitration.

25. The Arbitration Hearing took place on October 5 and 6, 2016.

26. On December 29, 2016, the Arbitrator issued a Partial Final Award. *See* Exhibit C. In pertinent part, the Arbitrator found as follows:

5

a. "Moser charged substantial personal expenses to his Salus credit card. This clearly violated [Salus's] established policies. Moser compounded his error by not repaying this indebtedness, despite repeatedly promising to do so. These failings, while worthy of rebuke, pale in contrast to Moser's pre-meditated and focused plan to falsify invoices and deceive Salus as to the true nature of the expenses incurred, directly involving a vendor in his scheme." *Id.* at 14.

b. "Moser is liable for the personal expenses he incurred which have not been reimbursed to Salus and for indemnifying Salus for the costs reasonably incurred in response to his wrongful actions. Salus is also entitled to disgorgement of Moser's compensation for the period of his wrongful activity under New York's faithless servant doctrine. Finally, Salus is entitled to an award of its attorneys' fees relating to this proceeding, pre-award interest, and reimbursement of its costs for bringing this proceeding, including amounts advanced on behalf of Respondent." *Id.* at 15.

c. The personal charges for which Respondent caused Petitioner to pay included the audio-visual equipment that he had installed in his personal residences, patio furniture, two watches, items purchased on Amazaon.com; family travel expenses, purchases at gas stations, coffee shops, grocery and liquor stores, and personal/family use of Petitioner's corporate jet account. *See id.* at 16-17.

d. Moser fraudulently concealed his actions. "Taking Moser at his word, he intended to reimburse Salus for all personal charges incurred. That does not explain, however, his scheme to deceive Salus as to the true nature of the [audio-visual] charges. Why falsify personal charges if the intent was to pay them all

6

along?" *Id.* at 19.

e. "Moser's actions compel the conclusion that, at least with respect to the [audio-visual company's] invoices, he intended to and did misappropriate Salus funds. Moser's fraudulent scheme had several key components. First, he made sure that each of the invoices from [the audio-visual company] were below the threshold of $25,000 and that the timing of payments was spread out over several months so as to reduce the risk of security and discovery. Second, the nature of the work performed was falsified to make it appear that the work was being done in Salus's offices, and not at Moser's residence and Cape Cod home. Third, Moser directed that the address on the invoices be the office address and that the invoices be forwarded directly to Salus, and not to his homes." *Id.* at 19

f. The "ample evidence demonstrates, and I find, that Moser fraudulently misappropriated Salus funds and converted Salus funds for his own benefit and violated his fiduciary duty to Salus." *Id.* at 20.

g. "Moser's fraud and misappropriation of funds clearly constituted Cause under the terms of the Employment Agreement. Whether characterized as a breach of the Employment Agreement or his fiduciary duty to Salus or as the torts of fraud or conversion, Moser's actions require full reimbursement for the personal expenses sought by Claimant here." *Id.*

h. Moser's manipulation of the [audio-visual company's] invoices had only one goal in mind, and that is to fraudulently transfer personal charges to Salus and to deceive Salus as to his intent. Moser involved a third party . . . in his fraudulent scheme. Significantly, Moser's fraudulent acts continued for many months and

7

involved various steps to accomplish." *Id.* at 23.

27.     Based on the above findings, the Arbitrator ruled (1) that Petitioner carried its burden of establishing its claims against Respondent for fraud, conversion and breach of fiduciary duty and awarded Petitioner $224,395.51 in connection with those claims; (2) that Petitioner carried its burden of establishing its claim for indemnification against Respondent under the LLC Agreement and awarded Petitioner $748,155.49 in connection with that claim; (3) that Petitioner carried its burden of establishing its faithless servant claim against Respondent; and (4) that Petitioner was entitled to its attorneys' costs and fees in connection with the Arbitration proceeding. *See id.* at 26. In the Partial Final Award, the Arbitrator directed Petitioner to file an application for attorneys' fees and to submit a specification of damages with respect to its faithless servant claim. *Id.* at 24.

28.     On January 10, 2017, Petitioner filed its Application for Attorneys' Fees and Costs and Calculation of Faithless Servant Damages and Pre-Award Interest.

29.     On April 17, 2017, the Arbitrator issued his Final Award. (A true and accurate copy of the Final Award is attached hereto as Exhibit D). In addition to the above findings, the Arbitrator awarded Petitioner (1) damages for its faithless servant claim in the amount of $879,514.02; (2) attorneys' fees in the amount of $360,124.08; (3) costs in the amount of $66,622.35; (4) pre-Award interest in the amount of $324,622.35; (5) and reimbursement of fees and expenses paid to the AAA in the amount of $23,560.41. The Arbitrator's total award for Petitioner against Respondent was $2,603,433.80 (exclusive of post-Award interest).

30.     The aforesaid award has not been vacated or modified upon any ground specified in CPLR 7511.

WHEREFORE, your Petitioner respectfully requests that this Court enter an Order

8

confirming the Final Award and directing that judgment be entered thereon in this Court,

together with interest, costs and disbursements as taxed and that Petitioner have such other and

further relief as this Court deems just and appropriate.

Ehsan Zargar
General Counsel, Chief Operating Officer and Corporate Secretary
of HGI Asset Management Holdings, LLC, parent company of
Petitioner, Salus Capital Partners

Sworn to before me this
day of               2017

Notary Public

RONALD D. CONLIFFE
Notary Public, State of New York
No. 01CO6298167
Qualified in Kings County
Commission Expires March 17, 2018

9

# PETITION EXHIBIT A

## Amended and Restated Employment Agreement

THIS AMENDED AND RESTATED EMPLOYMENT AGREEMENT ("Agreement") is made and entered into by and between Salus Capital Partners, LLC, a limited liability company formed under the laws of the State of Delaware with its principal place of business in Needham, Massachusetts (the "Company"), ANDREW MOSER, an individual residing at 12 Dover Drive, Walpole, MA 02081, (the "Employee").

WHEREAS, Company was formed for the purposes of identifying and pursuing opportunities to make asset based loans to persons who are not affiliates of Harbinger Group Inc., making such loans (either individually or in conjunction with affiliates of Harbinger Group Inc. (Harbinger Group Inc. and its direct and indirect subsidiaries, including but not limited to HGI Asset Management Holdings, LLC ("HAMCO"), (the "HRG Group")), and servicing such loans (the "Business"); and

WHEREAS, Employee has been employed by the Company pursuant to a November, 2011 Employment Agreement (the "2011 Employment Agreement"); and

WHEREAS, Company desires to employ Employee, and Employee wishes to work for Company, subject to the terms and conditions of this Amended and Restated Employment Agreement.

NOW THEREFORE, Company and Employee covenant and agree as follows:

1.    **Duties.**  Subject to the terms contained in this Agreement, effective as of August 26, 2014 (the "Effective Date"), Company hereby employs Employee as a President and Chief Executive Officer.  Employee hereby accepts such employment and represents and warrants to Company as follows:

   a.    Employee has the legal right to work in the United States.

   b.    Employee has the ability to enter into this Agreement; Employee's entering into and performing under this Agreement will not violate Employee's agreement with any third party; there are no restrictions or obligations to any third party which would restrict Employee's performance of Employee's duties under this Agreement; and Employee has not provided, or promised to provide, Company with any confidential information, trade secrets, or property of any former or current employer of Employee.

   c.    While employed by Company, Employee, as a key full-time employee of Company, shall devote Employee's full business time, attention, knowledge, and skill solely and exclusively to the business and interests of Company, and Company shall be entitled to all benefits or profits arising from or incidental to any and all work, services, and advice of Employee. Notwithstanding the foregoing, Employee may: (i) engage in personal investing and financial activities; or (ii) serve as a member of the board of directors of professional or charitable organizations after obtaining the Manager's prior written approval, which will not be unreasonably withheld, provided that such activities, either individually or together, do not interfere with Employee's performance of Employee's duties.

6258264v1

1

    d.    Employee shall report to the Manager and shall comply with all lawful instructions given by the Manager that are consistent with this Agreement.

    e.    Employee shall comply with (i) the laws of the United States and all other applicable jurisdictions, and (ii) such Company policies, rules, regulations, performance standards, and manuals as may be published or amended from time to time that are consistent with this Agreement.

    f.    While employed by Company, Employee shall not: (i) enter into any agreement that conflicts with Employee's duties or obligations to Company; (ii) violate any agreement between Employee and any former employer with respect to the solicitation or hiring of such former employer's employees or consultants, or the solicitation of or performing services for such former employer's customers; or (iii) violate any agreement between Employee and any former employer, or any duty owed by Employee to any former employer, with respect to the use or disclosure of such former employer's confidential information, trade secrets, or property; or

    g.    While employed by Company and thereafter, Employee shall not disparage Company and/or HRG Group or their respective businesses, managers, employees, agents, contractors, suppliers, customers, borrowers, or consultants, provided however, that this clause does not apply to communications with government or self-regulatory agencies or to judicial or arbitration proceedings.

**2.    Term.** Company agrees to employ Employee for the period starting on the Effective Date and ending November 30, 2014 (the "Current Term"), subject to the provisions of Section 8. The term of this Agreement shall thereafter be automatically renewed for additional one year periods unless written notice to the contrary shall be given by either Company or Employee to the other party not less than forty five (45) days prior to the end of the Current Term or any renewal term (each, a "Subsequent Term") that the term shall not thereafter be renewed, subject to the termination provisions of Section 8. The Current Term together with any Subsequent Terms are hereafter referred to as the "Term." If Employee's employment continues after the expiration of the Term, then such employment will be on an at-will basis, meaning that either Employee or Company may terminate the employment relationship at any time, for any reason or no reason at all, subject to the provisions of Section 8. This Agreement shall apply to the entire period in which Employee is employed by Company, both during and after the Term, except for those provisions which expressly apply only during the Term.

**3.    Compensation.** As payment for the services rendered to Company or HRG Group by Employee, Company shall pay the following compensation to Employee.

    a.    Salary. Employee will be paid base salary at the rate of $500,000 per year ("Salary"), payable in accordance with Company's payroll practices but at least monthly.

    b.    Bonus. Employee will be eligible to receive an annual bonus ("Bonus") during the Current Term and each Subsequent Term, provided that Employee is employed by Company as of December 31 of the applicable calendar year during the Current Term and each Subsequent Term (each such year, a "Bonus Year"). For each Bonus Year, Company will create a pool ("Bonus Pool") in an amount equal to 50% of Company's Net Income for such Bonus Year,

2

provided, however, that the calculation of the Bonus Pool and the determination of the Bonus payable to Employee hereunder shall at all times be subject to the approval of the HAMCO Compensation Committee, which shall retain ultimate authority to approve and modify the Company's bonus program from time to time in its sole discretion. For purposes of calculating Bonus, "Net Income" for Bonus Year will be determined by Company's accountants in accordance with U.S. GAAP. Employee's target Bonus will be set in an amount equal to 120% of his Salary (the "Target Bonus"), it being understood that the Bonus paid to Employee is subject to the approval of the HAMCO Compensation Committee as set forth above. Any Bonus shall be paid in the calendar year following the Bonus Year by March 15 of such following year.

        c.     <u>Deductions and Withholdings</u>. All payments made under this Agreement by Company shall be subject to all required federal, state and local withholdings and deductions, and such deductions as Employee may instruct Company to make that are authorized by applicable law.

**4.**    **Benefits.**

        a.     <u>Benefit Plan Participation</u>. Employee will be eligible to participate in Company's employee benefit plans in accordance with the provisions of such plans.

        b.     <u>Vacation</u>. Employee will be entitled to four (4) weeks of paid vacation per year beginning in 2012. To the extent Employee does not use Employee's full vacation allotment in any given calendar year, Employee may accrue and carry forward up to two (2) weeks of such unused vacation time.

        c.     <u>Payment of Attorney's Fees</u>. Subject to appropriate documentation, Company will reimburse Employee for the reasonable attorney's fees and costs incurred in connection with the review and negotiation of this Agreement and the Company Operating Agreement up to a maximum of $5,000, which may be reduced by any required tax withholdings, provided that such documentation is delivered to Company within 60 days after the execution of this Agreement. Such reimbursement shall be paid within 30 days of receiving such documentation.

        d.     <u>Expense Reimbursement</u>. During the period of Employee's employment with Company, Company will reimburse Employee for reasonable, customary and documented out-of-pocket expenses incurred by Employee in the course of Employee's employment, to the extent such expenses were authorized by the President and are eligible for reimbursement under the terms and conditions of Company's written policies and procedures. The amount of expenses eligible for reimbursement during any tax year of Employee shall not affect the expenses eligible for reimbursement in any other tax year. The right to reimbursement provided in this Agreement is not subject to liquidation or exchange for another benefit. In no event shall the reimbursement of an eligible expense occur later than the earlier of (i) six (6) months from the date of incurrence and (ii) the end of the calendar year following the calendar year in which such expense was incurred.

**5.**    **Confidential Information Covenants.**  By virtue of Employee's position with Company, Employee will have access to confidential information of Company and HRG Group which is extremely valuable to Company and HRG Group. Accordingly, Employee will not, at

any time during Employee's employment or thereafter, in any fashion, form, or manner, either directly or indirectly divulge, disclose, or communicate to any third party or make use of, directly or indirectly, for Employee or for others in any manner whatsoever any information, material or data of any kind, nature, or description that affects or relates to the business of the Company and/or HRG Group and that has not been disclosed by Company and/or HRG Group to the general public ("Confidential Information"), except: (a) if required to be disclosed by judicial, arbitral or governmental order or process or operation of law, in which event Employee shall as soon as reasonably practicable, and in all instances prior to making any disclosure, notify Company of the requirement of disclosure and comply with any protective order or other limitation on disclosure obtained by Company; (b) in performance of Employee's duties on behalf of Company; or (c) to those authorized by Company to know and only to the extent that there is a need to know in the course of their employment and/or carrying out their duties on behalf of Company. Confidential Information includes, solely by way of illustration and not limitation, financial plans; data; forecasts; strategic analyses; the names of borrowers, customers, clients and investors (prior, existing or prospective) and information provided by or relating to such borrowers, customers, clients and investors; financial and credit analyses; trade secrets or the working of any process, technology, invention or methods carried on or used by Company and/or HRG Group; the terms of loans or potential loans; personnel information; and legal affairs.

**6.    Non-Competition and Non-Solicitation Covenants.**

a.    Employee acknowledges and recognizes the highly competitive nature of the Business and accordingly agrees as follows:

(i)    While employed by Company, Employee will not, directly or indirectly, compete, plan or prepare to compete, or assist anyone else in competing or in planning or preparing to compete, against Company.

(ii)    For a period of either (x) one (1) year following the date Employee ceases to be employed by Company as a result of a Termination for Cause at any time or a Termination without Good Reason during the Term, or (y) six (6) months following the date Employee ceases to be employed by Company as a result of a Termination without Cause or a Termination for Good Reason at any time, or a Termination without Good Reason after the Term (the "Restricted Period"), Employee shall not engage in the Business, on Employee's own behalf or as an owner, investor, director, manager, partner, member, shareholder, trustee, employee, consultant, or agent of any other person or entity, in Massachusetts or any other state in the United States in which Company was engaged in the Business during the two year period preceding Employee's termination of employment. For purposes of applying this clause, Company will be considered to be engaged in the Business in a state if Company made or serviced a loan to a borrower that has its headquarters or principal place of business located in such state.

(iii)    During the Restricted Period, Employee shall not, whether on Employee's own behalf or on behalf of or in conjunction with any other person or entity that engages in the Business, directly or indirectly solicit or assist in soliciting any customer of

4

Company, or any prospective customer of Company which is actively being considered for a loan as of the Termination Date,

a) with whom Employee had personal contact or dealings on behalf of Company during the one year period preceding Employee's termination of employment;

b) with whom employees directly reporting to Employee have had personal contact or dealings on behalf of Company during the one year immediately preceding the Employee's termination of employment; or

c) for whom Employee had direct or indirect responsibility during the one year immediately preceding Employee's termination of employment.

(iv) During the Restricted Period, Employee shall not directly or indirectly interfere with, or attempt to interfere with, business relationships between Company and borrowers, customers, referral sources, suppliers, or investors of Company.

(v) During the Restricted Period, Employee shall not, whether on Employee's own behalf or on behalf of or in conjunction with any other person or entity, directly or indirectly:

a) solicit or encourage any employee of Company or employee of any member of HRG Group to leave the employment, respectively, of Company or an HRG Group member;

b) hire any such employee who was employed by Company or an HRG Group member as of the date of Employee's termination of employment with Company or who resigned from employment with Company or an HRG Group member coincident with or within one year prior to or after, the termination of Employee's employment with Company; or

c) solicit or encourage any consultant to cease to work with Company or an HRG Group member.

(vi) Notwithstanding anything to the contrary in this Agreement, Employee may, directly or indirectly own, solely as a passive investment, securities of any person engaged in the business of Company or its affiliates which are publicly traded on a national or regional stock exchange or on the over-the-counter market if Employee (A) is not a controlling person of, or a member of a group which controls, such person and (B) does not, directly or indirectly, own 5% of more of any class of securities of such person.

b. It is expressly understood and agreed that although Employee and Company consider the restrictions contained in this Section 6 to be reasonable, if a final determination is made by an arbitrator or court of competent jurisdiction that the scope, duration or territory of any restriction contained in this Agreement is an unenforceable restriction as applied to Employee, the provisions of this Agreement shall not be rendered void but shall be deemed amended to apply as to such maximum scope, time and territory as such arbitrator or court may

determine or indicate to be enforceable. Alternatively, if any arbitrator or court of competent jurisdiction finds that any restriction contained in this Agreement is unenforceable, and such restriction cannot be modified so as to make it enforceable, such finding shall not affect the enforceability of any of the other restrictions contained herein.

7.    **Injunctive Relief.**  The parties agree that the matters covered in Section 5 and Section 6 are important and material and gravely affect the effective and successful conduct of the business of Company and HRG Group and their respective goodwill; that Company would not enter into this Agreement but for the provisions of  Section 5 and Section 6; and that any breach of the terms of  Section 5 or Section 6 is a material breach of this Agreement which will cause irreparable harm and incalculable injury to Company and HRG Group for which an award of monetary damages alone may be inadequate or difficult to ascertain.  Employee therefore agrees that Company and HRG Group (as an acknowledged third party beneficiary of Section 5 and Section 6 of this Agreement), in addition to and without limiting any other remedy or right which they may have, shall  have the right to seek injunctive and any other equitable relief to restrain such breach and specific performance without posting bond.  Nothing herein shall be construed as prohibiting Company and HRG Group from pursuing any other remedies available at law.

8.    **Termination.**  This Agreement and Employee's employment with Company shall terminate immediately upon Employee's death, and may be terminated by Employee or Company in the following circumstances.   The last day of Employee's employment with Company is referred to as the "Termination Date."

  a.    By Company:

    (i)    By delivery of written notice to Employee, which will be effective on the date of such notice, following Employee's failure, because of illness, accident or any other physical or mental incapacity ("Disability"), to perform the essential functions of Employee's position for three consecutive months or an aggregate of any 65 business days within any 12 month period, subject to reasonable accommodation provisions of applicable laws (a "Disability Termination");

    (ii)    For "Cause" as hereinafter defined, by delivery of written notice to Employee, which will be effective on the date of such notice (a "Termination for Cause"), provided, however, in the event that Company terminates Employee for Cause pursuant to clause 8.c.(i)(f) or clause 8.c.(i)(g), (A) Company must specify the factual basis for the termination in such notice; (B) if such basis is curable, then Employee shall have 10 business days from receipt of such notice to cure such specified basis for termination; and  (C) if Employee cures such specified basis for termination to Company's satisfaction, then Employee may not be terminated for Cause for such specified basis;

    (iii)    For any reason other than Cause or Disability, by delivery of written notice to Employee, which will be effective 30 days after the delivery of such notice (a "Termination without Cause").

6258264v1

b.    By Employee:

(i)    For Good Reason (as hereinafter defined), by delivery of written notice to Company in the manner provided for in clause 8.c.(ii) (a "Termination for Good Reason"); or

(ii)    For any reason other than Good Reason, by delivery of written notice to Company, which will be effective 30 days after the delivery of such notice (a "Termination without Good Reason").

c.    Definitions:

(i)    Definition of "Cause:"

a)    Employee's commission of a felony or other crime involving fraud, dishonesty or moral turpitude;

b)    Employee's breach of duty of loyalty, willful dishonesty, or gross negligence in the performance of Employee's duties under this Agreement;

c)    The commission by Employee of an act of fraud or embezzlement against Company or HRG Group;

d)    Employee's conviction of, or plea of nolo contendre to, a criminal offense that (I) is a felony, or (II) could result in imprisonment;

e)    Employee's absenteeism for any reason, other than for authorized vacation or because of Disability, for a period in excess of five working days total in any six (6) month period, provided that this provision shall be applied so as not to conflict with any applicable state or federal laws;

f)    the knowing and intentional failure of Employee to perform the material duties of Employee's position (for purposes of clarity, Company may not terminate Employee for Cause pursuant to this clause based upon (x) Employee's inability to perform such duties because of Disability; (y) Employee's performance of such duties which produces results that are unsatisfactory to Company; or (z) Employee's performance of such duties in a manner which is unsatisfactory to Company);

g)    any breach of Section 1(b), Section 1(f)(ii) or (iii), Section 5 or Section 6 of this Agreement, the knowing and intentional failure or refusal to follow Company rules, regulations, or policies or instructions of the President or Manager (which are consistent with this Agreement), or any material breach of any other provision of this Agreement; or

h)    being under the influence of alcohol or non-prescription illegal drugs at work.

7

(ii)     Definition of "Good Reason:" Any of the following conditions, provided (A) Employee delivers a written notice to Company within 90 days of the initial existence of such condition that specifies such condition and states Employee's intent to end Employee's relationship with Company because of such condition; (B) Company does not within 30 days of such notice remedy such condition; and (C) Employee resigns within 30 days of the expiration of such cure period:

> a)     A change in the principal location at which Employee provides services to Company to a location which is not within 50 miles of Boston, MA, without Employee's prior written consent;

> b)     A reduction in, or failure to timely pay, Employee's Salary;

> c)     Any other material breach of this Agreement by Company; or

> d)     Any material breach of provisions of the Operating Agreement that provide for distributions to Employee in Employee's capacity as a member of Company.

d.     Company Obligations in the Event of Termination.

(i)     If Employee's employment hereunder is terminated as a result of Employee's death, a Disability Termination, a Termination for Cause or a Termination without Good Reason, Company will pay the "Accrued Obligations" (as hereinafter defined) to Employee or to Employee's estate within thirty (30) days following any such termination.   In addition, if the Termination Date for a termination as a result of Employee's death or a Disability Termination occurs after December 31, 2012, or a Termination without Good Reason occurs after the expiration of the Term, then Company will pay any Bonus earned and accrued but not yet paid for the Bonus Year prior to the year in which the Termination Date occurs, which will be paid at the time provided in Section 3(b).

(ii)     If Employee's employment is terminated as a result of a Termination without Cause or a Termination for Good Reason, and, with the exception of the Accrued Obligations paid pursuant to subsection (1) below, subject to Employee's execution in a form satisfactory to Employee (and submitted to Company so as to be effective no later than 60 days following such termination) of a general release of claims (which does not release claims to payments required to be made by this Section 8(d)(ii)) against Company and HRG Group, and their officers, managers, employees, members, agents, subsidiaries and affiliates, and a reaffirmation of the covenants in Sections 1(g), 5, 6, 8(g) and 9(a) of this Agreement, in a form provided by Company (the "Release") and continued compliance with those terms of the this Agreement which survive termination, then

> 1) Company will pay the Accrued Obligations to Employee within thirty (30) days after the Termination Date;

> 2) Company will pay Employee an amount equal to the Salary at the rate in effect at such termination for six months from the Termination Date, with such amounts

to be payable over the course of such period in accordance with Company's normal payroll schedule in effect on the Termination Date, less any amounts received by Employee as salary or fees for services performed by Employee on a job for which Employee may be hired (either as an employee or consultant) following the Termination Date by any company or organization other than Company or any company or organization considered to be the same "service recipient" as Company within the meaning of Code Section 409A. With regard to the foregoing sentence, Company acknowledges that Employee does not have any obligation to seek other employment or work as an independent contractor after the Termination Date and the amounts payable to Employee pursuant to Section 8(d) may only be reduced by compensation Employee actually earned (and not compensation Employee could have earned) as a result of other employment or work as an independent contractor after the Termination Date. Subject to the requirements of Section 8.d. (iii) regarding the submission of the Release, such payments shall begin on the first payroll date following the date which is 60 days following the Termination Date, provided that Employee has not exercised any revocation right before such date; and

3) Subject to the approval of the HAMCO Compensation Committee, Company will pay Employee a pro rata Bonus for the Bonus Year in which the Termination Date occurs, calculated based upon Employee's Target Bonus as defined in Section 3(b) above, and then multiplied by the fraction in which the numerator is the number of calendar days between January 1 and the Termination Date and the denominator is 365, which will be paid at the time provided in Section 3(b).

(iii)    In the event that Employee fails to execute the Release on or prior to the "Release Expiration Date" (as hereinafter defined), Employee shall not be entitled to any payments or benefits pursuant to Section 8.d.(ii) (other than the Accrued Obligations paid pursuant to subsection (1) above). Notwithstanding the foregoing, if the Release could become effective during the calendar year following the calendar year of the Termination Date, then no such payments that so constitute "deferred compensation" shall be made earlier than the first day of the calendar year following the calendar year of the Termination Date.

(iv)    As used in this Section 8(d) "Release Expiration Date" shall mean the date which is twenty-one (21) days following the date upon which the Company delivers Employee the Release contemplated in Section 8.d.(ii) above, or, in the event that such termination of employment is "in connection with an exit incentive or other employment termination program" (as such phrase is defined in the Age Discrimination in Employment Act of 1967), the date which is forty-five (45) days following such delivery date.

(v)    As used in this Section 8(d), "Accrued Obligations" means (i) Salary earned but not paid prior to the Termination Date, (ii) an amount equal to the value of Employee's accrued unused vacation days, and (iii) benefits owed pursuant to any employee benefit plan in which Employee is a participant.

6258264v1

(vi)    Notwithstanding any foregoing provision to the contrary, any Bonus payable after the Termination Date pursuant to clause 8.d.(i) or clause 8.d.(ii)(3) will be reduced by any amount borrowed by Employee from Company that has not been  repaid as of the Termination Date.

e.    Option to Require Cessation of Work Before End of Notice Period.  In its sole and absolute discretion, Company may, after a notice of a Termination without Cause or a Termination without Good Reason is delivered, require that Employee cease actual work for Company, and/or not make contact with any employees, agents, vendors or clients of Company except as directed by Company, during any portion of the thirty (30) day notice period, but will continue to pay Salary, calculate any Bonus and provide benefits through the end of such notice period.

f.    Resignation of Other Positions.  In the event of any termination of Employee hereunder, Employee shall immediately resign any positions Employee might hold as an officer of Company or HRG Group, which resignation shall be deemed effective on the Termination Date.

g.    Return of Materials.  All records, files, software, software code, memoranda, reports, price lists, customer lists, drawings, plans, sketches, documents, technical information, information on the use, development and integration of software, and the like (together with all copies of such documents and things) relating to the business of Company, which Employee shall use or prepare or come in contact with in the course of, or as a result of, Employee's employment or other engagement by Company shall, as between the parties to this Agreement, remain the sole property of Company, except for information, relating to Employee's compensation and benefits, and information Employee has received in Employee's capacity as a member of Company.  Laptop computers, other computers, software and related data, information and things provided to Employee by Company or obtained by Employee, directly or indirectly, from Company, also shall remain the sole property of Company.  Upon the termination of Employee's employment or upon the prior demand of Company, Employee shall immediately return all such materials and things to Company and shall not retain any copies or remove or participate in removing any such materials or things from the premises of Company after termination or Company's request for return.

h.    Survival of Contractual Provisions.  The following provisions shall survive termination of this Agreement and the termination of the employment relationship between the parties:  Sections 1(g), 5, 6, 7, 8(d), 8(f), 8(g), 8(h), 8(i), 9, 10, 12, 13, 14, 15, 16, 17, 18, 19 and 20.

i.    Impact on Rights As Member of Company.  The foregoing terms of this Section 8 are not meant to impact Employee's equity interest in Company, which is addressed by the Salus Capital Partners, LLC Limited Liability Company Agreement, as amended and restated from time to time (the "Company Operating Agreement").  In the event of a conflict between the terms of this Agreement and the Company Operating Agreement with respect to such equity interest, the terms of the Company Operating Agreement shall control.

9. **Litigation Assistance/Indemnification**.

a. _Litigation Assistance_. Employee shall, upon reasonable notice, furnish such information and proper assistance to Company (at reasonable times that do not interfere with current employment) as it may reasonably require in connection with any litigation in which it is, or may become, a party, either during or after Employee's employment with Company.

b. _Indemnification_. Company shall indemnify Employee, hold Employee harmless, and make advances for expenses (including attorneys and costs) to Employee with respect to any and all losses, claims, demands, liabilities, costs, damages, expenses (including, without limitation, reasonable attorneys' fees and expenses) and causes of action imposed on, incurred by, asserted against or to which Employee may otherwise become subject by reason of or in connection with any act or omission of Employee (or Employee's agents or employees), including any negligent act or omission, for and on behalf of Company that Employee reasonably believes is in furtherance of the interest of Company, unless such act or omission constitutes gross negligence or intentional misconduct or is outside of the scope of Employee's authority, provided, however, that the foregoing provisions shall not be construed to grant Employee a right to be indemnified by Company for actions brought by Company for breach of this Agreement by Employee.

10. **Internal Revenue Code 409A**.

a. _Interpretation and Administration_. This Agreement shall be interpreted and administered in a manner so that any amount or benefit payable hereunder shall be paid or provided in a manner that is either exempt from or compliant with the requirements Section 409A of the Code and applicable Internal Revenue Service guidance and Treasury Regulations issued thereunder (and any applicable transition relief under Section 409A of the Code).

b. _Coordination of Certain Defined Terms_. Notwithstanding anything in this Agreement to the contrary, to the extent that any amount or benefit that would constitute non-exempt "deferred compensation" for purposes of Section 409A of the Code would otherwise be payable or distributable hereunder or a different form of payment would be effected, by reason of Employee's termination of employment, such amount or benefit will not be payable or distributable to Employee, and/or such different form of payment will not be effected, by reason of such circumstance unless (i) the circumstances giving rise to such termination of employment, as the case, may be, meet any description or definition of "separation from service" in Section 409A of the Code and applicable regulations (without giving effect to any elective provisions that may be available under such definition), or (ii) the payment or distribution of such amount or benefit would be exempt from the application of Section 409A of the Code by reason of the short-term deferral exemption or otherwise. This provision does not prohibit the vesting of any amount upon termination of employment, however defined. If this provision prevents the payment or distribution of any amount or benefit, such payment or distribution shall be made on the date, if any, on which an event occurs that constitutes a Section 409A-compliant "separation from service."

c. _Specified Employee Determination_. Notwithstanding anything herein to the contrary, in the event that Employee is determined to be a "specified employee" within the

6258264v1

meaning of Section 409A of the Code on the Termination Date, for purposes of any payment on separation from service hereunder, payment(s) shall be made or begin, as applicable, on the first payroll date which is more than six months following the date of separation from service, solely to the extent required to avoid any adverse tax consequences under Section 409A of the Code.

**11.    Assignment.**  This Agreement may be assigned by Company to any entity in HRG Group, or to another employer in conjunction with the sale of all, or substantially all, of Company's assets. This Agreement may not otherwise be assigned by Company or be assigned or subcontracted by Employee, except by a written assignment signed by all parties to this Agreement.  Any assignment in violation of this provision shall be null and void.

**12.    Modification and Severability.**  The parties agree that any provision of this Agreement deemed unenforceable or invalid may be reformed to permit enforcement of the objectionable provision to the fullest permissible extent. Any provision of this Agreement deemed unenforceable after modification shall be deemed stricken from this Agreement, with the remainder of the Agreement being given its full force and effect.

**13.    Entire Agreement.**  This Agreement embodies the entire understanding between the parties and supersedes and replaces any and all prior understandings, arrangements, and/or agreements, whether written or oral, relating to the subject matter hereof, including but not limited to the 2011 Employment Agreement.

**14.    Amendment/Waiver.**

a.    No waiver or modification of this Agreement or of any covenant, condition, or limitation herein contained shall be valid unless in writing and duly executed by the party to be charged therewith.  Furthermore, no evidence of any waiver or modification shall be offered or received in evidence in any proceeding, arbitration, or litigation between the parties arising out of or affecting this Agreement, or the rights or obligations of any party hereunder, unless such waiver or modification is in writing, duly executed as aforesaid.  The provisions of this Section 14 may not be waived except as set forth in this Section.  Notwithstanding the foregoing, this Agreement may prospectively be modified by Company by delivering written notice to Employee at least 40 days in advance of the effective date of such modification, provided, however, such modification shall not be effective before the expiration of the Term.

b.    Failure to exercise or delay in exercising any right, power, or privilege of that party under this Agreement on the part of either party shall not in any circumstances operate as a waiver of any such rights, powers, or privileges, nor prejudice either party's rights to take subsequent action.

**15.    Notices.**

a.    Except as otherwise provided herein, any notice or other communications required to be given by either party to the other shall be deemed to have been duly given when made in writing and delivered  in person, by email or by facsimile, or two business days after being sent by recognized overnight courier and addressed as follows:

6258264v1

**To Company**:

Salus Capital Partners, LLC
c/o Deputy General Counsel
HGI Asset Management Holdings, LLC
450 Park, 30th floor
New York, New York 10022

**With a Copy to**:

Jay P. Warren
Bryan Cave LLP
1290 Avenue of the Americas
New York, New York 10104
Phone (212) 541-2110
Fax (212) 541-1466
jpwarren@bryancave.com

**To Employee**:

Andrew Moser
12 Dover Drive
Walpole, MA 02081

**16.     Remedies.** If any of the parties to this Agreement seeks judicial enforcement of its or Employee's rights under this Agreement, the prevailing party in any such action shall be entitled to recover its or Employee's costs incurred in such action, including reasonable attorneys' fees.

**17.     Arbitration.**

a.     Employee and Company agree to arbitrate any controversy or claim arising out of this Agreement or otherwise relating to Employee's employment by Company or the cessation of such employment for any reason (including, but not limited to, disputes over compensation, bonuses or the award, vesting, or repurchase of equity interests in Company pursuant to Company's Operating Agreement, or the making or amount of distributions relating such equity interests; any claims of breach of contract or wrongful termination; any claims of age, sex, race, disability or other discrimination or retaliation pursuant to the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act of 1990,); any claims arising any federal, state or local wage payment statutes, rules or regulations; any claims arising any federal, state or local statutes, rules or regulations that prohibit retaliation by an employer in response to an employee's engaging in activities protected by such statute, rule or regulation; any claims arising any federal, state or local medical or family leave, military service, or jury service statutes, rules or regulations; or any other applicable federal, state or local law).

13

b.       Any controversy or claim described in Section 17(a) shall be fully and finally resolved in confidential, binding arbitration to the fullest extent permitted by law. Such arbitration proceeding shall take place in the State of New York, City of New York, before a single arbitrator in accordance with the National Rules for the Resolution of Employment Disputes ("Employment Rules") of the American Arbitration Association "AAA") or any rules issued by the AAA to replace or revise the Employment Rules. The arbitrator may grant specific performance in addition to monetary damages. The arbitrator shall not have the authority to modify or change any of the terms of this Agreement. Notwithstanding any provision of the Employment Rules to the contrary, Employee and Company shall each be responsible for paying its or her attorney's fees and costs in such arbitration to the fullest extent permitted by law. The arbitrator's award shall be final and binding upon the parties.

c.       Notwithstanding the foregoing, Company shall have the right to, and be permitted to, seek and obtain interim injunctive relief from a court of competent jurisdiction to enforce Section 5 and Section 6 of this Agreement pending a final judgment confirming a final arbitration award.

d.       If any portion of this arbitration provision is determined by a court of competent jurisdiction to be unenforceable, such determination will not affect the remainder of this arbitration provision. If, however, a court of competent jurisdiction determines that a party's claim is not arbitrable, then the parties waive, to the fullest extent permitted by law, their right, if any, to a trial by jury of any such claim arising out of or in connection with this Agreement, Employee's employment by Company, or the termination of such employment by Employee or by Company.

**18.       Choice of Law/Personal Jurisdiction.**

a.       This Agreement shall be deemed to be made and performed in, and shall be governed and construed in accordance with the laws of the State of New York and of the United States of America, as applicable, without regard to conflicts of laws provisions, provided that any dispute regarding the enforcement of Section 17 or any arbitration award shall be governed by the Federal Arbitration Act.

b.       Company and Employee agree that any judicial proceeding in connection with (I) an arbitration pursuant to Section 17, including any proceeding to obtain interim relief in aid of arbitration pursuant to Section 17(c) or otherwise, and any proceeding to confirm, enforce, modify or vacate an arbitration award, or (II) any claim or controversy arising under this Agreement or the employment relationship between the parties that is alleged (expressly or implicitly) not to be subject to arbitration, shall, to the fullest extent permitted by law, exclusively be brought in a state or federal court located in New York County, New York. In furtherance of this forum selection agreement, Company and Employee each: (i) irrevocably submits to the personal jurisdiction of such courts; (ii) waives and agrees not to assert, by way of motion, as a defense or otherwise, in any such suit, action or proceeding, any claim that (A) Employee or Company is not subject personally to the jurisdiction of the above-named courts, (B) the suit, action or proceeding is brought in an inconvenient forum, (C) the venue of the suit, action or proceeding is improper, or (D) this Agreement or the subject matter hereof may not be enforced in or by such court; and (iii) waives, and agrees not to seek, any review by a court in

14

another jurisdiction that may be called upon to enforce the judgment of any of the above-referenced courts.

**19.     Headings/Interpretation.** The headings in this Agreement are for convenient reference only and shall not limit or otherwise affect any of the terms of this Agreement. As context may require, the singular shall mean and include the plural and vice versa, and the masculine shall include the feminine and vice versa.

**20.     Drafting.** This Agreement has been fully reviewed and negotiated by the parties; accordingly, any uncertainty or ambiguity shall not be construed for or against any party based on attribution of drafting to said party.

**21.     Counterparts; Effectiveness.** This Agreement may be signed in two or more counterparts, which together shall constitute one and the same instrument, provided that each party receives a copy fully executed by the other party.

**22.     Acknowledgement.** EMPLOYEE REPRESENTS AND WARRANTS THAT EMPLOYEE:    HAS CAREFULLY READ AND FULLY UNDERSTANDS THIS AGREEMENT AND ITS FINAL AND BINDING EFFECT; HAS BEEN AFFORDED SUFFICIENT TIME AND OPPORTUNITY TO REVIEW THIS AGREEMENT WITH ADVISORS OR ATTORNEYS OF EMPLOYEE'S CHOICE; HAS HAD AN OPPORTUNITY TO NEGOTIATE WITH REGARD TO THE TERMS OF THIS AGREEMENT; IS FULLY COMPETENT TO MANAGE EMPLOYEE'S OWN BUSINESS AFFAIRS AND TO ENTER INTO OR SIGN THIS AGREEMENT; HAS SIGNED THIS AGREEMENT KNOWINGLY, FREELY, AND VOLUNTARILY; AND THAT THE ONLY PROMISES MADE TO INDUCE EMPLOYEE TO SIGN THIS AGREEMENT ARE THOSE STATED HEREIN.

*[Signature page follows]*

6258264v1

IN WITNESS WHEREOF, the parties have executed this Agreement on August 26, 2014.

SALUS CAPITAL PARTNERS, LLC

By: HGI Asset Management Holdings, LLC,
    its manager

By: _____

Name: Omar Asali

Title: President

Andrew Moser

_____

**PETITION EXHIBIT B**

FILED: NEW YORK COUNTY CLERK 06/21/2017 07:23 PM INDEX NO. 654395/2017

NYSCEF DOC. NO. Case 1:17-cv-05536-NRB Document 22-1 Filed 09/01/17 Page 30 of 112 RECEIVED NYSCEF: 06/21/2017

**Execution Copy**

SALUS CAPITAL PARTNERS, LLC

LIMITED LIABILITY COMPANY AGREEMENT

DATED NOVEMBER 23, 2011

EFFECTIVE AS OF DECEMBER 1, 2011

# Table of Contents

ARTICLE I Definitions ................................................................................................ 1
    Section 1.1    Definitions.......................................................................................... 1
    Section 1.2    Terms Generally................................................................................ 9

ARTICLE II General Provisions ................................................................................ 10
    Section 2.1    Formation......................................................................................... 10
    Section 2.2    Name................................................................................................ 10
    Section 2.3    Term................................................................................................. 10
    Section 2.4    Purpose; Powers.............................................................................. 10
    Section 2.5    Place of Business; Registered Office and Registered Agent ........... 10

ARTICLE III Members.................................................................................................. 11
    Section 3.1    Name and Address .......................................................................... 11
    Section 3.2    Limitation of Liability .................................................................... 11
    Section 3.3    Liability of a Member to the Company............................................ 11
    Section 3.4    Action by Members Without a Meeting .......................................... 11
    Section 3.5    Certain Duties and Obligations of the Members.............................. 11

ARTICLE IV Management and Operation of the Company ...................................... 12
    Section 4.1    Appointment, Resignation and Removal of the Manager................ 12
    Section 4.2    General Responsibilities of the Manager ........................................ 13
    Section 4.3    Budget............................................................................................. 13
    Section 4.4    Additional Specified Rights of the Members................................... 13
    Section 4.5    Officers and Authorized Persons .................................................... 14
    Section 4.6    Expenses ......................................................................................... 14
    Section 4.7    Subsidiaries .................................................................................... 14

ARTICLE V Profit Units and Capital Contributions .............................................. 15
    Section 5.1    Profit Units of the Company ........................................................... 15
    Section 5.2    Capital Contributions ..................................................................... 17
    Section 5.3    Priority and Return of Capital ........................................................ 17
    Section 5.4    Withdrawal or Reduction of Capital Contributions ........................ 17
    Section 5.5    Capital Accounts ............................................................................ 17
    Section 5.6    Transfers ......................................................................................... 17
    Section 5.7    Deficit Capital Account .................................................................. 17
    Section 5.8    Modifications ................................................................................. 18

ARTICLE VI Allocations; Distributions ................................................................... 18
    Section 6.1    Allocations of Profits and Losses ................................................... 18
    Section 6.2    Required Special Allocations .......................................................... 18
    Section 6.3    Tax Allocations; Code Section 704(c) ............................................ 19
    Section 6.4    Distributions ................................................................................... 19
    Section 6.5    Tax Loans ....................................................................................... 20
    Section 6.6    Collection Account ......................................................................... 20
    Section 6.7    Offset.............................................................................................. 21
    Section 6.8    Interest on and Return of Capital Contributions ............................. 21
    Section 6.9    Withholding .................................................................................... 21

i

ARTICLE VII Taxes; Books and Records; Information ........................................................ 21
 Section 7.1 Tax Returns ........................................................................................ 21
 Section 7.2 Tax Elections ...................................................................................... 21
 Section 7.3 Tax Matters Member .......................................................................... 21
 Section 7.4 General Accounting Matters ............................................................... 22
 Section 7.5 Information .......................................................................................... 22
 Section 7.6 Financial Compliance ......................................................................... 23
 Section 7.7 Bank Accounts .................................................................................... 23
 Section 7.8 Accounting Period .............................................................................. 23
 Section 7.9 Managed Funds ................................................................................... 23

ARTICLE VIII Dissolution ............................................................................................... 24
 Section 8.1 Dissolution ......................................................................................... 24
 Section 8.2 Winding-up ........................................................................................ 24
 Section 8.3 Final Distribution ............................................................................... 24
 Section 8.4 Termination ........................................................................................ 25
 Section 8.5 Claims of the Members ....................................................................... 25

ARTICLE IX Transfer of Members' Interests ................................................................... 25
 Section 9.1 Restrictions on Transfer of Company Interests ................................. 25
 Section 9.2 Other Transfer Provisions .................................................................. 26
 Section 9.3 Drag-Along Rights .............................................................................. 26

ARTICLE X Miscellaneous ............................................................................................... 27
 Section 10.1 Representations and Covenants by the Members ............................. 27
 Section 10.2 Arbitration ......................................................................................... 28
 Section 10.3 Equitable Relief ................................................................................. 29
 Section 10.4 Governing Law ................................................................................... 29
 Section 10.5 Successors and Assigns ...................................................................... 29
 Section 10.6 Notices ............................................................................................... 29
 Section 10.7 Counterparts ...................................................................................... 30
 Section 10.8 Entire Agreement .............................................................................. 30
 Section 10.9 Amendments ...................................................................................... 30
 Section 10.10 Waivers ............................................................................................ 30
 Section 10.11 Severability ...................................................................................... 30
 Section 10.12 No Partition ...................................................................................... 30
 Section 10.13 Exhibits and Schedules .................................................................... 30
 Section 10.14 Further Action .................................................................................. 30
 Section 10.15 Cumulative Remedies; Prevailing Party .......................................... 30
 Section 10.16 Rules of Construction ...................................................................... 31
 Section 10.17 No Third Party Beneficiaries ........................................................... 31
 Section 10.18 Time of the Essence ......................................................................... 31

SCHEDULES

 Schedule 1.1  Certain Employment-Related Defined Terms

 Schedule 3.1  Members; Initial Capital Contributions; Initial Profit Units

Schedule 4.1(a)    Unanimous Actions

Schedule 4.5       Initial Officers

C075532\0329724\1648200.4

**LIMITED LIABILITY COMPANY AGREEMENT OF SALUS CAPITAL PARTNERS, LLC** (the "Company"), dated November 22, 2011, effective as of December 1, 2011 (the "Effective Date"), by and among **HGI Asset Management Holdings, LLC**, a Delaware limited liability company ("Harbinger"), **Macy L. Kiley**, an individual ("MK"), **Robert F. Kuppens**, an individual ("RK"), **Andrew H. Moser**, an individual ("AM"), **Marc S. Price**, an individual ("MP"), **Daniel F. O'Rourke**, an individual ("DO"), and such other persons as shall hereinafter become members as hereinafter provided (together with Harbinger, MK, RK, AM, MP and DO, each a "Member" and, collectively, the "Members").

Preliminary Statement

WHEREAS, the Company was formed as a Delaware limited liability company pursuant to the filing of a Certificate of Formation in the office of the Secretary of State of the State of Delaware on November 10, 2011 (the "Certificate");

WHEREAS, the Company was formed for the purposes of identifying and pursuing opportunities to make asset based loans to Persons who are not Affiliates of Harbinger, making such loans (either individually or in conjunction with Affiliates of Harbinger) and servicing such loans; and

WHEREAS, the Members desire to enter into this Agreement to provide for the regulation and establishment of the affairs of the Company, the conduct of the Company's business and the relations among them as Members of the Company;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members hereby agree as follows:

Agreement

ARTICLE I<br>Definitions

Section 1.1   Definitions.  The following terms shall have the following meanings for purposes of this Agreement:

"AAA" has the meaning given in Section 10.2(b).

"Acceleration Event" means, with respect to any Member who is also an employee of the Company (or a Subsidiary), the termination of such employee's employment with the Company (or such Subsidiary) at any time, as a result of a "Termination for Good Reason" or a "Termination without Cause," as such terms are defined in such employee's then-current employment agreement (or if such terms are not defined therein or such employee has not entered into any such employment agreement, as such terms are defined on Schedule 1.1 attached hereto).

"Affiliate" means, with respect to any Person, (i) any other person who Controls, is Controlled by or is under common Control with such person, (ii) any director, officer, partner or employee of such Person or any Person specified in clause (i) above, or

(iii) any immediate family member of any Person specified in clause (i), (ii) or (iii) above. Notwithstanding the foregoing, neither the Company nor any Subsidiary shall be deemed to be an Affiliate of any Member for any purposes of this Agreement. For purposes of this definition, an "immediate family member" of any individual means (a) such individual's spouse; (b) such individual's siblings (whether by the whole or half blood); (c) such individual's children, grandchildren and other lineal descendants (in each of the foregoing cases, whether by birth or adoption); (d) any trust for the benefit of any of the foregoing individuals; and (e) any entity 100% of which is beneficially owned by any one or more of the foregoing individuals (e.g., a so-called "family limited partnership").

"Agreement" means this Limited Liability Company Agreement, as it may be amended, supplemented, restated or otherwise modified from time to time.

"AM" has the meaning given in the caption to this Agreement.

"Authorized Person" has the meaning given in Section 4.5(a).

"Available Cash" means, for any period, the sum of (a) any cash receipts or other proceeds of the Company during such period from all sources other than Capital Contributions and (b) any reduction in Reserves previously established from such receipts; less the sum of (i) any such receipts that are reinvested in the business of the Company, subject to Section 6.5, (ii) all cash disbursements for operations of the Company or any Subsidiary during such fiscal period, excluding cash disbursements paid out of Reserves or Capital Contributions, and (iii) any additions to Reserves from such receipts.

"Book Basis" means, with respect to any asset of the Company, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)     The initial Book Basis of any asset contributed by a Member to the Company shall be the gross fair market value of such asset.

(ii)    The Book Basis of the Company Assets shall be adjusted to equal their respective gross fair market values if the Manager determines to restate Capital Accounts in accordance with the Regulations.

(iii)   The Book Basis of any item of Company Assets distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the Manager.

(iv)    The Book Basis of Company Assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) and subparagraphs (vi) of the definitions of "Net Profits" and "Net Losses" herein; provided, however, that Book Basis shall not be adjusted pursuant to this subparagraph (iv) to the extent that an adjustment pursuant to subparagraph (ii) is

C075532\0329724\1648200.4

required in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (iv).

If the Book Basis of an asset has been determined or adjusted pursuant to subparagraph (i), (ii) or (iv), such Book Basis shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Profits and Net Losses.

"Budget" has the meaning given in Section 4.3.

"Business Day" means any day other than Saturday, Sunday or any other day on which commercial banks in New York, New York are closed for commercial banking business.

"Capital Account" means, when used with respect to any Member, the capital account maintained for such Member in accordance with Section 5.5 hereof, as such capital account may be increased or decreased from time to time pursuant to the provisions of Section 5.5.

"Capital Contributions" means the amount of money and/or the agreed upon fair market value of property contributed to the Company by a Member or its predecessor in interest on the date of contribution and shall include the contributions of such Member made pursuant to Section 5.1.

"Cause Event" means, with respect to any Member who is also an employee of the Company (or a Subsidiary), the termination of such employee's employment with the Company (or such Subsidiary) (i) as a result of a "Termination without Good Reason," but only if such employee has entered into an employment agreement with the Company (or a Subsidiary) for a definite term and such termination occurs during such term, or (ii) at any time, as a result of a "Termination for Cause," as such terms are defined in such employee's then-current employment agreement (or if such terms are not defined therein or such employee has not entered into any such employment agreement, as such terms are defined on Schedule 1.1 attached hereto).

"Certificate" has the meaning given in the preliminary statement.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, or any successor statute.  Any reference herein to a particular provision of the Code shall mean, where appropriate, the corresponding provision in any successor statute.

"Collection Account" has the meaning given in Section 6.6.

"Company" has the meaning given in the caption to this Agreement.

"Company Assets" means any and all real property, personal property and other assets directly or indirectly owned by the Company or any Subsidiary, including the Loans.

3

"Company Nonrecourse Debt" has the meaning given the term "nonrecourse liability" in Regulation § 1.752-1(a)(2).

"Company Nonrecourse Deductions" has the meaning given the term "nonrecourse deductions" in Regulation § 1.704-2(b)(1) and Regulation § 1.704-2(b)(2). The amount of Company Nonrecourse Deductions for a Fiscal Year is determined in accordance with Regulation § 1.704-2(c).

"Control" (including its correlative meanings, "Controlled by" and "under common Control with") means possession, directly or indirectly, of the power to direct or cause the direction of management or policies of the Person in question (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise).

"Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such taxable year, except that if the Book Basis of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Book Basis as the federal income tax depreciation, amortization, or other cost recovery deduction for such taxable year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such taxable year is zero, Depreciation shall be determined with reference to such beginning Book Basis using any reasonable method selected by the Manager.

"Distribution" means any cash, securities, property or other assets distributed to a Member by the Company.

"DO" has the meaning given in the caption to this Agreement.

"Drag-Along Sale" means the sale of the Company, in a single transaction or a series of related transactions, to any Person that is not an Affiliate of Harbinger pursuant to the acquisition of 100% of the outstanding Interests (whether by merger, consolidation, recapitalization, reorganization, purchase of the outstanding Interests or otherwise).

"Effective Date" has the meaning given in the caption to this Agreement.

"Employment Agreement" has the meaning given in Section 4.5(c).

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Fiscal Year" means the twelve month period ending on September 30 of each year, except that the first Fiscal Year shall begin on the date of formation of the Company and shall end on September 30, 2012.

"Fund" has the meaning given in Section 7.9.

"Governmental Entity" means any court, tribunal, department, body, board, bureau, administrative agency or commission or other governmental authority or instrumentality, whether federal, state, local or foreign.

"Harbinger" has the meaning given in the caption to this Agreement.

"Interest" means the interest of a Member in the Company, including the right of such Member in the capital, profits and losses of, and Distributions from, the Company, and the right of such Member to any and all benefits to which such Member may be entitled under this Agreement.

"Investment Account" means an account to be maintained by the Company for each Member, initially equal to the initial Capital Contribution made by such Member, (i) to which is added the sum of the amount of all additional Capital Contributions made by such Member and (ii) from which is subtracted the sum of all Distributions made to such Member pursuant to Section 6.4(b)(ii); provided that the Investment Account cannot be reduced below zero.

"Issuance Date" means (i) with respect to any Profit Unit outstanding as of the Effective Date, the Effective Date or (ii) with respect to any Profit Unit issued to a Member of the Company after the Effective Date, the date of such issuance (which shall be the date on which such Member was admitted as a member of the Company unless otherwise specified by the Manager).

"Liquidation Value" means, with respect to any Profit Units, the amount determined by the Manager that the holder of such Profit Units would have been entitled to receive if, as of the date such Liquidation Value is to be calculated: (i) the Company sold each of the tangible Company Assets for its fair market value and immediately liquidated, (ii) the Company's debts and liabilities were satisfied and (iii) the proceeds of the liquidation were distributed in accordance with this Agreement.

"Liquidator" means (i) the Manager or (ii) such other Person who is appointed by the Manager in accordance with applicable law to take all actions related to the winding up of the Company's business and the distribution of the Company's assets.

"LLC Act" means the Delaware Limited Liability Company Act, 6 Del. C. §§ 18-101, et seq., as it may be amended from time to time, and any successor to such statute.

"Loan" means each of the asset based loans made by the Company (or a Subsidiary) to Persons who are not Affiliates of Harbinger.

"Manager" has the meaning given in Section 4.1(a).

"Member" has the meaning given in the caption to this Agreement.

"Member Nonrecourse Debt" means a nonrecourse debt of the Company within the meaning of Section 1.704-2(b)(4) of the Regulations.

C075532\0329724\1648200.4

"Member Nonrecourse Deductions" means the items of loss, deduction, and expenditure attributable to Member Nonrecourse Debt within the meaning of Section 1.704-2(i)(2) of the Regulations.

"MK" has the meaning given in the caption to this Agreement.

"MP" has the meaning given in the caption to this Agreement.

"Net Losses" means, for each Fiscal Year or other period, an amount equal to the excess of (a) the Company's items of loss and deduction for such year or other period over (b) the Company's items of income and gain for such year or other period, determined in accordance with Section 703(a) of the Code (including all items of income, gain, loss and deduction required to be stated separately under Section 703(a)(1) of the Code), with the following adjustments:

(i)     Any income of the Company that is exempt from federal income tax, and not otherwise taken into account in computing Net Losses, will be considered an item of income.

(ii)     Gain or loss resulting from any disposition of any Company Asset with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference to the Book Basis of such asset, notwithstanding that the adjusted tax basis of such asset may differ from its Book Basis.

(iii)     Any increase or decrease to Capital Accounts as a result of any adjustment to the Book Basis of Company Assets pursuant to Regulations Section 1.704 1(b)(2)(iv)(f) shall constitute an item of income or loss, respectively.

(iv)     Any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) expenditures under Regulations Section 1.704 1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Losses, will be considered an item of deduction.

(v)     In lieu of depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there will be taken into account the Depreciation for the taxable year or other period as determined hereunder.

(vi)     To the extent an adjustment to the adjusted tax basis of any of the Company Assets pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Losses.

C075532\0329724\1648200.4

(vii)    Notwithstanding any other provision of this definition, any items of income, gain, loss or deduction which are specially allocated pursuant to Section 6.2 shall not be taken into account in computing Net Losses.

The amounts of items of Company income, gain, loss or deduction available to be specially allocated pursuant to Section 6.2 shall be determined by applying rules comparable to those set forth in subparagraphs (i)-(vi) above.

"Net Profits" means, for each Fiscal Year or other period, an amount equal to the excess of (a) the Company's items of income and gain for such year or other period over (b) the Company's items of deduction and loss for such year or other period, determined in accordance with Section 703(a) of the Code (including all items of income, gain, loss and deduction required to be stated separately under Section 703(a)(1) of the Code), with the following adjustments:

(i)    Any income of the Company that is exempt from federal income tax, and not otherwise taken into account in computing Net Profits, will be considered an item of income.

(ii)    Gain or loss resulting from any disposition of any Company Asset with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference to the Book Basis of such asset, notwithstanding that the adjusted tax basis of such asset may differ from its Book Basis.

(iii)    Any increase or decrease to Capital Accounts as a result of any adjustment to the Book Basis of Company Assets pursuant to Regulations Section 1.704 1(b)(2)(iv)(f) shall constitute an item of income or loss, respectively.

(iv)    Any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) expenditures under Regulations Section 1.704 1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profits, will be considered an item of deduction.

(v)    In lieu of depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there will be taken into account the Depreciation for the taxable year or other period as determined hereunder.

(vi)    To the extent an adjustment to the adjusted tax basis of any of the Company Assets pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Profits.

(vii)    Notwithstanding any other provision of this Paragraph, any items of income, gain, loss or deduction which are specially allocated pursuant to Section 6.2 of this Agreement shall not be taken into account in computing Net Profits.

The amounts of items of Company income, gain, loss or deduction available to be specially allocated pursuant to Section 6.2 of this Agreement shall be determined by applying rules comparable to those set forth in subparagraphs (i)-(vi) above.

"Officer" has the meaning given in Section 4.5(c).

"Permitted Transfer" shall mean, in each instance, any direct or indirect Transfer in or by Harbinger.

"Person" or "person" means an individual, corporation, association, partnership, limited liability company, trust, joint venture, business trust or unincorporated organization or other entity or organization, or a Governmental Entity.

"Preferred Return Account" means an account to be maintained by the Company for each Member, initially equal to zero, which account shall be credited (increased) daily throughout the term of this Agreement by an amount equal to the product of (i) the aggregate of the amount of such Member's Investment Account plus such Member's Preferred Return Compounding Amount and (ii) eight percent (8%) per annum.  The balance of the Preferred Return Account shall be debited (reduced), but not below zero, each time, and to the extent such Member receives a Distribution pursuant to Section 6.4(b)(i).  The Preferred Return Account shall be calculated for the actual number of days elapsed on the basis of a 360 day year.

"Preferred Return Compounding Amount" means, with respect to any Member, the positive difference (if any) of (i) the balance of such Member's Preferred Return Account as of the last day of the immediately preceding calendar quarter less (ii) the amount of all Distributions made to such Member pursuant to Section 6.4(b)(i) since such date.

"Profit Percentage" means a fraction, expressed as a percentage, the numerator of which is the number of Profit Units (whether vested or unvested) held by such Member and the denominator of which is the total number of Profit Units outstanding (whether vested or unvested).

"Profit Units" has the meaning given in Section 5.1.

"Ratable Portion" has the meaning given in Section 5.1(b)(i).

"Regulations" means the regulations promulgated under the Code.

"Required Accounting Standards" shall mean United States generally accepted accounting principles, consistently applied.

"Reserves" means funds or other amounts set aside or otherwise allocated or designated for any valid purpose relating to any Loan, the Company or any Subsidiary, as determined by the Manager from time to time in accordance with, and subject to, the applicable provisions of this Agreement.

"Resignation Event" means, with respect to any Member who is also an employee of the Company (or a Subsidiary), the termination of such employee's employment with the Company (or such Subsidiary) (i) as a result of a "Termination without Good Reason," but only if either (A) such employee has entered into an employment agreement with the Company (or a Subsidiary) for a definite term and such termination occurs after such term, or (B) such employee has entered into an employment agreement with the Company (or a Subsidiary) for an indefinite term, or (ii) at any time, as a result of such employee's death or a "Disability Termination," as such terms are defined in such employee's then-current employment agreement (or if such terms are not defined therein or such employee has not entered into any such employment agreement, as such terms are defined on Schedule 1.1 attached hereto).

"RK" has the meaning given in the caption to this Agreement.

"Scheduled Vesting Date" has the meaning given in Section 5.1(b).

"SEC" has the meaning given in Section 7.6(a).

"SOA" has the meaning given in Section 7.6(a).

"Subsidiary" means any entity directly or indirectly owned in whole or in part by the Company.

"Tax Loan Cap" has the meaning given in Section 6.5.

"Tax Matters Member" has the meaning given in Section 7.3.

"Tax Period" means any of the periods commencing on the first day of a Fiscal Year and ending on any month end in such Fiscal Year, as determined by the Manager.

"Transfer" has the meaning given in Section 9.1(a).

"Transferee" has the meaning given in Section 9.1(b).

"Unanimous Actions" has the meaning given in Section 4.1(a).

Section 1.2    Terms Generally.  The definitions in Section 1.1 shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  Unless otherwise expressly specified, the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The terms "hereunder" "herein" and words of similar import shall mean this entire Agreement as a whole unless reference to a specific section

C075532\0329724\1648200.4

of this Agreement is made. All references in this Agreement to a section or article shall mean a section or article of this Agreement, unless otherwise expressly specified.

## ARTICLE II
### General Provisions

Section 2.1    Formation.    One or more Persons has acted as the organizer or organizers of the Company by preparing, executing and filing with the Delaware Secretary of State the Certificate pursuant to the LLC Act, as such Certificate may have been or may be amended from time to time. The Company was formed under the name Salus Capital Partners, LLC. The acts of such Persons are hereby authorized and ratified. The Manager and each Authorized Person are hereby designated as authorized persons, within the meaning of the LLC Act, to execute, deliver and file any amendments and/or restatements thereof and any other certificates necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business. The execution by the Manager or any Authorized Person of any of the foregoing certificates (and any amendments and/or restatements thereof) shall be sufficient.

Section 2.2    Name.    The Company shall conduct its activities under the name of Salus Capital Partners, LLC.

Section 2.3    Term.    The Company's existence shall be perpetual, unless sooner dissolved, wound up or terminated in accordance with Article VIII of this Agreement or the LLC Act.

Section 2.4    Purpose; Powers.    (a)  The purpose of the Company shall be to conduct and engage in the following activities: (i) to identify and pursue opportunities to make Loans, (ii) to make (either individually or in conjunction with Affiliates of Harbinger) and service the Loans, (iii) to conduct such other lawful business activities related or incidental thereto or as the Manager may otherwise determine and (iv) to exercise all powers enumerated in the LLC Act necessary to the conduct, promotion or attainment of the purposes set forth herein and for the protection and benefit of the Company.

(b)    The Company is authorized and empowered to do any and all acts and things necessary, appropriate, proper, advisable, incidental to, or convenient for the furtherance and accomplishment of its purposes and for the protection and benefit of the Company, including all acts and things permitted under the LLC Act and this Agreement.

Section 2.5    Place of Business; Registered Office and Registered Agent.    The Company shall maintain an office and principal place of business at 197 First Avenue, Second Floor, Needham, Massachusetts 02494, or such other place as the Manager shall designate. The Manager shall give the Members reasonable prior notice of any change of the Company's principal place of business. The Company shall maintain a registered office c/o Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, or such other office as is approved by the Manager. The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, or such other agent and place in the State of Delaware as the Manager may from time to time determine.

ARTICLE III
Members

Section 3.1    Name and Address.  The name, address, initial Capital Contributions and initial Profit Units of each of the Members as of the Effective Date are set forth on Schedule 3.1 hereto.  Such Schedule shall be amended from time to time by the Manager to reflect the admission or withdrawal of a Member or the Transfer of Interests in accordance with the terms of this Agreement and other modifications to or changes in the information set forth therein.  The Manager shall promptly distribute such amendments in writing to each of the Members.

Section 3.2    Limitation of Liability.  Subject to Section 3.3, each Member's liability to the Company, to any other Member or to any other third party shall be limited to the maximum extent permitted by law.  A Member shall not be personally liable for any indebtedness, liability or obligation of the Company, except that such Member shall remain liable for the payment of its Capital Contribution.

Section 3.3    Liability of a Member to the Company.  Except as otherwise expressly authorized by any provision of this Agreement, no Member is an agent of the Company solely by virtue of being a Member, and no Member has (or shall hold itself out as having) authority to sign, act for or bind the Company solely by virtue of being a Member, all of such powers being vested in the Manager (as set forth herein).  Any Member that executes any document or instrument or otherwise takes any action to bind the Company in violation of this Section 3.3 shall be solely responsible for, and shall indemnify, defend and hold harmless the Company and each other Member against, any damage, loss, liability, or expense, including reasonable attorneys' fees, as and when incurred, that the Company, or such other Member, as the case may be, may at any time become subject to or liable for by reason of the actions specified above.  The provisions of this Section 3.3 shall survive the termination of this Agreement.

Section 3.4    Action by Members Without a Meeting.  Whenever the Members of the Company are required or permitted to take any action by vote, such action may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing (including in electronic format), setting forth the action so taken, shall be signed by the Members who hold voting interests having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all of the Members entitled to vote thereon were present and voted and shall be delivered to the administrative office of the Company, or to an employee or agent of the Company.

Section 3.5    Certain Duties and Obligations of the Members.  (a)  The Members shall take all action which may be reasonably necessary or appropriate (i) for the formation and continuation of the Company as a limited liability company under the laws of the State of Delaware and (ii) for the development, maintenance, preservation and operation of the business of the Company in accordance with the provisions of this Agreement and applicable laws and regulations.  The Manager shall take all action which is reasonably necessary and appropriate to form or qualify the Company to conduct the business in which the Company is engaged under the laws of any jurisdiction in which the Company is doing business and to continue in effect such formation or qualification.

(b)     No Member shall take any action so as to cause the Company to be classified for federal income tax purposes as an association taxable as a corporation and not as a partnership.

(c)     The provisions of this Agreement, to the extent that they restrict or reduce the duties and/or liabilities of a Member or the Manager otherwise existing at law or in equity (including under the LLC Act), shall replace the other duties and liabilities of such Member or Manager (as the case may be).  Notwithstanding anything to the contrary contained in this Agreement and to the fullest extent permitted by the LLC Act, no Member or Manager shall have any fiduciary duties to any other Member or other Person bound by this Agreement, and each Member hereby disclaims, eliminates, and shall not be liable under any circumstances for, any actual or claimed breach of any duty (including any otherwise applicable fiduciary duties) of a Member, Manager or Authorized Person (or an agent of any of the foregoing).  To the extent any individual serving as a Member, Manager or Authorized Person (or as an agent of any of the foregoing) has any liabilities or duties at law or in equity, including fiduciary duties or any other standard of care, more expansive than those set forth in this Section 3.5, such liabilities and duties are hereby modified to the extent permitted under the LLC Act to those set forth in the second sentence of this Section 3.5(c).  Wherever in this Agreement a Person is empowered to take or make a decision, direction, consent, vote, determination, election, action or approval, whether in such Person's capacity as a Member, Manager or Authorized Person, such Person is entitled to consider, favor and further such interests and factors as it desires, including its own interests and the interests of its Affiliates, and has no duty or obligation to consider, favor or further any other interest of the Company, any Subsidiary or any other Member or Person.  This Section 3.5(c) shall not eliminate the implied contractual covenant of good faith and fair dealing.  To the fullest extent permitted by law, including Section 18-1101(e) of the LLC Act, no Member, Manager or Authorized Person shall be liable to the Company, any Member or any other Person bound by this Agreement for breach of duties (including fiduciary duties) unless such Member, Manager or Authorized Person acted in bad faith or engaged in willful misconduct.

(d)     Each Member shall defend and indemnify the Company and the other Members against, and shall hold it and them harmless from, any damage, loss, liability, or expense, including reasonable attorneys' fees, as and when incurred, in connection with or resulting from such indemnifying Member's (or its Affiliates') fraud, willful misconduct or willful misapplication or willful misappropriation of funds.

ARTICLE IV
Management and Operation of the Company

Section 4.1     Appointment, Resignation and Removal of the Manager.  (a) Subject to the proviso at the end of this sentence, the full right, power, authority and discretion to conduct the business and affairs of the Company, and to do all things necessary to carry on the business of the Company, shall be vested in a manager (who may, but need not, be a Member, the "Manager"), acting alone and without the consent of any Member; provided, however, that, notwithstanding the foregoing or anything to the contrary contained in this Agreement, (i) the Officers shall have, on a non-exclusive basis, responsibility and authority for the day-to-day operations of the Company in accordance with Section 4.5, (ii) the Manager may not take any of

the actions or make any of the decisions listed on Schedule 4.1(a) annexed hereto (each, a "Unanimous Action") without (in each instance) the prior written consent of each of the Members, and (iii) each of the Members shall have the right to take any action that this Agreement expressly authorizes such Member to take.

(b)    If (i) the Manager requests in writing that a Member approve any proposed Unanimous Action or other action requiring the approval of such Member, (ii) such Member fails to respond to such request within 5 Business Days after such written request, and (iii) such failure to respond to such request continues for an additional 5 Business Days after the Manager (in a second notice) notifies such Member in writing of such failure and provides in such written notice that such Member's failure to respond to the proposed matter in question within 5 Business Days after the giving of such notice will result in the Member having granted its approval thereof, then such approval shall be deemed to have been given by such Member.

(c)    Harbinger is hereby appointed as the Manager, and may only be removed or replaced as specifically provided in this Section 4.1(c). The Manager may be removed only by Harbinger. The Manager may resign as Manager by giving not less than 30 days written notice to each Member, and such resignation shall take effect at such time as is specified in such notice of resignation. Upon the removal or resignation of the Manager, the successor Manager shall be selected by Harbinger. The resignation or removal of the former Manager shall not affect such Manager's rights as a Member, if any, and shall not constitute a withdrawal of a Member.

Section 4.2   General Responsibilities of the Manager. Subject to the terms and conditions of this Agreement, the Manager shall have the power, authority and obligation to (i) manage the business and affairs of the Company in accordance with this Agreement, (ii) perform all other acts customary or incidental to the management of the Company, (iii) implement all Unanimous Actions that have been approved by the Members, and (iv) discharge the Company's obligations. The Manager accepts and agrees to perform its duties and undertake its responsibilities set forth in this Agreement, to act in good faith and in the best interests of the Company and (without limiting the generality of the foregoing) to exercise commercially reasonable efforts to carry out the intents and purposes of this Agreement. Subject to the terms and conditions of this Agreement, the Manager is, to the extent of its rights and powers set forth in this Agreement, a "manager" of the Company within the meaning of Section 18-101 of the LLC Act for the purpose of conducting the Company's business and the actions of the Manager taken in accordance with such rights and powers shall bind the Company.

Section 4.3   Budget. The Manager shall cause one or more of the Officers to prepare an annual budget for the Company (the "Budget") as set forth in such Officer's or Officers' Employment Agreement, which Budget shall be subject at all times to the approval of and revision by the Manager in its sole discretion.

Section 4.4   Additional Specified Rights of the Members. (a) Notwithstanding any provision of this Agreement to the contrary, the Manager shall not take or cause the Company or any Subsidiary to take any Unanimous Action, without in each instance first obtaining the approval of each of the Members therefor.

13

(b)   In addition to other rights reserved or granted to the Members in this Agreement or at law, each of the Members and its agents and representatives shall have the right, at any time and from time to time, upon reasonable notice (which shall not be deemed to require notice of more than three Business Days) and during normal business hours to:

(i)   review (x) the books and records required to be maintained under Article VII, and (y) any information and reports relating to the management, operations, policies or strategies of the Company or any Subsidiary; and

(ii)   discuss, provide advice and consult with the Manager with respect to the business, financial and other operations of the Company and/or any Subsidiary and any other matters materially affecting the business and affairs of the Company and/or any Subsidiary and submit business proposals or suggestions to the Manager from time to time.

Section 4.5    <u>Officers and Authorized Persons</u>.  (a)  The Manager may designate one or more individuals as officers or agents of the Company, who may but need not have titles, and shall exercise and perform such powers and duties as shall be assigned and delegated to them from time to time by the Manager.  Any such officer or agent (an "<u>Authorized Person</u>") may be removed by the decision of the Manager at any time, with or without cause.  Each Authorized Person shall hold office until his or her successor is elected and qualified, unless earlier removed in accordance with this Section 4.5.  Any number of offices may be held by the same individual.

(b)   The Authorized Persons, to the extent of their powers set forth in this Agreement or otherwise vested in them by action of the Manager not inconsistent with this Agreement, are agents of the Company for the purpose of the Company's business and the actions of the Authorized Persons taken in accordance with such powers shall bind the Company.

(c)   The Company hereby appoints the Persons set forth on <u>Schedule 4.5</u> hereto as Authorized Persons with the officer titles set forth on such schedule (the Authorized Persons set forth on such schedule, as updated from time to time by the Manager, the "<u>Officers</u>").  The Company or a Subsidiary shall enter into an employment agreement with each of the Officers (each, an "<u>Employment Agreement</u>").  The Officers shall have the non-exclusive right, power and authority, and the duty, to manage the day-to-day business and affairs of the Company in accordance with their respective Employment Agreements and consistent with the Budget, as more fully set forth in their respective Employment Agreements.  Each Officer shall be automatically removed as an Authorized Person of the Company immediately upon termination of his or her employment in accordance with his or her Employment Agreement.

Section 4.6    <u>Expenses</u>.  Except as otherwise provided in a Member's employment agreement (to the extent such Member is an employee of the Company or a Subsidiary), each of the Members shall be responsible for (a) its own formation and organizational expenses with respect to the entities constituting each of the Members and (b) its own costs and expenses incurred in connection with the due diligence, negotiation and execution of this Agreement.

Section 4.7    <u>Subsidiaries</u>.  All of the provisions of this Agreement regarding the management and governance of the Company shall apply to the management and governance of each Subsidiary, whether any such Subsidiary is managed or controlled directly or indirectly by

14

the Company, as member, manager or otherwise. Any action to be taken by any of the Subsidiaries shall for all purposes hereof be construed as an action taken by the Company and shall be subject to the same rights and limitations granted and imposed on the Members under this Agreement, subject to any additional rights and limitations granted or imposed in the governing documents of such Subsidiary. Any and all references herein to the Company, the Manager or any Member causing or directing any action on behalf of a Subsidiary shall be deemed to refer to the Company causing (or the Manager or such Member causing the Company to cause), in its capacity as member or manager of such Subsidiary, such action to be taken for and on behalf of such Subsidiary. In the event that the Company conducts its business through one or more Subsidiaries, the Manager shall perform, with no additional compensation, the same or substantially identical services for each such Subsidiary as the Manager performs for the Company, subject to the terms, conditions, limitations and restrictions set forth in this Agreement. The Manager agrees to perform such duties, and in such circumstances and with regard to such duties, the Manager shall be subject to the same standards of conduct and shall have the same duties and obligations in performing or such services on behalf of each such Subsidiary as are set forth in this Agreement. Without limiting the generality of the foregoing (and notwithstanding anything contained herein to the contrary), any action or decision to be taken or made by or on behalf of a Subsidiary that, if taken or made by or on behalf of the Company (a) would constitute a Unanimous Action, will require approval of the Members in accordance with this Agreement and (b) would otherwise require the direction or approval of one or more Members under this Agreement, will require the direction or approval of the same.

## ARTICLE V
### Profit Units and Capital Contributions

Section 5.1    Profit Units of the Company. A portion of each Member's Interest shall be denominated in unit increments ("Profit Units"). Unless otherwise determined by the Manager, Profit Units will not be certificated or issued to the Members, but will be recorded on the Company's books and records. Profit Units may be issued and may vest in fractional units. The initial Profit Units held by each of the Members as of the Effective Date are set forth on Schedule 3.1. All Profit Units shall be subject to vesting, cancellation and redemption as follows:

(a)    All Profit Units held by Harbinger shall vest immediately as of the Issuance Date.

(b)    For each Member other than Harbinger, all of such Member's Profit Units shall be unvested as of the Issuance Date. One third of such Member's Profit Units shall vest on each of the first, second and third anniversaries of the Issuance Date (each, a "Scheduled Vesting Date"), provided that:

(i)    Upon an Acceleration Event with respect to a Member, (w) if the Acceleration Event occurs prior to the third anniversary of the Issuance Date, a Ratable Portion of such Member's unvested Profit Units shall vest immediately as of the date of such Acceleration Event (and the applicable provisions of Section 6.6 shall apply), (x) any remaining unvested Profit Units held by such Member shall be canceled, (y) the Company shall redeem all of such Member's vested Profit Units (including the Profit Units that vested as of the date of

such Acceleration Event) for a redemption price equal to the Liquidation Value of such vested Profit Units, and (z) such Person shall cease to be a member of the Company.  For purposes hereof, "Ratable Portion" means (A) if the Acceleration Event occurs prior to the first anniversary of the Issuance Date, all of such Member's unvested Profit Units that are scheduled to vest on the first anniversary of the Issuance Date or (B) if the Acceleration Event occurs after the first anniversary of the Issuance Date, a fraction, the numerator of which is the number of days during the period commencing on the day after the last Scheduled Vesting Date to occur and ending on the date of the Acceleration Event and the denominator of which is the number of days during the period commencing on the day after the last Scheduled Vesting Date to occur and ending on the third anniversary of the Issuance Date.

        (ii)     Upon a Resignation Event with respect to a Member, (x) all of such Member's unvested Profit Units shall be canceled, (y) the Company shall redeem all of such Member's vested Profit Units for a redemption price equal to the Liquidation Value of such vested Profit Units, and (z) such Person shall cease to be a member of the Company.

        (iii)     Upon a Cause Event with respect to a Member, (x) all of such Member's Profit Units (whether or not vested) shall be canceled, and (y) such Person shall cease to be a Member of the Company.

        (iv)     Upon a Drag-Along Sale or a sale of all or substantially all of the Company Assets, all unvested Profit Units shall be deemed to have vested immediately prior to the consummation of such sale.

        (v)     The redemption price of any Profit Units redeemed under Sections 5.1(b)(i) or 5.1(b)(ii) shall be payable by the Company from Available Cash that would otherwise be distributed pursuant to Sections 6.4(b)(ii) and 6.4(b)(iii).  Notwithstanding Section 6.4(b), such redemption payments shall (i) be payable pari passu with any Distributions to be made pursuant to Section 6.4(b)(ii) in proportion to the amount owed to each current or former Member (i.e., Harbinger's outstanding Investment Account balance and each such former Member's unpaid redemption payments) and (ii) have priority over all Distributions to be made pursuant to Section 6.4(b)(iii).

        (c)     The Profit Units held by each Member other than Harbinger are intended to constitute the grant of a "partnership profits interest" for services provided or to be provided to or for the benefit of the Company, as contemplated by Revenue Procedure 93-27 as clarified by Revenue Procedure 2001-43 and such Profit Units shall be treated consistent therewith for federal income tax purposes.

        (d)     To the extent the Manager from time to time appoints additional Officers in accordance with Section 4.5, and such additional Officers do not hold any Profit Units, then a majority of the Officers serving prior to such appointment may authorize the issuance and granting of additional Profit Units to such additional Officers and determine the number of Profit Units to be granted to each such additional Officer, provided that (i) such issuance (together with the admission of such individuals as additional Members) shall be subject in all events to the approval, not to be unreasonably withheld, of the Manager, and (ii) no more than five (5)

C075532\0329724\1648200.4

additional Profit Units in total (with respect to all such additional Officers) may be authorized by the Officers pursuant to this Section 5.1(d).

Section 5.2    <u>Capital Contributions</u>.  (a)  The Members' initial Capital Contributions as of the Effective Date are set forth on <u>Schedule 3.1</u>.   Harbinger shall make additional Capital Contributions to the Company from time to time as it deems necessary or desirable in its sole discretion.  In addition, to the extent Harbinger or any of its Affiliates incurs any expenses on behalf of the Company (in Harbinger's capacity as Manager or otherwise), Harbinger shall be deemed to have made a Capital Contribution in the amount of such expenses at the time such expenses are incurred.

(b)    No Member shall be required to make a Capital Contribution except as expressly provided in this Agreement.

Section 5.3    <u>Priority and Return of Capital</u>.  No Member shall have priority over any other Member, whether for the return of a Capital Contribution or for Net Profits, Net Losses or a Distribution except as provided herein; provided, however, that this Section 5.3 shall not apply to any loan, guaranty, endorsement, collateral or other indebtedness (as distinguished from a Capital Contribution) given, made or incurred by a Member to the Company or any creditor of the Company or to any indebtedness of the Company to a Member in connection with any business transaction.

Section 5.4    <u>Withdrawal or Reduction of Capital Contributions</u>.  Except as otherwise expressly provided in this Agreement, no Member shall be entitled to demand or receive the return of its Capital Contributions.

Section 5.5    <u>Capital Accounts</u>.   A Capital Account shall be maintained for each Member.  Said Capital Account shall be kept in accordance with the provisions of Section 1.704-1(b)(2)(iv) of the Regulations.  Without limiting the foregoing, each Member's Capital Account shall be (a) increased by the net agreed value of each Capital Contribution made by such Member, allocations to such Member of the Net Profits and any other allocations to such Member of income pursuant to Section 6.2, and (b) decreased by the net agreed value of each Distribution made to such Member by the Company, allocations to such Member of Net Losses and other allocations to such Member pursuant to Section 6.2.  The Manager shall restate Capital Accounts upon any event for which such restatement is permitted pursuant to the Regulations promulgated under Code Section 704(b).

Section 5.6    <u>Transfers</u>.   Upon a permitted sale or other transfer of an Interest in the Company, the Capital Account of the Member transferring its Interest shall become the Capital Account of the Person to whom such Interest is sold or transferred in accordance with Section 1.704-1(b)(2)(iv) of the Regulations.

Section 5.7    <u>Deficit Capital Account</u>.   Notwithstanding anything to the contrary contained herein, no Member shall have any liability to restore all or any portion of a deficit balance in a Capital Account. A deficit balance in a Member's Capital Account is not an asset of the Company.

C075532\0329724\1648200.4

Section 5.8    Modifications.    The manner in which Capital Accounts are to be maintained pursuant to this Agreement is intended to comply with the requirements of Section 704(b) of the Code.  If the Manager determines in writing that the manner in which Capital Accounts are to be maintained pursuant to this Agreement should be modified to comply with Section 704(b) of the Code, then the method in which Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members.

ARTICLE VI
Allocations; Distributions

Section 6.1    Allocations of Profits and Losses.  For purposes of maintaining the Capital Accounts of the Company, Net Profits or Net Losses for any tax year (or portion thereof) shall be allocated among the Members, to the extent possible, in such a manner as to cause the balance in the Capital Account of each Member, as adjusted to reflect the allocations provided hereunder and the allocations under Section 6.2, to be equal to the aggregate amount of cash such Member would receive if the Company were liquidated and each asset of the Company were sold for an amount of cash equal to its respective Book Basis, all debt obligations were satisfied in accordance with their respective terms (limited with respect to each Company Nonrecourse Debt or Member Nonrecourse Debt to the Book Basis of the asset(s) securing such debt) and the remaining cash were distributed as provided in Section 6.4(b), assuming all amounts held in a Member's Collection Account were released from such Collection Account and paid to such Member.

Section 6.2    Required Special Allocations.  Notwithstanding the terms of Section 6.1:

(a)    Any Member Nonrecourse Deductions shall be specially allocated to the Member(s) that bear(s) the economic risk of loss with respect to the Member Nonrecourse Debt to which the Member Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Regulations.  Nonrecourse deductions shall be allocated among the Members in proportion to their Percentage Interests.

(b)    Appropriate allocations of income, gain, loss or deduction shall be made to the extent required to comply with the "qualified income offset" provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations, the Company "minimum gain chargeback" provisions of Section 1.704-2(f) of the Regulations, and the Member "minimum gain chargeback" provisions of Section 1.704-2(i)(4) of the Regulations, all issued pursuant to Section 704(b) of the Code. To the extent permitted by such Regulations, the allocations in such year and subsequent years shall be further adjusted so that the cumulative effect of all the allocations shall be the same as if all such allocations were made pursuant to Section 6.1 hereof without regard to Section 6.2(a) and this Section 6.2(b).

(c)    In the event any Member has a deficit Capital Account balance at the end of a Fiscal Year that is in excess of the sum of (i) the amount (if any) such Member is obligated to restore pursuant to the Agreement, and (ii) the amount (if any) such member is deemed to be obligated to restore pursuant to the Regulations, taking into account all other allocations and adjustments under this Agreement (made as if this Section 6.2(c) were not in this Agreement),

18

each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible.

(d)    Any Company Nonrecourse Deductions for a Fiscal Year shall be specially allocated to the Members in accordance with their Percentage Interests. Solely for purposes of determining a Member's proportionate share of any excess nonrecourse liability of the Company, as described in Regulation § 1.752-3(a)(3), the Members' interests in Company profits shall be deemed to coincide with their respective Percentage Interests.

(e)    Net Profits, Net Losses, income, gain, deductions and credits allocated to a Company interest transferred, issued, or reissued during a Fiscal Year shall be allocated to the Persons who were the holders of such Company interest during such Fiscal Year, using any method selected by the Manager to the extent permitted by the Code.

Section 6.3    Tax Allocations; Code Section 704(c).    (a)  Except as otherwise provided for in this Section 6.3, for federal income tax purposes, each item of income, gain, loss and deduction shall be allocated among the Members in the same manner as the correlative item of book income, gain, loss or deduction is allocated pursuant to Sections 6.1 and 6.2. In addition, in accordance with Code Section 704(c) and the Regulations thereunder, items of income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for U.S. federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted tax basis of such property at the time of contribution to the Company for U.S. federal income tax purposes and its initial Book Basis at the time of contribution using an allocation method in accordance with applicable Regulations determined by the Tax Matters Member.

(b)    In the event the Book Basis of any Company Asset is adjusted in accordance with the definition of Book Basis hereof, subsequent allocations of items of income, gain, loss, and deductions with respect to such asset shall take account of any variation between the adjusted tax basis of such asset for U.S. federal income tax purposes and its adjusted Book Basis in a manner consistent with the principles of Code Section 704(c) and the Treasury Regulations thereunder.

Section 6.4    Distributions.    (a)    The Manager shall from time to time distribute Available Cash in accordance with this Section 6.4. At such times as the Manager makes Distributions, it shall provide the Members with a statement setting forth in reasonable detail the manner in which the Distributions were calculated and determined. Notwithstanding any provisions to the contrary in this Agreement, the Company shall not make a Distribution if such Distribution would violate the LLC Act.

(b)    Distributions of Available Cash shall, subject to Sections 5.1(b)(v), 6.5, 6.6 and 8.3, be applied and distributed to the Members as follows:

(i)    First, such Available Cash shall be distributed to the Members in the ratio of their respective Preferred Return Account balances until each Member's Preferred Return Account has been reduced to zero;

(ii)      Second, any remainder of such Available Cash (after the distribution of such Available Cash in the manner described in clause (i) above) shall be distributed to the Members in the ratio of their respective Investment Account balances until each Member's Investment Account has been reduced to zero; and

(iii)     Thereafter, any remainder of such Available Cash (after the distribution of such Available Cash in the manner described in clauses (i) and (ii) above) shall be distributed to the Members in the ratio of their respective Profit Units; provided that any amounts to be distributed in respect of unvested Profit Units shall be transferred into the applicable Member's Collection Account to be held and released in accordance with Section 6.6.

(c)       Any reference in this Agreement to a Distribution pursuant to this Section 6.4 or any subsection thereof shall, as the context requires, include a corresponding Distribution pursuant to Section 8.3(e).

Section 6.5     Tax Loans.  Notwithstanding anything to the contrary herein, to the extent that actual Distributions made to each Member other than Harbinger with respect to a Tax Period are less than the product of forty percent (40%) multiplied by the taxable income allocated by the Company to such Member for such Tax Period, then within ten (10) days after the end of such Tax Period, the Company shall lend to such Member an amount equal to the lesser of (i) such shortfall less the principal amount of any loans previously made to such Member under this Section 6.5 with respect to such Tax Period or (ii) such Member's Tax Loan Cap less the principal amount of any loans previously made to such Member under this Section 6.5 with respect to such Tax Period.  Such borrowed amount shall be deemed a demand loan payable by such Member to the Company with interest at the short term applicable federal rate under Section 1274(d) of the Code.  The Manager may, in its sole discretion, either demand payment of the principal and accrued interest on such demand loan at any time, and enforce payment thereof by legal process, or may withhold from one or more Distributions or other payments owing to a Member under this Agreement amounts sufficient to satisfy such Member's obligations under any such demand loan.  Such demand loan automatically shall become due and payable in full immediately upon the occurrence of any Cause Event, Resignation Event or Acceleration Event. For purposes hereof, "Tax Loan Cap" means, with respect to any loan to be made pursuant to this Section 6.5, the product of:

(a)       the applicable Member's Profit Percentage, multiplied by

(b)       the positive difference (if any) of (x) the aggregate Available Cash with respect to the applicable Tax Period increased by the sum of all Distributions theretofore made therefrom plus any reinvested funds that would otherwise have been Available Cash with respect to such Tax Period, less (y) the sum of all Distributions theretofore made pursuant to Section 6.4(b)(i) with respect to such Tax Period plus the balance of Harbinger's Preferred Return Account following such Distributions.

Section 6.6     Collection Account.  The Company shall maintain for each Member an account or reserve to which funds shall be transferred in accordance with Section 6.4(b)(iii) and from which funds shall be released solely in accordance with this Section 6.6 (such Member's "Collection Account").  Upon a Scheduled Vesting Date or Acceleration Event with respect to a

Member's unvested Profit Units, all amounts held in such Member's Collection Account that were originally transferred in respect of such newly vested Profit Units shall be released to the holder of such Profit Units. The Company shall maintain records of the amounts transferred into each Collection Account in respect of each tranche of unvested Profit Units held by the applicable Member. Upon the cancellation of a Member's Profit Units in accordance with Section 5.1(b), all amounts held in such Member's Collection Account in respect of such newly canceled Profit Units shall be released to the Company and shall be deemed Available Cash.

Section 6.7    Offset. The Company may offset all amounts owing to the Company by a Member against any Distribution to be made to such Member.

Section 6.8    Interest on and Return of Capital Contributions. No Member shall be entitled to interest on its Capital Contribution or to a return of its Capital Contribution, except as specifically set forth in this Agreement.

Section 6.9    Withholding. With respect to any withholding tax or other similar tax liability or obligation to which the Company may be subject as a result of any act or status of any Member or to which the Company becomes subject with respect to any Interest, the Company shall have the right to withhold amounts of Available Cash otherwise distributable to such Member, to the extent of the amount of such withholding tax or other similar tax liability or obligation. The Company shall have a right of set off against any such Distributions of Available Cash in the amount of such withholding tax or other similar tax liability or obligation. For purposes of this Agreement, any amount of federal, state or local tax that is withheld by the Company with respect to any amount distributable by the Company to any Member shall be deemed to be a Distribution to such Member and shall reduce the amount otherwise distributable to such Member under this Agreement. The Company agrees to pay such amount of federal, state or local tax withheld by the Company with respect to any amount distributable by the Company to any Member to the appropriate federal, state or local taxing authority on such Member's behalf.

ARTICLE VII
Taxes; Books and Records; Information

Section 7.1    Tax Returns. The Manager shall cause to be prepared and filed all necessary federal, state and local income tax returns for the Company (and each Subsidiary). Each Member shall furnish to the Manager all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed.

Section 7.2    Tax Elections. The Company (and each Subsidiary's) tax returns shall include such elections, and shall otherwise be completed, as the Manager shall determine. Neither the Company nor any Member may make an election for the Company or any Subsidiary to be taxed as a corporation under the Code or any similar provisions of applicable state law, and no provisions of this Agreement shall be interpreted to authorize any such election.

Section 7.3    Tax Matters Member. Harbinger shall be the "tax matters member" of the Company pursuant to Section 6231(a)(7) of the Code (the "Tax Matters Member"), and is hereby

21

authorized and required to represent the Company (at the expense of the Company) in connection with all examinations of the affairs of the Company by tax authorities.

Section 7.4    <u>General Accounting Matters</u>.    On behalf of the Company, the Manager shall keep or cause to be kept books and records pertaining to the Company's (and each Subsidiary's) business showing all of its assets and liabilities, receipts and disbursements and all transactions entered into by the Company (or such Subsidiary).    Such books and records, and all supporting data, of the Company (and each Subsidiary) shall be kept at the office of the Company and the Members and their representatives shall at all reasonable times have free access thereto for the purpose of inspecting or copying the same.    The Company's (and each Subsidiary's) books of account shall be kept on an accrual method of accounting  and otherwise in accordance with the Required Accounting Standards.    Unless otherwise determined by Harbinger, the quarterly financial statements of the Company shall be reviewed and the year end financial statements of the Company shall be audited at the Company's cost by an independent third party accounting firm designated by Harbinger.    Without limiting the foregoing or the information available to Harbinger under Section 7.5, the Company shall deliver the following financial information to Harbinger (i) no later than the dates set forth below, and (ii) in such form as reasonably requested by Harbinger to comply with its or its Affiliates' reporting obligations, which shall mean, at a minimum, that the financial information shall either be presented in accordance with the Required Accounting Standards or in a manner to permit Harbinger to convert such information into the Required Accounting Standards without incurring material cost or delay:

(a)    Monthly, unaudited management reports, within 14 days after the end of each month;

(b)    Quarterly unaudited consolidated financial statements of the Company and a management's discussion and analysis of such financial statements, within 14 days after the end of each fiscal quarter; and

(c)    Annual consolidated financial statements of the Company and a management's discussion and analysis of such financial statements, accompanied by the audit report of the auditor within 45 days after the end of each Fiscal Year; provided, however, that in the event that Harbinger or its Affiliate reports financial results and financial position of the Company as a consolidated subsidiary, then the Company shall use commercially reasonable efforts to provide the foregoing financial information and access to Harbinger's independent outside auditor on such shorter time frames as Harbinger may reasonably specify taking into account Harbinger and its Affiliates' applicable periodic reporting obligations under the Exchange Act.

Section 7.5    <u>Information</u>.  A Member may inspect during ordinary business hours and at the principal place of business of the Company the Certificate, this Agreement, any tax returns of the Company for the immediately preceding three (3) Fiscal Years, and all other business records in the possession of the Company; provided that such inspection does not unreasonably interfere with the day-to-day operations of the Company and is for a purpose reasonably related to the Member's Interest in the Company, and is at reasonable times on reasonable notice.  At the request of Harbinger, the Manager will furnish promptly to Harbinger and/or its representatives

C075532\0329724\1648200.4

all information concerning the business and properties of the Company, including financial information, as Harbinger and/or its representatives reasonably request to comply with Harbinger or its affiliates' disclosure obligations, including disclosure pursuant to any applicable securities laws (including Harbinger's or its Affiliates' reporting obligations under Sections 13(a) and 15(d) of the Exchange Act), any offering of such Person's securities (including customary assistance in connection with underwritten offerings) or any disclosure required or requested by any Governmental Entity or in response to a valid request for information in a subpoena, court order or as otherwise required by applicable law.

Section 7.6    <u>Financial Compliance</u>.  (a)  The Company shall take all actions at the Company's cost that Harbinger may deem necessary or appropriate to enable the Company to satisfy its financial reporting obligations, including the applicable obligations under Sections 302, 404 and 906 of the Sarbanes-Oxley Act of 2002 and the rules and regulations promulgated by the Securities and Exchange Commission (the "<u>SEC</u>") pursuant thereto (collectively, as amended from time to time, the "<u>SOA</u>") and the other requirements of the SOA with respect to the Company, including establishing and maintaining adequate disclosure controls and procedures and internal controls over financial reporting, as such terms are defined in the SOA.

(b)    At the request of Harbinger, the Company shall provide Harbinger with one or more certificates containing reasonable representations and warranties regarding the information provided to Harbinger pursuant to Sections 7.4, 7.5 and 7.9, including (a) that financial information was, as of the date presented, prepared in accordance with the Required Accounting Standards and applied on a consistent basis throughout the periods presented, and fairly presented in all material respects the financial position and consolidated results of the Company as of the date presented, (b) that all other information did not, as of the date provided, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading and (c) that the Company is in compliance with the requirements of Sections 302, 404 and 906 of the SOA.

Section 7.7    <u>Bank Accounts</u>.  All receipts, funds and income of the Company or any Subsidiary shall be deposited in the name of the Company in such banks or other financial institutions as are determined by the Manager.  Withdrawals from said banks or other financial institutions (including the writing of checks or making wire transfers therefrom) shall be made only on signatures of such person or persons as shall be authorized by the Manager.

Section 7.8    <u>Accounting Period</u>.  The accounting period of the Company shall be the Fiscal Year.

Section 7.9    <u>Managed Funds</u>.  To the extent the Company manages funds of Harbinger or Harbinger is required to consolidate the financial position, results of operation and cash flows of any pooled investment vehicle to which the Company provides management services (each a "<u>Fund</u>") or reports its investment in such Fund on the equity method in accordance with Required Accounting Standards, the Company shall cause such Fund to establish and implement all accounting, financial reporting and bookkeeping policies and procedures, and to prepare and deliver all tax, accounting, financial and other information, at the Company's cost, in such form and manner and at such times as Harbinger may request (in its sole discretion) to enable

Harbinger to satisfy its tax, accounting, financial reporting, bookkeeping and other obligations under applicable laws, rules and regulations (including those of the SEC) and its obligations under the SOA.

## ARTICLE VIII
### Dissolution

Section 8.1    Dissolution.    The Company shall be dissolved and subsequently terminated upon the occurrence of the first of the following events:

(a)    decision of the Manager to dissolve and subsequently terminate the Company;

(b)    any other event that terminates the continued membership of any Member, but only if all of the remaining Members agree in writing to dissolve the Company;

(c)    the entry of a decree of judicial dissolution under the LLC Act;

(d)    the occurrence of any other event of dissolution under the provisions of this Agreement or, subject to the provisions of this Agreement to the contrary, the LLC Act; and

(e)    if all or substantially all of the Company Assets are sold or otherwise disposed of and the proceeds thereof distributed.

Section 8.2    Winding-up.    When the Company is dissolved, the business and property of the Company shall be wound up and liquidated by the Liquidator.  The Liquidator shall use its best efforts to reduce to cash and cash equivalent items such Company Assets as the Liquidator shall deem it advisable to sell, subject to obtaining fair value for such assets and any tax or other legal considerations.

Section 8.3    Final Distribution.    Upon winding up of the Company, the assets of the Company shall be distributed in the following manner and order:

(a)    to the payment of the expenses of the winding-up, liquidation and dissolution of the Company;

(b)    to pay all creditors of the Company, other than Members, either by the payment thereof or the making of reasonable provision therefor;

(c)    to the setting up of any reserves which the Liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company as provided in Section 18-804(b) of the LLC Act and, subject to such Section 18-804(b), at the expiration of such period as the aforesaid person or persons may deem advisable, for distribution in the manner hereinafter provided;

(d)    to pay, in accordance with the provisions of this Agreement applicable to such loans or in accordance with the terms agreed among them and otherwise on a pro rata basis,

all creditors of the Company that are Members, either by the payment thereof or the making of reasonable provision therefor; and

> (e)	the remaining assets of the Company shall be applied and distributed to the Members in accordance with Section 6.4(b).

Section 8.4	Termination.	The Company shall terminate when all of the assets of the Company have been distributed in the manner provided for in this Article VIII, and the existence of the Company shall have been terminated in the manner required by the LLC Act.	The Liquidator (or Members if necessary) shall take all other actions as may be necessary to terminate the Company.

Section 8.5	Claims of the Members.	Current Members and former Members shall look solely to the Company's assets for the return of their Capital Contributions, and if the assets of the Company remaining after payment of or due provision for all debts, liabilities and obligations of the Company are insufficient to return such Capital Contributions, the Members and former Members shall have no recourse against the Company or any other Member or former Member.

ARTICLE IX
Transfer of Members' Interests

Section 9.1	Restrictions on Transfer of Company Interests.	(a)	Except for Permitted Transfers, no Member may, directly or indirectly, assign, sell, exchange, transfer, pledge, hypothecate or otherwise dispose of all or any part of its Interest (or permit any of the foregoing to occur), including any direct or indirect interest (whether legal or beneficial) in such Member (any such assignment, sale, exchange, transfer, pledge, hypothecation or other disposition of an Interest or a direct or indirect interest in a Member being herein collectively called a "Transfer") to any Person without the prior approval of the Manager.	In the event of a partial Transfer of an Interest that is effectuated in accordance with the provisions hereof, such Transferee shall, for the purposes of this Article IX, be treated, together with the Member who transferred such Interest to the Transferee, as a single entity, with such transferor Member having the authority to make elections and give notices hereunder on behalf of such transferor Member and Transferee.	Any such partial Transferee will be bound by the elections made by such transferor Member.

> (b)	Upon any Transfer of a Member's Interest in the Company in compliance with this Article IX, the Person (the "Transferee") to whom the Member's Interest was Transferred shall be admitted as a Member upon the Transferee's written acceptance and adoption of all of the terms and provisions of this Agreement and delivery to the Manager by the transferring Member and its Transferee of any other documents and instruments, including any legal opinions, reasonably requested by the Manager.	For all purposes hereof, the terms "Harbinger", "MK," "RK," "AM," "MP" or "DO" shall be deemed to include any Transferee of such Member.

> (c)	Notwithstanding the foregoing, no Transfer or substitution shall be recognized if the Manager reasonably believes that such Transfer or substitution would pose a

material risk that the Company will be treated as a "publicly traded partnership" within the meaning of Section 7704 of the Code and the regulations promulgated thereunder.

Section 9.2    Other Transfer Provisions.  (a)  Any purported Transfer by a Member of all or any part of its Interest in violation of this Article IX shall be null and void and of no force or effect.

(b)    Except as provided in this Article IX, no Member shall have the right to withdraw from the Company prior to its termination and no additional Member may be admitted to the Company unless approved by the Manager.  In the event that a Member purports to resign as a Member, such Member shall not be entitled to receive any Distributions or fees and shall not otherwise be entitled to receive value for or in respect of its Interest except as otherwise expressly provided herein.  Notwithstanding any provision of this Agreement to the contrary, a Member may not Transfer all or any part of its Interest if such Transfer would jeopardize the status of the Company as a partnership for federal income tax purposes, or would violate, or would cause the Company to violate, any applicable law or regulation, including any applicable federal or state securities laws or any document or instrument evidencing indebtedness of the Company secured by the Company Assets.

(c)    Concurrently with the admission of any substitute or additional Member, the Members shall forthwith cause any necessary papers to be filed and recorded and notice to be given wherever and to the extent required showing the substitution of a Transferee as a substitute Member in place of the Member Transferring its Interest, or the admission of an additional Member, all at the expense, including payment of any professional and filing fees incurred, of such substituted or additional Member.  The admission of any person as a substitute or additional Member shall be conditioned upon such person or entity's written acceptance and adoption of all the terms and provisions of this Agreement.

(d)    If any Interest of a Member is Transferred during any accounting period in compliance with the provisions of this Article IX, each item of income, gain, loss, expense, deduction and credit and all other items attributable to such Interest for such period shall be divided and allocated between the transferor and the transferee by taking into account their varying Interests during such period in accordance with Section 706(d) of the Code, using any conventions permitted by law and selected by the Manager.  All Distributions on or before the date of such Transfer shall be made to the transferor, and all Distributions thereafter shall be made to the transferee.  Solely for purposes of making such allocations and Distributions, the Company shall recognize a Transfer on the date that the Manager receives notice of the Transfer which complies with this Article IX from the Member Transferring its Interest.

(e)    If a Member Transfers its Interest in accordance with this Agreement, then, at the election of such Member, the Company will make a Section 754 election under the Code.

Section 9.3    Drag-Along Rights.  (a)  Harbinger shall have the right to cause a Drag-Along Sale pursuant to this Section 9.3 at any time.  In the event of any such Drag-Along Sale, each Member other than Harbinger (i) will consent to and raise no objections against a Drag-Along Sale or the process pursuant to which the Drag-Along Sale was arranged and (ii) sell its

Interest on the terms and conditions of the Drag-Along Sale; provided that in the case of any Drag-Along Sale: (A) the terms and conditions of the Drag-Along Sale provide that the purchase of the Interests of each of the non-Harbinger Members shall be upon terms and conditions not worse for each such non-Harbinger Member than the terms and conditions of the purchase of the Interest of Harbinger; and (B) each non-Harbinger Member's liability in any Drag-Along Sale shall not bear more than its proportionate share of the aggregate liability of all Members in any Drag-Along Sale.

(b)    Upon the completion of a Drag-Along Sale, the Members will be entitled to receive all the amounts they would have received if the Company had sold all the Company Assets for the purchase price of the Drag-Along Sale and the proceeds of such sale were distributed in accordance with Section 8.3.  Each Member will take all necessary and desirable actions as directed by Harbinger in connection with the consummation of any Drag-Along Sale, including executing the applicable agreements.  Each of Harbinger and the non-Harbinger Members shall bear its respective portion of all transactions costs associated with such Drag-Along Sale, whether or not any Drag-Along Sale is actually consummated, in the ratio of their respective Profit Units.

ARTICLE X
Miscellaneous

Section 10.1    Representations and Covenants by the Members.    Each Member represents, warrants, covenants, acknowledges and agrees that:

(a)    It is either (i) a corporation, limited liability company or partnership, as applicable, duly organized or formed and validly existing and in good standing under the laws of the state of its organization or formation or (ii) an individual; it has all requisite power and authority to enter into this Agreement, to acquire and hold its Interest and to perform its obligations hereunder; and the execution, delivery and performance of this Agreement has been duly authorized.

(b)    This Agreement and all agreements, instruments and documents herein provided to be executed or caused to be executed by it are duly authorized, executed and delivered by and are and will be binding and enforceable against it.

(c)    Neither (i) the execution and delivery of this Agreement and the performance of its obligations hereunder nor (ii) the origination or acquisition by the Company or any Subsidiary of any Loan will conflict with, result in a breach of or constitute a default (or any event that, with notice or lapse of time, or both, would constitute a default) or result in the acceleration of any obligation under any of the terms, conditions or provisions of any other agreement or instrument to which it (or any of its Affiliates) is a party or by which it (or any of its Affiliates) is bound or to which any of its (or any of its Affiliate's) property or assets are subject, conflict with or violate any of the provisions of its organizational documents, or violate any statute or any order, rule or regulation of any Governmental Entity, that would materially and adversely affect the performance of its duties hereunder; such Member has obtained any consent, approval, authorization or order of any court or governmental agency or body required for the execution, delivery and performance by such Member of its obligations hereunder.

(d)     There is no action, suit or proceeding pending or, to its knowledge, threatened against it in any court or by or before any other Governmental Entity that would prohibit its entry into or performance of this Agreement.

(e)     This Agreement is a binding agreement on the part of such Member enforceable in accordance with its terms against such Member.

(f)     It has been advised to engage, and has engaged, its own counsel (whether in-house or external) and any other advisors it deems necessary and appropriate.  By reason of its business or financial experience, or by reason of the business or financial experience of its own attorneys, accountants and financial advisors (which advisors, attorneys and accountants are not Affiliates of the Company or any other Member), it is capable of evaluating the risks and merits of an investment in the Interest and of protecting its own interests in connection with this investment.  Nothing in this Agreement should or may be construed to allow any Member to rely upon the advice of counsel acting for another Member or to create an attorney-client relationship between a Member and counsel for another Member.

(g)     (i) each Person owning a 10% or greater interest in such Member (A) is not currently identified on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury (or any other similar list maintained by the Office of Foreign Assets Control pursuant to any authorizing statute, executive order or regulation) and (B) is not a Person with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of U.S. law, regulation, or executive order of the President of the United States, and (ii) such Member has implemented procedures, and will consistently apply those procedures, to ensure the foregoing representations and warranties remain true and correct at all times.

(h)     It acknowledges and agrees that Bryan Cave LLP serves as counsel to Harbinger, and that Bryan Cave LLP does not serve as counsel to any other Member.  Each Member other than Harbinger acknowledges and agrees that it does not have an attorney-client relationship with Bryan Cave LLP, and that no such relationship will arise in the course of the Company's existence or dissolution by any means.  It also acknowledges that Bryan Cave LLP may represent the Company following the Effective Date.  Each Member has been given an opportunity to evaluate Bryan Cave LLP's role as described in this Section 10.1(h), and to consider any conflict of interest which may develop therefrom.  Each Member has been advised to seek independent counsel to advise it as to this waiver of conflict.  After consultation with such independent counsel, each Member hereby consents to Bryan Cave LLP's representation of the Company and Harbinger.

(i)     It shall comply with all requirements of law relating to money laundering, anti-terrorism, trade embargos and economic sanctions, now or hereafter in effect and shall immediately notify the other Members in writing if it becomes aware that any of the foregoing representations, warranties or covenants are no longer true or have been breached or if the Member has a reasonable basis to believe that they may no longer be true or have been breached.

Section 10.2   Arbitration.  (a)  Each of the Members agrees to arbitrate any controversy or claim arising out of this Agreement or otherwise relating to the Members' Interests.

C075532\0329724\1648200.4

(b)     Any such controversy or claim shall be fully and finally resolved in confidential, binding arbitration to the fullest extent permitted by law. Such arbitration proceeding shall take place in the State of New York, City of New York, before a single arbitrator in accordance with the applicable Rules of the American Arbitration Association ("AAA"). The arbitrator may grant specific performance in addition to monetary damages. The arbitrator shall not have the authority to modify or change any of the terms of this Agreement. Notwithstanding any provision of the Rules of the AAA to the contrary but subject to Section 10.15, each Member shall each be responsible for paying its or his attorney's fees and costs in such arbitration to the fullest extent permitted by law. The arbitrator's award shall be final and binding upon the parties.

(c)     If any portion of this arbitration provision is determined by a court of competent jurisdiction to be unenforceable, such determination will not affect the remainder of this arbitration provision. If, however, a court of competent jurisdiction determines that a party's claim is not arbitrable, then the parties waive, to the fullest extent permitted by law, their right, if any, to a trial by jury of any such claim arising out of or in connection with this Agreement or each Member's Interest.

Section 10.3   Equitable Relief.  The Members hereby confirm that damages at law may be an inadequate remedy for a breach or threatened breach of this Agreement and agree that, in the event of a breach or threatened breach of any provision hereof, the respective rights and obligations hereunder shall (in addition to remedies at law) be enforceable by specific performance, injunction or other equitable remedy, but, nothing herein contained is intended to, nor shall it, limit or affect any right or rights at law or by statute or otherwise of a Member aggrieved as against the other for a breach or threatened breach of any provision hereof, it being the intention of this Section 10.3 to make clear the agreement of the Members that the respective rights and obligations of the Members hereunder shall be enforceable in equity as well as at law or otherwise and that the mention herein of any particular remedy shall not preclude a Member from any other remedy it or he might have, either in law or in equity.

Section 10.4   Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.  In particular, the Company is formed pursuant to the LLC Act, and the rights and liabilities of the Members shall be as provided therein, except as herein otherwise expressly provided.

Section 10.5   Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their respective successors and permitted assigns.

Section 10.6   Notices.  Whenever notice is required or permitted by this Agreement to be given, such notice shall be in writing and shall be given to any Member or Manager at its address (including via electronic mail) or facsimile number shown either in the Company's books and records or on Schedule 3.1 hereto.  Each such notice shall be effective (i) if given by facsimile or electronic mail, upon transmission, (ii) if given by mail, on the 4th day after deposit in the mails (certified or registered return receipt requested) addressed as aforesaid, (iii) if given by overnight courier service, when received and (iv) if given by any other means, when delivered to and receipted for at the address of such Member or Manager specified as aforesaid.

Section 10.7  <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, all of which together shall constitute a single instrument. In addition, the parties may execute this Agreement by telecopy or other facsimile machine and such facsimile signature shall be deemed an original.

Section 10.8  <u>Entire Agreement</u>.  This Agreement embodies the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein.  There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein.  This Agreement supersedes all prior agreements and understandings between the parties with respect to such subject matter hereof.

Section 10.9  <u>Amendments</u>.  Any amendment to this Agreement shall be effective if such amendment is evidenced by a written instrument duly executed and delivered by each Member, except that Harbinger may unilaterally adopt amendments to this Agreement so long as adoption of such amendment does not constitute a Unanimous Action.

Section 10.10  <u>Waivers</u>.  No waiver of any breach of any term of this Agreement shall be effective unless made in writing signed by the party against whom enforcement of the waiver is sought, and no such waiver of any breach of that term or any other term of the same or different nature shall be construed as a waiver of any subsequent breach of that term of the same or different nature.

Section 10.11  <u>Severability</u>.  It is the express intention of the parties that the agreements contained herein shall have the widest application possible.  If any agreement contained herein is found by a court having jurisdiction to be unreasonable in scope or character, the agreement shall not be rendered unenforceable thereby, but rather the scope or character of such agreement shall be deemed reduced or modified with retroactive effect to render such agreement reasonable and such agreement shall be enforced as thus modified.  If the court having jurisdiction will not review the agreement, then the parties shall mutually agree to revise the unenforceable provision to as close as permitted by law to the provision declared unenforceable.  The parties further agree that in the event a court having jurisdiction determines, despite the express intent of the parties, that any portion of any covenant or agreement contained herein is not enforceable, the remaining provisions of this Agreement shall nonetheless remain valid and enforceable.

Section 10.12  <u>No Partition</u>.  The Members hereby waive any right of partition they may have with respect to any assets of the Company, now existing or hereafter acquired.

Section 10.13  <u>Exhibits and Schedules</u>.  The Schedules and Exhibits attached hereto are hereby incorporated herein and made a part of this Agreement.

Section 10.14  <u>Further Action</u>.  The parties shall execute and deliver all documents, provide all information and take or refrain from taking action as may be necessary or appropriate to achieve the purposes of this Agreement.

Section 10.15  <u>Cumulative Remedies; Prevailing Party</u>.  The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive its right to use any or all other remedies.  Said rights and remedies are given in addition to any other rights the parties may have by law or otherwise.  If any

Member seeks judicial enforcement of its rights under this Agreement, the prevailing party in any such action shall be entitled to recover its costs incurred in such action, including reasonable attorneys' fees.

Section 10.16 <u>Rules of Construction</u>. Section titles are for descriptive purposes only and shall not control or alter the meaning of this Agreement as set forth in the text hereof. This Agreement is not subject to the principle of construing its meaning against the party that drafted it, and each Member acknowledges that it was represented by its own counsel in connection with its negotiation and drafting. Wherever in this Agreement the Manager or any Member is permitted or required to make a decision or determination (including any direction, vote, election, action, consent or approval), (i) the Manager or Member may make that decision or determination in its sole and absolute discretion (except as otherwise expressly provided herein), and (ii) without limiting the generality of the foregoing, in making such decision or determination, the Manager or Member is entitled to consider, favor and further only such interests and factors as it desires, including its own interests, and has no duty or obligation to consider, favor or further any other interest of the Company, any Subsidiary or any other Member.

Section 10.17 <u>No Third Party Beneficiaries</u>. No provision of this Agreement (including any obligation of any Member to make Contributions) shall be interpreted as bestowing any rights whatsoever upon any third party.

Section 10.18 <u>Time of the Essence</u>. Time is of the essence as to the parties' obligations under this Agreement.

**[Remainder of Page Intentionally Left Blank]**

C075532\0329724\1648200.4

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

MEMBERS:

**HGI ASSET MANAGEMENT HOLDINGS, LLC**

By: _____

    Name:    IAN ESTUS

    Title:    AUTHORIZED SIGNATORY

_____

**Macy L. Kiley**

_____

**Robert F. Kuppens**

_____

**Andrew H. Moser**

_____

**Marc S. Price**

_____

**Daniel F. O'Rourke**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

MEMBERS:

**HGI ASSET MANAGEMENT HOLDINGS, LLC**

By: _____
    Name:
    Title:


_____
Macy L. Kiley


_____
Robert F. Kuppens


_____
Andrew H. Moser


_____
Marc S. Price


_____
Daniel F. O'Rourke

<u>Schedule 1.1</u>

<u>Certain Employment-Related Defined Terms</u>

If a Member who is also an employee of the Company (or a Subsidiary) does not have an employment agreement, or if the any of the following defined terms are not defined in such employee's employment agreement, then any such undefined terms shall have the following meanings for purposes of this Agreement, provided, however, if the employment agreement substantively addresses a defined term in different language, the employment agreement shall apply. For purposes of this Schedule 1.1, if such employee is employed by a Subsidiary and not the Company itself, all references below to "the Company" shall mean such Subsidiary.

"<u>Disability Termination</u>" means the termination by the Company of an employee's employment with the Company following the employee's failure, because of illness, accident or any other physical or mental incapacity (a "Disability"), to perform the essential functions of the employee's position for three consecutive months or an aggregate of any 65 business days within any 12 month period, subject to reasonable accommodation provisions of applicable laws.

"<u>Termination for Cause</u>" means the termination by the Company of the employee's employment with the Company upon the occurrence of any of the following:

(a)    the employee's commission of a felony or other crime involving fraud, dishonesty or moral turpitude;

(b)    the employee's breach of duty of loyalty, willful dishonesty, or gross negligence in the performance of the employee's duties with respect to the employee's position;

(c)    the commission by the employee of an act of fraud or embezzlement against the Company, Harbinger Group Inc. or its direct or indirect subsidiaries (the "<u>HRG Group</u>");

(d)    the employee's conviction of, or plea of nolo contendre to, a criminal offense that (i) is a felony, or (ii) could result in imprisonment;

(e)    the employee's absenteeism for any reason, other than for authorized vacation or because of a Disability, for a period in excess of five working days total in any six (6) month period, provided that this provision shall be applied so as not to conflict with any applicable state or federal laws;

(f)    the knowing and intentional failure on the part of the employee to perform any of the material duties of the employee's position and the employee's failure to cure such failure within 10 business days after the receipt of notice from the Company of such failure (for purposes of clarity, a termination based upon (i) the employee's inability to perform such duties because of a Disability; (ii) the employee's performance of such duties which produces results that are unsatisfactory to the Company, or (iii) the employee's performance of such duties in a manner which is unsatisfactory to the Company do not constitute a "Termination for Cause" pursuant to this clause (f));

(g)    the employee's knowing and intentional failure or refusal to follow the Company's rules, regulations, or policies or instructions of the Company, and the employee's failure to cure such failure or refusal within 10 business days after the receipt of notice from the Company of such failure or refusal;

(h)    in the course of employee's employment with the Company, the employee violates any agreement entered into by the employee with any third party, or provides the Company with any confidential information, trade secrets, or property of any former employer of the employee;

(i)    the existence of any agreement entered into by the employee with any third party that restricts the performance of the employee's duties on behalf of the Company, where such agreement was not disclosed to the Company before the employee commenced employment with the Company;

(j)    the violation by the employee of any of the employee's obligations pursuant to any applicable non-solicitation or non-competition covenants agreed to by the employee in connection with the employee's employment with the Company;

(k)    the employee, in any fashion, form, or manner, either directly or indirectly divulges, discloses, or communicates to any third party or makes use of, directly or indirectly, for the employee or for others in any manner whatsoever any information, material or data of any kind, nature, or description that affects or relates to the business of the Company and/or the HRG Group and that has not been disclosed by the Company and/or the HRG Group to the general public ("Confidential Information"), except (i) if required to be disclosed by judicial, arbitral or governmental order or process or operation of law, in which event the employee shall as soon as reasonably practicable, and in all instances prior to making any disclosure, notify the Company of the requirement of disclosure and comply with any protective order or other limitation on disclosure obtained by the Company; (ii) in performance of the employee's duties on behalf of the Company; or (iii) to those authorized by the Company to know and only to the extent that there is a need to know in the course of their employment and/or carrying out their duties on behalf of the Company.  Confidential Information includes, solely by way of illustration and not limitation, financial plans; data; forecasts; strategic analyses; the names of borrowers, customers, clients and investors (prior, existing or prospective) and information provided by or relating to such borrowers, customers, clients and investors; financial and credit analyses; trade secrets or the working of any process, technology, invention or methods carried on or used by the Company and/or the HRG Group; the terms of loans or potential loans; personnel information; and legal affairs; and

(l)    being under the influence of alcohol or non-prescription illegal drugs at work.

"Termination for Good Reason" means the termination by an employee of such employee's employment with the Company for any of the following conditions, provided (A) the employee delivers a written notice to Company within 90 days of the initial existence of such condition that specifies such condition and states the employee's intent to end the employee's relationship with the Company because of such condition; (B) the Company does not within 30

C075532\0329724\1648200.4

days of such notice remedy such condition; and (C) the employee resigns within 30 days of the expiration of such cure period: (i) a change in the principal location at which the employee provides services to the Company to a location which is not within 50 miles of Boston, MA, without the employee's prior written consent; (ii) a reduction in, or failure to timely pay, the employee's salary; or (iii) any material breach of the provisions of this Agreement that provide for distributions to the employee in the employee's capacity as a Member.

"Termination without Cause" means any termination by the Company of an employee's employment with the Company that is not a Termination for Cause or a Disability Termination.

"Termination without Good Reason" means any termination by an employee of such employee's employment with the Company that is not a Termination for Good Reason.

Schedule 3.1

Members; Initial Capital Contributions; Initial Profit Units

| Member | Initial Capital Contribution | Initial Profit Units |
|---|---|---|
| **HGI Asset Management Holdings, LLC**<br>c/o Harbinger Group, Inc.<br>450 Park Avenue, 27th Floor<br>New York, New York 10022<br>Attn: Francis T. McCarron<br>Email: fmccarron@Harbingergroupinc.com<br>Fax: (212) 906-8559<br><br>**with a copy to:**<br>Bryan Cave LLP<br>1290 Avenue of the Americas<br>New York, New York 10104<br>Attn: Tara Newell, Esq.<br>Email: tara.newell@bryancave.com<br>Fax: (212) 261-9884 | $100,000.00 | 80.0 |
| **Macy L. Kiley**<br>137 Shingle Mill Lane<br>Hanover, Massachusetts 02339<br>Email: mktwoo@gmail.com<br>Fax: n/a<br><br>**with a copy to:**<br>Greenfield Stein & Senior, LLP<br>600 Third Avenue, 11th Floor<br>New York, New York 10016<br>Attn: Paul T. Shoemaker, Esq.<br>Email: PShoemaker@gss-law.com<br>Fax: (212) 818-1264 | $0 | 1.5 |

C075532\0329724\1648200.4

| | | |
|---|---|---|
| **Robert F. Kuppens**<br>39 Homeward Lane<br>Walpole, Massachusetts 02081<br>Email: Rfkuppens@gmail.com<br>Fax: (508) 660-1527<br><br>**with a copy to:**<br>Greenfield Stein & Senior, LLP<br>600 Third Avenue, 11th Floor<br>New York, New York 10016<br>Attn: Paul T. Shoemaker, Esq.<br>Email: PShoemaker@gss-law.com<br>Fax: (212) 818-1264 | $0 | 1.5 |
| **Andrew H. Moser**<br>12 Dover Drive<br>Walpole, Massachusetts 02081<br>Email: amoser@saluscapital.com<br>Fax: (508) 668-8132<br><br>**with a copy to:**<br>Greenfield Stein & Senior, LLP<br>600 Third Avenue, 11th Floor<br>New York, New York 10016<br>Attn: Paul T. Shoemaker, Esq.<br>Email: PShoemaker@gss-law.com<br>Fax: (212) 818-1264 | $0 | 4.0 |
| **Marc S. Price**<br>6 Kesseler Way<br>Chestnut Hill, Massachusetts 02467<br>Email: mprice@h-pmgmt.com<br>Fax: n/a<br><br>**with a copy to:**<br>Greenfield Stein & Senior, LLP<br>600 Third Avenue, 11th Floor<br>New York, New York 10016<br>Attn: Paul T. Shoemaker, Esq.<br>Email: PShoemaker@gss-law.com<br>Fax: (212) 818-1264 | $0 | 4.0 |

C075532\0329724\1648200.4

| | | |
|---|---|---|
| **Daniel F. O'Rourke**<br>128 Brooks Avenue<br>Arlington, Massachusetts 02474<br>Email: danorourke@yahoo.com<br>Fax: n/a<br><br>**with a copy to:**<br>Greenfield Stein & Senior, LLP<br>600 Third Avenue, 11th Floor<br>New York, New York 10016<br>Attn: Paul T. Shoemaker, Esq.<br>Email: PShoemaker@gss-law.com<br>Fax: (212) 818-1264 | $0 | 4.0 |

C075532\0329724\1648200.4

Schedule 4.1(a)

Unanimous Actions

1.  Changing the legal structure or purpose of the Company.

2.  Modifying any of the economic terms of this Agreement in a manner that dilutes any Member's Profit Percentage by a higher percentage than the percentage by which Harbinger's Profit Percentage is diluted in connection with such modification; modify this Agreement in any other manner that (as compared to the material adverse effect on Harbinger) has a disproportionate material adverse effect on the rights or remedies of another Member.  For the avoidance of doubt, no Member other than Harbinger shall have any right to consent to the granting by the Company to any Person of additional Profit Units or similar economic interests, so long as the granting thereof does not dilute any non-Harbinger Member's Profit Percentage by a higher percentage than the percentage by which Harbinger's Profit Percentage is diluted in connection with such grant.

C075532\0329724\1648200.4

Schedule 4.5

Initial Officers

| Name | Title |
|---|---|
| Macy L. Kiley | Senior Vice President |
| Robert F. Kuppens | Senior Vice President |
| Andrew H. Moser | President |
| Marc S. Price | Senior Vice President |
| Daniel F. O'Rourke | Senior Vice President |

C075532\0329724\1648200.4

# PETITION EXHIBIT C

AMERICAN ARBITRATION ASSOCIATION
EMPLOYMENT ARBITRATION TRIBUNAL

------------------------------------------------------------X

SALUS CAPITAL PARTNERS, LLC,

              Claimant,

     -against-                              Case No. 01-15-0004-9758

ANDREW MOSER,

              Respondent.

------------------------------------------------------------X

### PARTIAL FINAL AWARD

       This matter comes before me by means of a Demand for Arbitration dated
September 11, 2015 filed by Claimant Salus Capital Partners, LLC ("Claimant" or
"Salus") against Respondent Andrew Moser ("Respondent" or "Moser") asserting
various claims, including breach of contract, breach of fiduciary duty and the duty of
loyalty, fraud, conversion, and a violation of New York's faithless servant doctrine.
Respondent denied each claim, and brought a counterclaim seeking an unpaid bonus
and severance pay. The counterclaim was dismissed without prejudice by Order dated
June 17, 2016. The hearing in this matter was held on October 5-6, 2016.

       Based on the testimony and documentary evidence presented at the hearing, a
full review of the record in this case, the parties' post-hearing memoranda, and
applicable case law, I find as follows.

### PROCEDURAL HISTORY

       The extensive procedural history in this matter is recounted in detail in Arbitrator
Exhibit 4 and will not be fully repeated here.[1]   Rather, a summary of the key pre-
hearing events is provided.

---

[1] Also, the "Pre-Hearing Proceeding" section of Claimant's Post-Hearing Memorandum, at pages 1-7, as
well accurately recounts the events that preceded the hearing.

Respondent was represented by counsel, at least for the period immediately following his termination for Cause through most of the discovery stage of this proceeding. Counsel withdrew after a telephonic management conference held on June 14, 2016. Discovery demands had been exchanged and an initial production was made by both sides, although certain objections remained outstanding as of the time of counsel's withdrawal.

Moser's deposition was scheduled prior to the withdrawal of counsel. Respondent's counsel first sought to adjourn Moser's deposition scheduled for March 16, 2016 and eventually the hearing as well, representing that Moser suffered from a serious health condition which would prevent him from appearing for his deposition or the hearing.[2] Based on this representation, Respondent's application to continue the hearing was granted over the objection of Claimant. In a subsequent conference, Respondent's counsel represented that Moser's poor health prevented him from participating in the proceeding for the "foreseeable future." Claimant, in turn, presented credible evidence that Moser was gainfully employed – indeed, traveling extensively, including cross country, as part of his duties. After receipt of a doctor's note in support of Respondent's request for an adjournment "at least through the remainder of 2016" I again adjourned the scheduled deposition of Respondent and the hearing as well. I also attempted to schedule a preliminary hearing at which Respondent's physician would be examined to determine the extent to which Moser could participate safely in these proceedings, if at all. Moser declined to make his physician available for these purposes.

A telephonic management conference was held on July 26, 2016, in which Moser appeared *pro se*. Respondent indicated during this conference, as he has several times since, that he was actively seeking new counsel. The hearing was scheduled during this conference to begin on October 5, 2016. Moser was reminded that his deposition

---

[2] I would note that just a few months prior, at a management conference held on November 3, 2015, Moser's counsel insisted that the hearing be promptly scheduled for no later than May 2016. Indeed, the parties submitted a "Joint Proposed Scheduling Order" dated November 2, 2015, which proposed that the hearing be conducted during the week of May 2, 2016. No mention was made at that time that Respondent's chronic health conditions would stand in the way of meeting this demand.

would be rescheduled and it was expected that he would appear for his deposition. A further telephonic management conference was scheduled for August 11, 2016. When Moser failed to appear, it was rescheduled for the next day. Once again, Moser did not participate. Respondent's deposition was noticed three times after that; in each instance, Moser failed to appear for his deposition.

In an email dated September 16, 2016, Moser informed Salus and the Arbitrator that he would not appear for his scheduled deposition because he had not yet retained counsel. I responded with an Order dated September 19, 2016 which provided that neither the deposition nor the hearing would be adjourned due solely to Moser's continued inability to obtain counsel. Moser did not appear for the scheduled deposition nor did he participate in a management conference scheduled for September 23, 2016.

On October 3, 2016, 2 days before the scheduled hearing, Hugh Curran, Esq., sent an email indicating that Respondent was in the process of retaining him and his colleague Conrad Bletzer, Esq., and asked for 90-day adjournment. I scheduled a telephonic management conference for the next day and Mr. Bletzer joined the call. During that conference, Mr. Bletzer confirmed that his firm had not yet been retained but was expecting to be so later that week. I declined to adjourn the hearing based solely on the representation by Mr. Bletzer that his firm "expected" to be retained but had not yet been so.[3] Attorneys Bletzer and Curran made no further appearance in this matter and apparently were not in fact retained by Respondent as "expected".

The hearing proceeded as scheduled on October 5th and October 6th. Moser did not appear.

On October 10, 2016, in keeping with the practice of the American Arbitration Association where a party has failed to appear for a hearing, notice was provided to the parties that Respondent would be permitted to submit documents and evidence for the record. On October 13, 2016, a notice of appearance on behalf of Respondent was

---

[3] Salus made a convincing case during this conference that any further delay in the proceeding would be severely prejudicial to it. Beyond the obvious inconvenience and expense of a last-minute adjournment of a hearing, Claimant had also made arrangements for the appearance of a variety of non-party witnesses, including former Salus employees and witnesses from the firms of Skadden Arps and AlixPartners.

3

submitted by Peter Brooks, Esq., of the firm of Saul Ewing.  Mr. Brooks requested additional time to submit documents or other evidence for my consideration.  I granted this request, again over the objection of Claimant, and permitted Respondent's new counsel to submit "exhibits and other admissible evidence as [Moser] intended to proffer at the hearing."

On October 26, 2016, Moser's counsel submitted two affidavits, one from Respondent and the second for Robert Kuppens, the former Chief Financial Officer of Salus ("Kuppens").  Both affidavits had exhibits attached to them.  I declined to accept the affidavits of both witnesses in lieu of their testimony at the hearing.  In doing so, I noted that Respondent had failed to appear for five scheduled depositions and that Kuppens failed to cooperate with Claimant during the investigation.[4]  I also concluded that to allow Respondent to submit his affidavit in lieu of subjecting himself to cross-examination not only did not comport with Rule 30 of the Employment Arbitration Rules "but would reward Respondent for his repeated failure to comply with my Orders and to participate in good faith in these proceedings or allow himself to be examined by Claimant in any manner."  In my Order dated November 18, 2016, I reviewed the exhibits accompanying the two affidavits and accepted into evidence those exhibits which would have been admissible had they been offered at the hearing.

Moser's counsel submitted a Post-Hearing Memorandum in support of his position.  To the extent that reference was made in this Memorandum to the affidavits of Moser and Kuppens or to other information or documents not in evidence, those references were ignored.  Otherwise the arguments of Respondent's counsel were fully considered in my rendering of this Partial Final Award.

---

[4] Moser was also served with a subpoena duces tecum directing him to appear at the hearing. (Arbitrator Exhibit 2).  Moser did not comply with the subpoena.

4

## FACTUAL BACKGROUND

### The Parties and Operative Agreements

Salus is in the business of providing secured asset-based loans aimed at the middle market. In or about November 2011, Moser was hired as its President and Chief Executive Officer. Salus is a wholly-owned subsidiary of HRG Group, Inc., a publicly traded company, and is managed by HGI Asset Management Holdings, which is also wholly-owned by HRG (together, "HRG").

### Relevant Agreements and Policies

The relationship between Salus and Moser was governed by an employment agreement first executed in November 2011 and later amended as of August 26, 2014 (the "Employment Agreement") and a Limited Liability Agreement effective as of December 1, 2011 ("LLC Agreement").

Under the Employment Agreement, Moser was paid $500,000 a year and was entitled to a bonus. Moser's employment could be terminated for cause or without cause. "Cause" is defined as including Moser's "breach of duty of loyalty, willful dishonesty" and the "commission by [Moser] of an act of fraud or embezzlement against Company or HRG". The Employment Agreement was governed by New York law without regard to its conflict of laws provisions.

The LLC Agreement provides, in relevant part, that "no Member or Manager shall have any fiduciary duties to any other Member or other Person bound by this Agreement" and no Member or Manager "shall be liable to the Company, any Member or any other Person bound by this Agreement for breach of duties (including fiduciary duties) unless such Member, Manager, or Authorized Person acted in bad faith or engaged in willful misconduct." The LLC Agreement further provides that each Member "shall defend and indemnify the Company . . . from, any damage, loss, liability, or expense, including reasonable attorneys' fees, . . . in connection with or resulting from such indemnifying Member's . . . fraud, willful misconduct or willful misapplication or willful misappropriation of funds." Delaware law governs the LLC Agreement.

5

Salus's Accounting Policies and Procedures Manual ("Accounting Manual") set forth various limitations on the incurring of business and personal expenses. For example, checks greater than $25,000 required two signatures. The Accounting Manual discouraged family members from accompanying employees on business trips and required employees to pay for personal expenses incurred when on combination business-vacation trips. In addition, Salus had a separate credit card policy which limited the use of the corporate credit card for "approved expenses for vendors who will not accept payment by check."

## Moser's Installation of Audio-Visual Equipment in his Homes

Salus retained the services of a vendor, Audio Video Intelligence ("AVI"), to install sophisticated audio-visual systems in its offices. James Shapiro ("Shapiro") is the founder and owner of AVI. Shapiro personally oversaw the work and arranged for Salus to be invoiced for those services, for which AVI was paid in full by corporate check in accordance Salus's policy of paying invoices by check unless only a credit card would be accepted.

While on Salus's premises, Moser asked Shapiro if AVI could install audio-visual equipment at his home in Walpole, Massachusetts and his vacation home on Cape Cod. Shapiro agreed to do so. From March 2014 to March 2015, AVI installed audio-visual equipment at Moser's two homes at his direction. These services include the installation or upgrading of an Xbox system in a playroom, a Nest home thermostat, in-wall game port interfaces, AppleTV, outdoor loudspeakers, and upgrades for an existing home theatre. Overall, AVI's invoices totaled $98,355.86 for its services performed at Moser's residence and Cape Cod vacation home.

## Solicitation of Fraudulent Invoices

Moser requested that Shapiro falsify invoices for the expenses incurred. In particular, he asked that the Salus office address be substituted on the invoices for the addresses of his residence and vacation home where the work was actually performed. Moser also instructed Shapiro to make the descriptions of the work performed "plain"

6

and that "work invoices" be produced, that is as he explained to Shapiro, to falsify the descriptions of the work performed on the invoices to make them appear as if the work had been performed on Salus's premises. Shapiro complied by substituting on the invoices the description of the work previously done by AVI for Salus in its offices for the work in fact done at Moser's homes. Respondent also requested that no invoice be for more than $25,000 and directed AVI's staff to send the invoices to Salus directly and not to Moser's homes.[5]

Maureen Gibbons[6], Salus's former Vice President and Controller (and Vice President of Finance and Administration for a period), testified that Claimant paid AVI for the work performed in its offices by check in accordance with its normal practice. Ms. Gibbons noted that there were charges on Moser's credit card from AVI and she asked the CFO, Kuppens, for invoices related to those charges. Once she started receiving the falsified AVI invoices in or about June 2015, she booked those charges as an expense to the business. She also testified that had she known that the AVI invoices related to work done at Moser's residences for non-work related services she would not have booked those charges.

She acknowledged noticing some personal charges by Moser on the Salus credit card and, when asked, Moser's assistant informed her that Respondent "would settle up with Salus later." (Hearing Transcript at ("Tr.") 393). Ms. Gibbons informed the assistant that there was no procedure in place for that and that Salus would be reversing those personal expenses. As Ms. Gibbons put it, the corporate credit card "was never meant to be for personal use." (Tr. 411). Ms. Gibbons did not book those personal expenses and, in fact, reversed the charges. She also noted that Moser had charges on the credit card for plane tickets for his family. She expensed them as business travel as she was not privy to the terms of Moser's employment agreement and she believed it was possible that the trip was for work purposes.

---

[5] I note that Kuppens also asked AVI to perform work at his residence, for which he paid out of his own funds.
[6] Ms. Gibbons is related to Moser's wife and due to this relationship knew Respondent prior to working for him.

**Additional Charges to Salus Credit Card**

Overall, Moser charged more than $90,000 of questionable charges, beyond the AVI charges, to his Salus credit card. For example, Moser purchased patio furniture for his home using his Salus credit card in the amount of $4,100. He also incurred approximately $60,000 in chartered flights, commercial flights, hotels, car services, and other travel expenses which appear to be for personal trips with his family. He also purchased two watches while on a business trip, using Salus's credit card, for $12,595. He further charged $3,412 in personal charges on Amazon.com, $18,972 in purchases at gas stations (Moser received bi-weekly car payments of $700 which was intended to include fuel expenses), coffee shops, restaurants, grocery stores, and liquor stores, and $1,945 for such purchases from iTunes Music and Boston Bruins gear. In addition, $30,343 was spent for a suite at the rink for Boston University's ice hockey team. Moser's son was a student at Boston University and the suite appeared to be used principally, if not exclusively, for his family's use, although it may have also been used for business purposes on occasion.

**Collateralized Loan Obligation**

Salus served as the Collateral Manager for collateralized loan obligations for Radio Shack. In 2013 Moser purchased at a cost of $25,000 a zero-coupon subordinated note through which he would receive $25,000 on the note's maturity date in 2021 and periodic interest payments along the way. By late 2014, the value of this subordinated note was expected to diminish significantly with the anticipated bankruptcy filing of Radio Shack in mind, of which Moser was fully aware. Moser caused Salus to purchase his interest at its full face value of $25,000, knowing that the shortfall in value would ultimately likely be borne by Salus, just prior to the filing of bankruptcy by Radio Shack. No witness on behalf of Salus could explain precisely how it came to be that this purchase was accomplished, although it is clear that the transaction was approved by Kuppens who authorized payment of the full $25,000 investment by Moser. No other Salus or HRG employee was offered the same opportunity. Neither Moser nor Kuppens notified HRG of the decision to offer Respondent this accommodation.

8

## Decision to Terminate Moser's Employment

Claimant provided notice on April 24, 2015 to Moser that it was terminating his employment. The reasons offered were poor performance, lack of trustworthiness, lack of transparency with respect to the value of the loan portfolio, and disparagement of HRG. The termination was characterized as "without Cause" but Salus expressly reserved the right to re-characterize the termination as being for Cause if it determined that such grounds existed. As explained by Doyle, he had "watched the relationship [between Moser and Salus] completely deteriorate", had been put on notice of Moser's lack of disclosure regarding his use of the corporate chartered jet account Salus had with NetJets, and was not sure what else Salus might later learn. Under these circumstances, Salus did not want to preclude the option that termination for Cause may be warranted upon further review of Moser's activities. (Tr. 51-52).

## Decision to Conduct Investigation

Following Moser's termination, a routine due diligence review by Doyle of Respondent's emails uncovered evidence that Moser affirmatively sought to conceal unauthorized personal charges on the corporate credit card. In particular, an email from Moser to Shapiro supported the view that Moser was trying to avoid detection of such personal charges relating to services provided by AVI at Moser's residences.

Salus is an investment advisor registered with the SEC and a subsidiary of HRG, a public company. Moser, as Salus's President and CEO, signed the auditor's letter for the consolidated financial statements for Salus in which, among other things, Moser attested that he had no knowledge of "fraud or suspected fraud" affecting Respondent's finances. (Hearing Exhibit 19). Salus's management, lacking the expertise internally, made the decision to retain outside counsel to advise it on the potential regulatory implications and its potential affirmative obligations in the face of the apparent misappropriation of funds and fraudulent activities of its President and CEO. Further, Doyle was concerned that if he led an investigation, even assuming he had the necessary expertise, he would not be viewed as objective since he had worked closely with Moser and had a financial interest in Claimant's financial success.

9

Salus retained the law firm of Skadden Arps ("Skadden") which had previously represented Salus. As explained by Doyle, under other circumstances he would have sought out firms with lower billing rates but time was of the essence and Skadden had counseled Salus on investment advisory matters in the past. Upon Skadden's advice, Salus authorized an internal investigation to confirm whether Moser was in fact guilty of misappropriating funds or fraudulent activity. As Doyle testified, "the concern was was [Moser] directing people at Salus to similarly subvert policies, procedures, securities laws . . .." (Tr. 109). In the absence of confirmation that any misappropriation or fraud was limited to AVI invoices, Salus was advised that the investigation must focus on "whether there was a persuasive corruption scheme to defraud the company in other ways, or defraud investors." (Tr. 79). As testified by the lead Skadden attorney on the investigation, Salus is "a registered investment advisor, it has a fiduciary duty to the funds it advises and it's the subsidiary of the public company, we were concerned if there was a really significant issue it would roll up and become an issue to the parent company where it would have to restate its financials if the information had been materially incorrect." (Tr. 297). Doyle added "Skadden's mandate was to lead the internal investigation and get us at HRG comfortable and Salus comfortable that we discharged our duties as a registered investment advisor, as a publicly traded company, to our auditors, internal and external, to our board of directors and make a recommendation to us as to what, if anything, do we need to do to disclose this; are there other misrepresentations that need to be addressed . . .." (Tr. 107-08).

The investigation included the review of the electronic communications of Moser, Kuppens, and the Executive Vice President of Sales which resulted in the review of approximately 10,000 emails and attachments. As part of the internal investigation, Skadden engaged the firm of AlixPartners to provide forensic financial analysis and accounting assistance with respect to the books and records of Claimant. AlixPartners performed a detailed review, among other things, of Salus's general ledger, cash disbursements, credit card charges, T&E expenses, expense account records, and other relevant documents.

**Costs of Investigation**

Doyle testified that he was under "incredible pressure from the business folks to keep legal costs down", including costs related to the investigation and that he was going to be judged by management on how efficiently and effectively the investigation was conducted. (Tr. 344). Various steps were taken by Doyle to minimize the cost of the investigation. Most notably, he did much of the investigatory legwork, such as reviewing the relevant emails, for which Salus is not seeking reimbursement. For example, Doyle investigated a suspicious cred card charge by Moser of almost $8,500 from Radio Shack. After his due diligence, Doyle concluded that the charge may have been related to the purchase of holiday gifts for employees and removed the charge from the monies for which Claimant is seeking reimbursement.

Various discounts were offered or sought on Skadden's bills. For example, Skadden, on its own, applied two courtesy discounts due to some inefficiencies in the firm's efforts. A 10% discount was demanded by Doyle which the lead Skadden attorney felt was unwarranted, but nonetheless granted, for client relations purposes. Other steps taken to keep costs down included requiring the Skadden attorneys to remain in New York rather than travel to Boston on August 3rd when Moser and his counsel agreed to meet with Doyle. Instead, the Skadden attorneys participated by telephone. Approximately $77,000 was deducted from Skadden's bills because of these discounts and write offs.

**Results of Investigation**

AlixPartners provided an interim status report on June 2, 2015, and Skadden provided its report on June 25, 2015, to the Salus and HRG leadership. Skadden concluded, relying in part on the forensic accounting efforts of AlixPartners, that there was "substantial evidence that Mr. Moser misappropriated company funds for personal use" and that "Mr. Kuppens knew or should have known of Mr. Moser's misconduct." (Hearing Exhibit 12, p. 6). The misappropriation of funds by Moser included: approximately $97,000 for personal audio-visual equipment; $12,595 for personal jewelry, in particular, two watches; approximately $34,000 for personal use by his

11

family; $4,100 for the purchase of patio furniture for his home, and; approximately $4,700 for 27 deliveries of flowers to his home.

Skadden also found that Moser caused Salus to purchase a zero-coupon subordinated note in a Salus CLO, with a maturity date in 2021, for full face value in December 2014. Skadden characterized the purchase as a "prohibited transaction" and, even if permitted, the purchase was far more than the note's present value.

Skadden concluded, however, that "None of the misconduct affected Salus clients [or] materially harmed HRG investors." (Hearing Exhibit 12, p. 3).

**Termination for Cause**

By letter dated June 2, 2015 from counsel, Claimant put Moser's counsel on notice that a number of "troubling issues" had come to light including "strong evidence showing that [Moser] misappropriated corporate funds and resources for personal use." Before recharacterizing the termination as one for Cause, the request was made to meet with Moser "so he can address these issues directly." (Hearing Exhibit 7). Moser curiously wrote a letter to his former assistant rather than to anyone in power explaining that he charged personal expenses to the corporate credit card so that Salus could benefit from the "points" earned on the credit card but assured her that he was focused on the issue and would reimburse Salus for his personal expenses. (Hearing Exhibit 8).

Efforts were made to reach out to Moser to review with him the charges in question while the investigation was being conducted, to no avail. Doyle testified that his efforts to meet with Moser, through his counsel, were unsuccessful for such reasons as Moser's family vacation and his health issues.

On July 7, 2015, Salus notified Moser that his termination had been recharacterized as one for cause for having "engaged in repeated acts of fraud, willful misconduct, willful misapplication and willful misappropriation of corporate funds and breaches of fiduciary duties." (Hearing Exhibit 17).

12

## Moser's Response

Moser's counsel responded to the termination for Cause notice by acknowledging that Respondent "will reimburse Salus for all personal expenses charged on a corporate credit card" but because Moser did not have access to the relevant documents he could not confirm that amount at that time. (Moser Exhibit 2).

Moser finally agreed to meet with Salus.  On August 3, 2015, he and his counsel met with Doyle to review the credit card statements accompanied by spreadsheets prepared by Claimant relating to the credit card charges in question. At this meeting, Respondent personally noted on the spreadsheets those charges which were personal in nature, valued at approximately $140,000.  Moser agreed to reimburse Salus for these expenses, which included the AVI charges, the purchase of his patio furniture, meals and personal vacations.  He also asked for additional time to research and confirm some additional charges.  Neither Moser nor his counsel ever got back to Claimant with respect to these open items, nor was payment ever made or the admitted indebtedness put in escrow.

Moser's complaint that the only reason payment was not made was a lack of documentation in support of the personal charges however rings hollow.  The personal charges were just that, personal to Moser.  Other than the credit card charges, by definition Salus would not have any further documentation supporting Moser's personal purchases.  Put another way, the best evidence supporting Moser's purchase of patio furniture for his home is the furniture in his home and the purchase agreement and receipts that came with it when it was purchased.  He was also in the best position to attest to the 27 deliveries of flowers to his home that he charged to Salus's account.

Moser further alleged, in his defense, that the expenses on the credit card were pursuant to what he described as a credit card "Points Program" in place at Salus "so the company and its employees could benefit from corporate 'points' earned and for use in our charitable and community giving." (Hearing Exhibit 8).  According to Moser, Salus encouraged the use of the corporate credit card for big ticket personal purchases to accumulate reward points to be used for charitable purchases.

13

The record is devoid of any evidence of such a policy.[7]  Indeed, each of the four current or former Salus executives who testified at the hearing, Jacqueline Bamman, Senior Vice President of Human Resources and Administration, Kyle Shonak, previously Executive Vice President of Special Assets and now Salus's President, Alexander Burdony, formerly Account Manager and now its Controller, and Maureen Gibbons, denied knowledge of any such points policy or that one even existed. Moreover, had a credit card points policy been in effect it would have directly violated Salus's Accounting Manual and its existing credit card policy in multiple ways. Most notably, Salus's credit card policy limited use of the credit card to vendors who did not accept checks. However, AVI accepted checks as that was the way it was paid by Salus for services performed of it. Had there been a points policy in place there would have been no reason for Salus to have paid AVI by check for work performed in its offices as it is clear that AVI accepted credit card payments, as confirmed by Respondent.

Moser failed to reimburse Salus for even the monies he acknowledged that he owed, and Claimant filed the Demand for Arbitration in this case soon after.

## DISCUSSION

Moser charged substantial personal expenses to his Salus credit card.  This clearly violated Claimant's established policies.  Moser compounded his error by not repaying this indebtedness, despite repeatedly promising to do so.

These failings, while worthy of rebuke, pale in contrast to Moser's pre-meditated and focused plan to falsify invoices and deceive Salus as to the true nature of the expenses incurred, directly involving a vendor in his scheme.  That was fraud, and once discovered set in motion a series of foreseeable affirmative steps taken by Salus in response.  These steps were reasonably designed to uncover the scope of Moser's fraudulent activities and to determine what disclosures to the government and investors might be required and what remedial regulatory steps might need to be taken.

---

[7] Credit card points were only used once to purchase gift cards in support of a fundraising effort by an employee who was running the Boston Marathon for charitable purposes.

The actions taken by Salus were a direct and reasonable reaction to Moser's fraudulent acts. Indeed, had Salus not taken the steps it did with the expedition and thoroughness that it did, it may have been subject to investor and regulatory challenges. In short, the post-termination costs incurred by Claimant at issue here were causally connected to Moser's fraud, foreseeable, and reasonable under the circumstances presented at the time. Salus's actions were made all the more necessary by Moser's ill-advised unwillingness or, at best, tardiness in cooperating with the investigation. The fact that he sent a self-serving letter to his assistant rather than engage directly with Doyle or outside counsel supports the view that Moser was capable of cooperating with the investigation in a timely fashion but chose not to do so.

For the reasons offered below, Moser is liable for the personal expenses he incurred which have not been reimbursed to Salus and for indemnifying Salus for the costs reasonably incurred in response to his wrongful actions. Salus is also entitled to disgorgement of Moser's compensation for the period of his wrongful activity under New York's faithless servant doctrine. Finally, Salus is entitled to an award of its attorneys' fees relating to this proceeding, pre-award interest, and reimbursement of its costs for bringing this proceeding, including amounts advanced on behalf of Respondent.

## Misappropriation of Funds

That Moser used the Salus credit card for personal charges that were not reimbursed to Salus is not in dispute. Moser admitted as much multiple times, including when he met with Doyle and marked up the credit card statements, confirming that at least $140,000 in credit card charges were personal in nature. Indeed, in answering the Statement of Claim, Moser represented, at page 13, that he "remains fully prepared to reimburse Salus for anything that was, in fact, a legitimately personal expense (which Moser currently estimates is approximately $115,000)." The Answer is dated October 13, 2015; no payments to Salus by Moser in response to this admitted liability were made as of the date of the hearing.[8]  Moser also represented, in footnote 3 of the

---

[8] I note that Moser received in discovery, in response to requests framed by his counsel, further documentation related to his personal charges. Even if his professed need for further details before

15

Answer, that he was willing to reimburse Salus for any actual cost incurred as the result of a family trip on the NetJet account on December 30, 2013, one of the two trips for which Salus is seeking reimbursement.

Based on the investigation and Moser's admissions, Claimant is seeking reimbursement for personal expenses from Moser as follows: $98,355.86 in payments to AVI; $90,964.55 in personal charges to credit card; $35,075.10 for unauthorized use of NetJet account for personal use, and; $25,000 for the purchase of Moser's interest in the CLO. Claimant is also seeking in this action recovery of compensation paid to Moser from December 31, 2013 until his termination under New York's faithless servant doctrine. Claimant is also seeking indemnification for the costs incurred in conducting the forensic investigation in the amount $781,155.49.

### 1. Personal Charges

The amount owed on the AVI invoices is not in dispute and is reflected in the applicable invoices. A variety of additional personal expenses – some clearly personal, some somewhat ambiguous – were charged to the corporate credit card. Claimant is only seeking reimbursement for a percentage of the overall expenses incurred. I find Salus's conservative approach to be reasonable and that reimbursement of the amounts requested as being fully warranted.

Included in the over $90,000 in personal charges on the credit card are purchases for patio furniture, two watches, and for items on Amazon.com, family travel expenses, purchases at gas stations, coffee shops, grocery and liquor stores, and miscellaneous items like Boston Bruins gear. Just as important is what is not included as Claimant gave Moser the benefit of the doubt on any charge that might possibly have a business purpose. A notable example of this is Claimant's decision not to seek recovery of $30,343 spent on a private box at Boston University's hockey arena that Moser purchased while his son was a student at the University and which was used principally, if not exclusively, by his family. Doyle testified that if it was up to him he would have included this charge in its request for damages, but there was enough

paying his acknowledged indebtedness was legitimate before this arbitration commenced, that argument became harder to sustain after he received the additional documentation in discovery.

circumstantial evidence of possible business use of the box that Claimant was not pursuing this claim.

In sum, I find that the evidence supports Salus's request for recovery of personal charges to the corporate credit card and that the requests in this regard are conservatively made and reasonable under the circumstances presented.

### 2. NetJet Expenses

Moser has acknowledged that Claimant is entitled to reimbursement for costs incurred because of his personal use of the corporate jet account with NetJet. His defense that he understood that his personal use of the jet for himself and his family was at no additional cost to Salus proved not to be the case as the 25 hours purchased by Salus was exceeded.

Salus's request for reimbursement is limited to Moser's use of the corporate plane twice, on December 30, 2013 at a cost of $23,383.40 (which Respondent acknowledged is owed), and on August 8, 2014, in the amount of $11,691.70, for a total $35,075.10.[9] The evidence fully supports Salus's recovery of these costs from Respondent on these personal expenses.

### 3. Disgorgement of Payment of CLO Interest

Moser received the full value of his investment in the CLO, $25,000, the same amount that he invested.[10] In doing so, he placed his personal interests above those of the other investors. He should not have been able to do sell his investment back to Salus as the note had not matured, but the controls to prevent such an occurrence were not in place. Indeed, one of the few officials with authority to write checks for Salus, CFO Kuppens, signed the check. However odorous Moser's behavior, he recovered

---

[9] I note that Salus is not seeking to recover for such other questionable instances of use of the NetJets account such as taking a jet with Salus sales staff to St. Louis for a Red Sox World Series game. As explained by Doyle, Claimant was only looking to recover "where it was purely personal and unequivocally personal in nature." (T. 212).

[10] There was testimony that the investment is currently worth 30¢ on the dollar.

17

the value of his own investment as it was valued at the time that he arranged for Salus to repurchase his interest in the CLO, with Salus's CFO's approval.

For these reasons, Salus's request for recovery of the payment made to Moser on his CLO investment is denied.

### 4. No Offset or Recoupment

Moser argues that he is entitled to offset any monies he may be liable for with his claims for an unpaid bonus and severance pay equal to $450,000 embodied in his counterclaim. As previously noted, Respondent's counterclaim was dismissed without prejudice.

There is no basis in the record here to offset or to allow recoupment of Moser's claimed damages on his dismissed counterclaim. Neither Moser's claims for an unpaid bonus nor his claimed entitlement to severance is currently before me nor do they arise from the same transactions at issue here. Rather, Moser's claims – after having been dismissed from this proceeding – are more in the nature of self-help, that is, Respondent decided that he did not have to pay an admitted indebtedness unless certain claims that he was making, which were not admitted by Salus, were conceded or found without the necessary factual predicate.

Moser's severance and bonus claims were dismissed without prejudice, and are available for him to pursue by presenting the evidence necessary to prevail on these claims before an appropriate fact-finder. No such evidence or factual record is present here, nor is there a basis to apply principles of offset or recoupment in this proceeding.

### Fraudulent Concealment of Misappropriation

If the only issue here were Moser's improper use of the credit card, that would be merely a violation of Salus's credit card policy requiring the obvious remedy of reimbursement of those personal expenses, a remedy that Moser has acknowledged is warranted. And for many of the expenses at issue here, that is the case. Even Moser does not dispute that the purchase of patio furniture is personal in nature, and Salus is entitled to reimbursement.

Taking Moser at his word, he intended to reimburse Salus for all personal charges incurred. That does not explain, however, his scheme to deceive Salus as to the true nature of the AVI charges. Why falsify personal charges if the intent was to pay for them all along?

Moser's actions compel the conclusion that, at least with respect to the AVI invoices, he intended to and did misappropriate Salus funds. Moser's fraudulent scheme had several key components. First, he made sure that each of the invoices from AVI were below the threshold of $25,000 and that the timing of payments was spread out over several months so as to reduce the risk of scrutiny and discovery. Second, the nature of the work performed was falsified to make it appear that the work was being done in Salus's offices, and not at Moser's residence and Cape Cod home. Third, Moser directed that the address on the invoices be the office address and that the invoices be forwarded directly to Salus, and not to his homes.

Moser's attempt to justify his use of the credit card, his "credit card points" defense, has no support in the record and is absurd on its face. First, any such policy directly violates established Salus policy barring use of the company credit card for personal use. If there were such a points policy in place, then it is logical that Salus would have used the credit card to pay its vendors' invoices, such as AVI's invoices, when a credit card would be accepted. That was not the case. Second, all the present and former Salus executives testifying at the hearing were definitive in stating that they knew of no such points policy, including Salus's former Controller, who managed the account and obtained the credit card. Third, if there was such a policy and Moser fully intended to reimburse Salus for his personal expenses, then why did he direct AVI to prepare false invoices intended to hide the personal nature of the audio-visual services provided and require Salus to pay for them. Put another way, even if there were a points policy and Moser was acting in accordance with it, that policy would only excuse the incurring of the personal expenses – not the failure to reimburse Salus or the fraudulent acts that ensued.

19

This ample evidence demonstrates, and I find, that Moser fraudulently misappropriated Salus funds and converted Salus funds for his own benefit and violated his fiduciary duty to Salus. See *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001) (setting forth elements of fraud); *VTech Holdings Ltd. v. Lucent Technologies, Inc.*, 172 F.Supp.2d 435, 439 (S.D.N.Y.2001) (same). *Peters Griffin Woodward, Inc. v. WCSC, Inc.*, 88 A.D.2d 883, 883-84 (1st Dep't 1982) (elements for conversion); *Sorrentino v. Bohbot Entertainment and Media, Inc.*, 265 A.D.2d 245 (1st Dep't 1999) (affirming trial court's finding of conversion of stock where employer did not offer fair market value for the shares). See also *Lord v. Souder,* 748 A.2d 393 (Del. 2000) (elements of fraud claim under Delaware law).

Moser's fraud and misappropriation of funds clearly constituted Cause under the terms of the Employment Agreement. Whether characterized as a breach of the Employment Agreement or of his fiduciary duty to Salus or as the torts of fraud or conversion, Moser's actions require full reimbursement for the personal expenses sought by Claimant here.

**Indemnification Claim**

The LLC Agreement, at Section 3.5(d), provides that Members such as Respondent are obligated to defend and indemnify Salus and its Members, including for reasonable attorneys' fees, "resulting from such indemnifying Member's . . . fraud, willful misconduct or willful misapplication or willful misappropriation of funds." Contractual indemnity provisions such as this allocate the risk of a loss between the parties by obligating a breaching party to pay the expenses incurred by the indemnified party. As a registered investment adviser, Salus bears substantial reporting obligations to the SEC and has fiduciary duties to its investors. For the reasons offered above, Salus's decision to conduct an outside investigation was both prudent and necessary and was caused solely by Moser's malfeasance coupled with his failure to fully cooperated when his fraudulent acts were uncovered.

As a result of Moser's willful misconduct in his misappropriation of Salus funds and his fraud, I find that he is obligated to indemnify Claimant as provided for under the

20

LLC Agreement for the resulting costs reasonably incurred. Under the circumstances here, the scope of such indemnification includes both the cost of the investigation as well as the fees and costs Claimant incurred related to this proceeding.

Moser cites in his defense a provision in Section 3.5(c) of the LLC Agreement which eliminates any duty, including fiduciary duties, between and among Members in the absence of bad faith or willful misconduct. That provision, directed at fiduciary duties Members may have to each other, is inapplicable here as the duty to indemnify that members have to the LLC itself was not, nor could it be, eliminated. This is clearly recognized by the presence of Section 3.5(d) in the LLC Agreement. In any event, willful misconduct was clearly present here eliminating application of that provision.

There is no doubt that the investigation that Salus conducted was expensive, involving as it did such preeminent firms as Skadden and AlixPartners. Under the circumstances presented, however, the selection of Skadden to lead the investigation with the assistance of AlixPartners was reasonable and prudent. The total cost of the investigation to Salus was $748,155.49 which I find that Moser is obligated to pay. The expenses incurred in undertaking the investigation – including the fees of Skadden and Alix Partners – are all expenses of the investigation and are all indemnifiable by Moser under the LLC Agreement. Even were these expenses to be subject to the "reasonable" qualification in the LLC Agreement applicable to attorneys' fees generally (which I find to be the case), the fees charged by Skadden and AlixPartners were in fact reasonable. The circumstances warranted a fulsome investigation conducted by qualified professionals on short notice. Appropriate steps were taken to limit or reduce costs. Of course, the costs of the investigation would have been significantly lessened had Moser cooperated promptly with Claimant and its counsel which he chose not to do. The fault for the high costs lies as much with Moser as otherwise, for which he must bear the consequences.[11]

---

[11] I note that HRG and Salus retained several other firms, including Choate Hall, Greenberg Traurig, and Milbank Tweed to perform other compliance-related activities directly or tangentially resulting from Moser's actions. Claimant is not seeking recovery for these not insignificant expenses.

**Faithless Servant Claim**

"New York law with respect to disloyal or faithless performance of employment duties is grounded in the law of agency, and has developed for well over a century." *Phansalkar v. Andersen Weinroth & Co., L.P.,* 344 F.3d 184, 200 (2d Cir. 2003) (citing *Murray v. Beard,* 102 N.Y. 505, 7 N.E. 553 (1886)).

New York's faithless servant doctrine provides that an employee must forfeit the compensation earned during a period that he or she violates the duty of loyalty or fidelity in the performance of that employee's duties to the employer. The faithless servant doctrine applies "when 'the misconduct and unfaithfulness . . . substantially violates the contract of service' such that it 'permeate[s] [the employee's] service in its most material and substantial part.'" *CARCO Group, Inc. v. Maconachy,* 383 F. App'x 73, 76 (2d Cir. 2010). Thus, to apply, Moser's acts must be fundamental to his job responsibilities and materially permeate his service to Salus. New York applies two alternative standards, one requiring that the unfaithful actions substantially violate the employee's duties and the second requiring that the employee act adversely to the employer's interests as part of a transaction or in failing to disclose a matter of interest to the employer. *Phansalkar,* 344 F.3d at 200.

New York law applies here as being the law governing the terms of the Employment Agreement, without respect to New York's conflict of laws, inasmuch as the behavior at issue here relates specifically to Moser's activities as an employee of Salus rather than a member of the LLC. [12]  See *Stanley v. Skowron,* 989 F.Supp.2d 356, 360 (S.D.N.Y. 2013). Moreover, Salus's connection to New York and Moser's activities on behalf of Claimant in New York further support application of New York law here.

I reject Claimant's argument that Moser's mere use of the corporate credit card for personal reasons rises to the level of faithless acts covered by the faithless servant

---

[12] In this regard, I note that Skadden concluded that "[n]one of the misconduct affected Salus clients" and "[n]one of the misconduct materially harmed HRG investors".

22

doctrine. Moser professed a willingness to pay for those charges and, while Ms. Gibbons reversed at least one charge, the CFO repeatedly approved the charges incurred by Moser without repercussion. Those charges were paid by Salus for over a year without consequence to Moser. I also reject a similar claim with respect to the return of Moser's full CLO investment. That transaction was apparently accomplished, as well, with the knowledge and approval of Kuppens. To the extent that Moser abused policies or expectations with respect to each of these matters, Salus must share the blame to the extent of lacking the necessary controls in place to prevent the possibility of such self-dealing.

Moser's submission of fraudulent invoices is different. As described in detail above, Moser's manipulation of the AVI invoices had only one goal in mind, and that is to fraudulently transfer personal charges to Salus and to deceive Salus as to his intent. Moser involved a third party, Shapiroand AVI, in his fraudulent scheme. Significantly, Moser's fraudulent acts continued for many months and involved various steps to accomplish. See *Stanley,* 989 F. Supp.2d at 362 (one admitted instance of insider trading which was followed up by lies and a cover up patently violates terms of employment and permeated employee's service so as to constitute violation of faithless servant doctrine). These actions fit comfortably within the standards under well-established New York law for the finding of a faithless servant. See *City of Binghamton v. Whalen,* 141 A.D.3d 145 (3rd Dep't 2016) (theft of $50,000 constitutes breach of fiduciary duty and violates faithless servant doctrine warranting forfeiture of all compensation for six-year period). The seriousness of discovering that its President and CEO had fraudulently misappropriated funds from it is reflected in the urgency with which Salus responded, namely, in its retention of Skadden and the prompt initiation of the investigation.

"An employee who is found to be faithless normally forfeits all compensation received during the period of disloyalty, regardless of whether the employer suffered any damages." *Stanley,* 989 F.Supp.2d at 360. I find that the period of disloyalty ran from June 2014 to the last compensation paid to him following his termination. Moser's fraudulent scheme commenced at the end of May 2014 when he asked AVI to submit

23

"plain" invoices that cloaked the nature of the work performed and the fact that services were being rendered at his residence and vacation home. (Hearing Exhibits 4-7, 4-8, 4-9, and 4-10). The fraudulent invoices were then submitted by AVI to Salus in June for payment. See *Phansalkar*, 344 F.3d at 204-05 (forfeiture under faithless servant doctrine warranted where defendant "intended to keep at least some of the benefits for himself" and had "sufficient knowledge of his omissions, and their consequences"). As a result, Moser must forfeit all compensation earned for services performed during that period, including his salary, bonus, and any payments for taxes.[13] See *In Re Blumenthal*, 40 A.D.3d 318 (1st Dep't 2007) ("acts of faithlessness warrant disgorgement of all compensation paid after the first such act . . ..").

Although Claimant provided support for its damages calculations on its faithless servant claim, the period employed was from December 31, 2013 to May 29, 2015. Claimant is directed to provide updated calculations for the relevant period (June 2014 to Moser's last compensation payment), based on the exhibits already in evidence (e.g. Hearing Exhibits 20 and 21) and hearing testimony, in support of its claim for damages on this claim along. Their calculations should accompany its application for attorneys' fees, costs, and pre-award interest.

### Attorney's Fees and Costs

Claimant is entitled to its reasonable attorneys' fees and costs under paragraph 16 of the Employment Agreement and Section 3.5(d) of the LLC Agreement. An attorneys' fees application is to be submitted in accordance with the following schedule.

Claimant is directed to submit its application for attorneys' fees and costs, supported by contemporaneous time records and other documentation as may be appropriate, on or before January 27, 2017. Respondent's opposition papers to Claimant's application are to be submitted on or before February 21, 2017. Further, the parties are directed to provide their respective calculations relating to pre-award interest to be paid on the damages awarded here.

---

[13] Benefits such as payment for accrued but unused vacation days and car allowance payments are not to be included in this calculation.

## Conclusion

In sum, Claimant is awarded the following damages:

| | |
|---|---|
| *Reimbursement for AVI Invoices:* | *$ 98,355.86* |
| *Reimbursement for Misc. Personal Charges:* | *$ 90,964.55* |
| *Reimbursement for Personal NetJet Costs:* | *$ 35,075.10* |
| *Indemnification for Investigation:* | *$748,155.49* |
| *TOTAL* | *$972,551.00* |

Further, Claimant is entitled to an award of damages on its faithless servant claim, an award of pre-award interest, and attorneys' fees and costs following submission by the Parties of papers in support of and opposition to Claimant's application.

In the Matter of the Arbitration between

                   **Re:    01-15-0004-9758**

**Salus Capital Partners, LLC, Claimant**
        **-against-**
**Andrew Moser, Respondent**

## PARTIAL FINAL AWARD

      I, THE UNDERSIGNED ARBITRATOR, having been duly designated pursuant to the Amended and Restated Employment Agreement ("Employment Agreement") effective as of August 26, 2014, between Claimant Salus Capital Partners, LLC ("Salus") and Respondent Andrew Moser ("Moser"), and Limited Liability Agreement effective as of December 1, 2011, ("LLC Agreement"), having been duly sworn, and having duly heard the proofs and allegations presented at the hearing, AWARD as follows:

1)      Claimant Salus has carried its burden of establishing its claim of fraud, conversion, and breach of fiduciary duty and is awarded $224,395.51 (Two hundred and twenty-four thousand three hundred and ninety-five dollars and fifty-one cents) ($98,355.86 + $90,964.55 + $35,075.10);

2)      Claimant Salus has carried its burden of establishing its claim for indemnification under the applicable LLC Agreement and is awarded $748,155.49 (Seven hundred and forty-eight thousand one hundred and fifty-five dollars and forty-nine cents);

3)      Claimant Salus has carried its burden of establishing its faithless servant claim and is directed to submit its specification of damages with respect to that claim along with its fees' application per the schedule set below; Respondent may oppose such application in accordance with that same schedule.

4)      Claimant is entitled to an award of attorneys' fees and costs under paragraph 16 of the Employment Agreement and Section 3.5(d) of the indemnification provision of the LLC Agreement. Salus's fees' application, accompanied by contemporaneous time records, is to be submitted on or before January 27, 2017, and Moser's opposition papers are to be submitted on or before February 21, 2017.

5)      This Partial Final Award is final with respect to the matters addressed herein and shall remain in full force and effect until the Final Award is rendered. All claims not expressly granted are herein denied.

ARBITRATOR

I, Alfred G. Feliu, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Partial Final Award.

December 29, 2016
Date

Alfred G. Feliu

27

# PETITION EXHIBIT D

AMERICAN ARBITRATION ASSOCIATION
EMPLOYMENT ARBITRATION TRIBUNAL
-------------------------------------------------------------X
SALUS CAPITAL PARTNERS, LLC,
                    Claimant,
            -against-

Case No. 01-15-0004-9758

ANDREW MOSER,

                    Respondent.
-------------------------------------------------------------X

## FINAL AWARD

In my Partial Final Award dated December 29, 2016, I found, among other things, that Claimant Salus Capital Partners, LLC ("Claimant" or "Salus") had sustained its burden of establishing its claims of fraud, conversion, and breach of fiduciary duty as well as its claims for indemnification and under the faithless servant doctrine. As provided for under paragraph 16 of the Employment Agreement in this matter and Section 3.5(d) of the indemnification provision of the LLC Agreement between the parties, I further awarded reimbursement of Claimant's attorneys' fees and costs incurred and directed that Claimant's counsel submit a fees' application and its damages under its faithless servant claim. Respondent Andrew Moser ("Respondent" or "Moser") was given the opportunity to submit papers in opposition to Claimant's application, but failed to do so.[1] Despite the fact that Respondent did not oppose Claimant's application, I have an independent obligation to ensure that the fees and costs sought are reasonable under applicable law. See e.g. Cent. N.Y. Laborer's Health and Welfare Fund et al. v. Steven M. Taylor, 2012 WL 3201950 (N.D.N.Y.) (hourly rate reduced despite default by defendant).

---

[1] Moser, who was represented by counsel at the time, failed to submit papers in opposition before the due date and did not request an extension. When contacted as a courtesy by the case manager, Respondent indicated that he had terminated his relationship with his counsel and requested an extension of time to submit his papers until he found new counsel and that counsel had time to prepare and submit papers. By Order dated March 16, 2017, I ruled that with "the procedural history of this matter as reflected in the Partial Final Award and with the untimely nature of Respondent's request for an extension of time in mind, Respondent's request for an indefinite extension of time to oppose the pending fees application is denied."

1

Claimant's application consisted of Affidavits from Brendan M. Doyle, Esq., Douglas S. Brooks, Esq., and Kristen A. Kearney, Esq., with accompanying attachments including billing records, resumes of the billing attorneys, interest calculations, and other documents in support of Claimant's application.

Claimant is seeking $397,625.03 in fees (including costs advanced by counsel), costs in the amount of $99,546.31, damages of $879,514.02 under its faithless servant claim, and $328,287.09 in interest.

## BACKGROUND

The "lodestar" method for calculating reasonable fees applies to the award of fees here. "[T]he starting point for calculating a fee award is the lodestar method, which multiplies the number of hours the prevailing party's attorney expended on the case by the reasonable hourly rate charged for similar work by attorneys of like skill in the jurisdiction." *Marchuk v. Faruqi & Faruqi, LLP*, 2015 WL 1811153, *1 (S.D.N.Y.). The lodestar method, as articulated by the Second Circuit in *Arbor Hill v. County of Albany*, 522 F.3d 182, 190 (2d Cir. 2008), looks to "case-specific variables" when determining a "presumptively reasonable fee". Those variables include the effort required, the novelty and difficulty of the questions posed, the skill required, the experience and reputation of the attorneys involved, and awards in similar cases. The most critical factor in determining the reasonableness of fees to be awarded is the degree of the success obtained. *Farrar v. Hobby*, 506 U.S. 103, 114 (1992); *Castillo v. Time Warner Cable*, 2013 WL 1759558, *3 (S.D.N.Y.).

This case presented numerous challenges which served to greatly expand the time and effort expended by counsel and, as a result, the costs of the proceeding. Those challenges are reviewed in detail in the Partial Final Award and will not be repeated here. As noted there, many of these challenges were the direct result of Moser's actions and various applications by him for adjournments and other relief. Some of those circumstances appear to have been out of his control, many others not. In any event, consequences flowed from Moser's actions and the attendant additional costs are reflected in Claimant's application.

2

Overall, Claimant's degree of success in this matter was high and I find that Claimant's counsel conducted themselves with the utmost professionalism and with due concern for the reasonableness of the fees and costs incurred.

## Reasonable Hourly Rates

Three attorneys, Brooks, Kearney, and Benjamin Towbin, and one paralegal, Cara Murphy, from the firm of LibbyHoopes billed time to this matter. I note that LibbyHoopes agreed to an approximate 15% discount on its hourly rate for its professional staff working on this matter. The resulting hourly rates actually billed to Salus were as follows: $495/hour for Mr. Brooks (partner), $395/hour for Ms. Kearney (counsel), $350/hour for Mr. Towbin (associate), and $125/hour for Ms. Murphy. Resumes for counsel were provided. Claimant made no effort, however, to support these billing rates with case citations to fees awarded in similar cases in this judicial district or to provide fees awarded to LibbyHoopes in other judicial or arbitral matters.

In determining reasonable hourly rates, a court will look to the prevailing rates in the district in which the matter was heard.[2] *General Nutrition Investment Co. v. General Vitamin Centers,* 817 F.Supp.2d 66, 75-76 (E.D.N.Y. 2011). Upon full review of Claimant's application and applicable case law, I find the rates sought by Claimant's counsel, even discounted, to be slightly higher than those that the courts in this district have awarded in similar cases. This is not a reflection of the quality of counsels' representation of Salus, which was high, but rather of the prevailing rates that the courts have shown to be willing to award under similar circumstances. I find that the hourly rate for Mr. Brooks, who proved himself to be a talented litigator who effectively represented his client in this matter and who received a very favorable result for it, is reasonably set at $450. See, e.g., *Patino v. Brady Parking, Inc.,* 2015 WL 2069743 at *2-3 (S.D.N.Y. Apr. 30, 2015) (awarding $400 for senior partner and $325 for "senior counsel"); *Finch v. New York State Office of Children & Family Servs.,* 861 F.Supp.2d 145, 153 (S.D.N.Y. 2012); ($450 an hour for lead attorney with forty-two years of

---

[2] The applicable arbitration clause here set New York as the governing law and as the location for the arbitration. At the request of counsel for both sides (Claimant was represented at the time), it was agreed that for the convenience of the parties and witnesses the hearing would be held in Boston. This accommodation, however, does not change the analysis here, namely that the rates for a proceeding in New York should be applied.

3

experience); *Khalil v. Original Homestead Restaurant,* 2009 WL 3103846 *7-8
(S.D.N.Y.) ($400/hour awarded to attorney with 25 years' experience in employment
law); *Becerril v. East Bronx NAACP Child Development Center,* 2009 WL 2611950 *7,
report and recommendation adopted, 2009 WL 2972992 (S.D.N.Y.) ($450/hour awarded
to attorney with 15 years' experience who was a founder of the firm); *Simmonds and
Henderson v. New York City Department of Corrections,* 2008 WL 4303474 *5
(S.D.N.Y.) (rates ranging from $425-$325 for senior attorneys); *Insinga v. Cooperative
Centrale Raiffeisen Boerenleenbank B.A.,* 478 F. Supp. 2d 508 (S.D. N.Y. 2007)
(awarding lead attorney and second chair in a successful retaliation case $475 and
$350, respectively) ); *Heng Chan v. Sung Yue Tung Corp.,* 2007 WL 1373118, at *3–4
(S.D.N.Y.) ($450 an hour for partner at private firm with sixteen years of experience and
$400 for attorney with fifteen years of experience).

Similarly, Ms. Kearney, a 2007 graduate of Northeastern Law School who served
as second chair at the hearing, as well was highly effective and I assign a rate to her of
$375/hour as more in keeping with the prevailing rates in this district for an attorney with
her experience. See *Kadden v. VisuaLex, LLC,* 2012 WL 6097656, at *2 (S.D.N.Y. Dec.
6, 2012) (finding rate of $375 per hour to be reasonable for a senior lawyer with a focus
on labor and employment law and litigation). Mr. Towbin was principally involved in
discovery and pre-hearing matters. A reasonable rate for his services in this district is
$325/hour. See *Toussi v. County of Suffolk,* 2011 WL 2173870, at *2 (E.D.N.Y. May 31,
2011) (awarding $450 for partner with 34 years of experience, $400 for partner with 17
years of experience, $350 for attorney with 14 years of experience, and $300 for
attorney with 6 years of experience).

Claimant is also seeking compensation for Ms. Murphy's time at $125/hour. A
more appropriate rate for the paralegals in this district is $100/hour. See *Gonzalez v.
Scalinatella, Inc.,* 112 F. Supp. 3d 5, 29 (S.D.N.Y. 2015) (awarding paralegal hourly
rates of $100 to $105); *Robinson v. City of New York,* 2009 WL 3109846 *6 (S.D.N.Y.)
($100/hour awarded to paralegals).

**Hours Billed**

Mr. Brooks contends that LibbyHoopes "took affirmative steps to keep our total fees and costs as low as possible while providing what we believe to be top-quality service to Salus." Brooks Affidavit, dated January 10, 2017 ("Brooks Aff't"), at paragraph 10. A careful review of LibbyHoopes' time records bears Mr. Brooks' representation out. Time consuming, pre-hearing matters were generally handled by Mr. Towbin and Ms. Murphy, duplicative billing entries and efforts were minimal, and particular tasks appear to have been efficiently handled. I note, for example, that Mr. Brooks drafted the document requests and witness lists himself (time entries for January 24-30, 2015) and did so with notable efficiency.

Claimant also seeks reimbursement for counsel's time "interfacing with various law enforcement agencies who contacted Salus concerning Mr. Moser's willful misconduct and willful misappropriation." Brooks Aff't, at para. 8. Testimony at the hearing was extremely limited with respect to these events, and there is no indication that in fact criminal or other governmental proceedings resulted from these inquiries. I cannot say on the thin record, generally hearsay in nature, before me on this point that these inquiries from law enforcement agencies appropriately fall within the indemnification provision of the LLC Agreement here. Mr. Brooks spent 15.3 hours (1.4 + 8.1 + 5.8 hours) and Ms. Murphy spent .2 hours on these tasks. (See Brooks Aff't, at para. 9). These hours are deducted from the total hours sought in this application.

The total hours sought by LibbyHoopes for its professional staff, and awarded except as noted above, are: 466 hours for Mr. Brooks; 203.6 hours for Ms. Kearney; 123.1 hours for Mr. Towbin, and; 72.1 hours for Ms. Murphy.

Applying the designated rates to the allowable hours, Claimant will be awarded a total of $ 333,287.05 in fees as denoted below:

| | | |
|---|---|---|
| Douglas A. Brooks: | 466.00 hrs x $450 = | $ 209,700.00 |
| Kristen Kearney: | 203.60 hrs x $375 = | $ 76,350.00 |
| Benjamin Towbin: | 123.10 hrs x $325 = | $ 40,007.05 |
| Cara Murphy: | 72.30 hrs x $100 = | $ 7,230.00 |
| | **TOTAL FEES** | **$ 333,287.05** |

5

Salus is also entitled, in addition to fees in the amount of $333,287.05, costs advanced by LibbyHoopes in the amount of $26,837.03, for a total of **$360,124.08.**

## Reimbursement for Costs

Claimant seeks reimbursement of the costs expended on this matter totaling $99,546.31. Included in these costs are: arbitration fees of $52,400; additional fees to Skadden Arps in the amount of $44,620, and; travel costs in the amount of $2,526.31. The arbitration fees and travel costs are awarded in full.

The firm of Skadden Arps conducted the investigation into Moser's activities at issue in this proceeding. A partner, David Schwartz, Esq., led that investigation and testified for about an hour at the hearing regarding that investigation. Skadden Arps billed Salus $44,620 for Mr. Schwartz's testimony and $1,376 in expenses. The request for reimbursement of this cost is rejected as grossly excessive.[3] The Skadden Arps invoice submitted does not provide hourly rates, but I will assume that Mr. Schwartz's hourly rate is $1,220, as it was when he led the investigation. Five hours is more than sufficient time for Mr. Schwartz to prepare for his testimony, in addition to one hour to actually testify regarding the investigation he led. Fees for other attorneys or professionals engaged to help him prepare will not be reimbursed. Travel costs of $1,376 are also awarded. Claimant is awarded $8,696 (fees of $7,320 and costs of $1,376) for the costs of having Mr. Schwartz testify at the hearing.

Claimants are awarded a total of **$63,622.31** in costs.

## Specification of Damages under Faithless Servant Claim

Salus prevailed on its faithless servant claims and was directed to specify its damages under that claim. It did so, and concluded that it is owed **$879,514.02** in forfeited salary, bonus, and tax payments. I find this amount to be supported by the record and is awarded.

---

[3] I note that no request for reimbursement of costs was submitted on behalf of Alix Partners, from whom a partner also testified at the hearing.

6

## Award of Interest on Damages Awarded

Claimant seeks, and is entitled to, interest on the damages awarded in the Partial Final Award under CPLR § 5001. Ms. Kearney submitted an Affidavit dated January 10, 2017, which calculated the interest awardable under CPLR § 5001 to various components of damages awarded in the Partial Final Award. In particular, she calculated the interest awardable to Claimant, measured to December 30, 2016, to be as follows; $19,353.20 on the AVI Charges; $19,782.92 on the Miscellaneous Personal Charges; $8,510.28 on the Personal NetJet Costs; $87,626.43 on the investigation costs, and; $164,818.52 on the faithless servant claim. She also calculated the interest on the attorneys' fees and costs to be $28,195.74. As both the attorneys' fees and costs were reduced, I reduced proportionately the interest sought for fees and costs from the initial amount as against the amount actually awarded.[4] As a result, I find that Claimant is entitled to $24,531 in interest on the fees and costs incurred.

On this basis, I find that Salus is entitled to a total of **$324,622.35** in interest ($19,353.20 + $19,782.92 + $8,510.28 + $87,626.43 + $164,818.52 + $24,531).

## Conclusion

In sum, Claimant is awarded **$360,124.08** in attorneys' fees and counsel's costs, **$66,622.35** in costs, **$879,514.02** in damages on its faithless servant claim, and **$324,622.35** in interest on these amounts.

---

[4] Fees and costs were reduced from $497,171.34, the amount sought by Salus, to $423,746.39, or a reduction of 13%. The total interest sought on the fees and interest originally sought by Claimant was $28,195.74. A 13% reduction of that amount is $3,665, which makes the proper interest amount awarded on the fees and costs awarded $24,531.

7

In the Matter of the Arbitration between
               **Re:    01-15-0004-9758**
**Salus Capital Partners, LLC, Claimant**
      **-against-**
**Andrew Moser, Respondent**

I, THE UNDERSIGNED ARBITRATOR, having been duly designated pursuant to the Amended and Restated Employment Agreement ("Employment Agreement") effective as of August 26, 2014, between Claimant Salus Capital Partners, LLC ("Salus") and Respondent Andrew Moser ("Moser"), and Limited Liability Agreement effective as of December 1, 2011, ("LLC Agreement"), having been duly sworn, and having duly heard the proofs and allegations presented at the hearing, and having issued a Partial Final Award on December 29, 2016, AWARD as follows:

1)     Claimant Salus has carried its burden of establishing its claim of fraud, conversion, and breach of fiduciary duty and is awarded **$224,395.51** (Two hundred and twenty-four thousand three hundred and ninety-five dollars and fifty-one cents) ($98,355.86 + $90,964.55 + $35,075.10);

2)     Claimant Salus has carried its burden of establishing its claim for indemnification under the applicable LLC Agreement and is awarded **$748,155.49** (Seven hundred and forty-eight thousand one hundred and fifty-five dollars and forty-nine cents);

3)     Claimant Salus has carried its burden of establishing its faithless servant claim and is awarded **$879,514.02** in forfeited salary, bonus, and tax payments.

4)     Claimant is entitled to an award of attorneys' fees and costs initially paid by LibbyHoopes of **$360,124.08** (Three hundred and sixty thousand one hundred and twenty-four dollars and eight cents) ($333,287.05 + $26,837.03), and costs in the amount of **$66,622.35** (Sixty-six thousand six hundred and twenty-two dollars and thirty-five cents).

5)     Claimant is entitled to an award of interest in the amount of **$324,622.35** ($19,353.20 + $19,782.92 + $8,510.28 + $87,626.43 + $164,818.52 + $24,531).

6)     The administrative fees and expenses of the American Arbitration
       Association totaling $18,700 (Eighteen thousand seven hundred dollars)
       are to be borne as incurred. The compensation and expenses of the
       Arbitrator totaling $60,120.82 (Sixty thousand one hundred and twenty
       dollars and eighty-two cents) are to be borne equally. Therefore,
       Respondent Andrew Moser has to pay Claimant Salus Capital Partners,
       LLC, the amount of $23,560.41.

7)     This Final Award is in full settlement of all claims and counterclaims
       submitted to this Arbitration. All claims not expressly granted herein are
       hereby denied.

                                                    _____
                                                    ARBITRATOR

I, Alfred G. Feliu, do hereby affirm upon my oath as Arbitrator that I am the individual
described in and who executed this instrument which is my Final Award.

April 17, 2017                              _____
     Date                                   Alfred G. Feliu

9